1

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

KAJAN JOHNSON, et al.,              )  Case No. 2:21-cv-01189-RFB-BNW
                                    )
MIKHAIL CIRKUNOVS, et al.,          )  Case No. 2:25-cv-00914-RFB-BNW
                                    )
PHIL DAVIS, et al.,                 )  Case No. 2:25-cv-00946-RFB-BNW
                                    )
              Plaintiffs,           )  Las Vegas, Nevada
                                    )  September 29, 2025
        vs.                         )
                                    )
ZUFFA, LLC; TKO OPERATING              DISCOVERY HEARING
COMPANY, LLC f/k/a Zuffa
Parent, LLC (d/b/a Ultimate
Fighting Championship and
UFC); and ENDEAVOR GROUP
HOLDINGS, INC.,

              Defendants.
_____


TRANSCRIPT OF PROCEEDINGS

THE HONORABLE BRENDA WEKSLER,
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:             See Next Page

DIGITALLY RECORDED:      Liberty Court Recorder
                         3:05 p.m.


TRANSCRIBED BY:          PATRICIA L. GANCI
                         (702) 385-0670


Proceedings recorded by electronic sound recording, transcript produced by mechanical stenography and computer.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

APPEARANCES:

For the Plaintiffs:

**MICHAEL J. GAYAN, ESQ.**
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane, Suite #100
Las Vegas, Nevada 89107
(702) 655-2346

**MICHAEL C. DELL'ANGELO, ESQ.**
**PATRICK F. MADDEN, ESQ.**
BERGER & MONTAGUE, P.C.
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000

**ROBERT CHARLES MAYSEY, ESQ.**
BERGER & MONTAGUE, P.C.
505 Montgomery Street, Suite 625
San Francisco, California 94111
(415) 906-0684

**DANIEL GIFFORD, ESQ.**
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(617) 877-0508

**DANIEL H. SILVERMAN, ESQ.**
COHEN MILSTEIN SELLERS & TOLL
1100 New York Avenue, N.W., Suite 500
Washington, D.C.  20005
(202) 408-4600

**JOSEPH SAVERI, ESQ.**
**ITAK MORADI, ESQ.**
THE JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1505
San Francisco, California 94108
(415) 500-6800

////

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

APPEARANCES CONTINUED:

For the Defendants:

**J. COLBY WILLIAMS, ESQ.**
CAMPBELL & WILLIAMS
700 South 7th Street
Las Vegas, Nevada 89101
(702)382-5222

**AARON T. CHIU, ESQ.**
LATHAM & WATKINS, LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
(415) 391-0600

**AGBEKO C. PETTY, ESQ.**
**BENJAMIN CABRANES, ESQ.**
DUNN ISAACSON & RHEE, LLP
401 Ninth Street NW
Washington DC 20004
(202) 240-2900

**JOSEPH AXELRAD, ESQ.**
LATHAM & WATKINS, LLP
10250 Constellation Boulevard, Suite 1100
Los Angeles, California 90067
(424) 653-5500

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

LAS VEGAS, NEVADA; MONDAY, SEPTEMBER 29, 2025; 3:05 P.M.

--oOo--

P R O C E E D I N G S

COURTROOM ADMINISTRATOR:  This is the time set in the case of 2:21-cv-1189-RFB-BNW, Kajan Johnson, et al., versus Zuffa, LLC, dba Ultimate Fighting Championship, et al.; Case Number 2:25-cv-914-RFB-BNW, Mikhail Cirkunovs versus Zuffa, LLC, dba Ultimate Fighting Championship, et al.; and Case Number 2:25-cv-946-RFB-BNW, Phil Davis versus Zuffa, LLC, dba Ultimate Fighting Championship, et al.

Your Honor, present in the courtroom and via Zoom are Daniel Silverman, Itak Moradi, Joseph Saveri, Michael Dell'Angelo, Patrick Madden, Robert Maysey, Daniel Gifford, Michael Gayan.  And for defendants' counsel:  Aaron Chiu, Agbeko Petty, J. Colby Williams, Jacob Alrex [sic], Benjamin Cabranes, Aaron and -- yes, that's all I have.

And key speakers will be, for plaintiffs' side, Michael Dell'Angelo and, for defendants' side, Aaron Chiu.

THE COURT:  All right.  Good afternoon to everyone.

So I understand it, we have some housekeeping matters first.  So, so that the record is clear, we're here on the Joint Status Report which has been filed at Document 253.  I understand the plaintiffs have prepared a PowerPoint, and there's some concerns by the defense.  Is that correct, Mr. Chiu?

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. CHIU:  That's correct, Your Honor.

THE COURT:  What are the concerns?

MR. CHIU:  The concerns are, it's a 26-page PowerPoint which was just handed to us minutes before the hearing.  We've barely had a chance to review it.  It, I think, tries to repackage in argumentative style a lot of the issues raised in the --

THE COURT:  How would it be different if they're not showing a PowerPoint and just simply presenting oral arguments?  Would you be prepared for that?

MR. CHIU:  I would be, but I think there are a lot of things that we still have to look at here in terms of representations of things that are not in the Joint Status Report that we --

THE COURT:  Okay.  So I'm looking at the PowerPoint only as an aid to facilitate the oral argument.  To the extent that the PowerPoint presents information that's not contained in any of the motions, point that out to me and I'll make sure not to consider that.

MR. CHIU:  Sure.  Thank you.

THE COURT:  Having said that, I think that I told Ms. Garcia so the plaintiffs know, in the morning, to submit the PowerPoint to the defendants.  Why was that not done?

MR. DELL'ANGELO:  I was not aware of the fact that it was not provided to the defendants, Your Honor.  So I --

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

THE COURT:  These are the kinds of things that we're trying to avoid in a case that already has multiple issues that need resolving.

MR. DELL'ANGELO:  Understood, Your Honor.

THE COURT:  Okay.

MR. DELL'ANGELO:  And I apologize.  I -- I will say, I also brought paper copies that I provided, but I apparently understand that it may not have been provided to them electronically.  So I apologize for that.  So we can certainly, you know, not use it and I can just reference the details.

THE COURT:  Well, to the extent that it's useful to me, I want you to use it.

MR. DELL'ANGELO:  Okay.

THE COURT:  Except, obviously, providing this to the defendants 15 minutes prior to the hearing is no good to them.

MR. DELL'ANGELO:  Understood, Your Honor.

THE COURT:  All right.  As I said, I'm using this as an aid to your oral presentation.  To the extent that you find that there are things that are disclosed or provided in the PowerPoint that add to the argument, point that out to me. Okay?

MR. CHIU:  Thank you.

THE COURT:  All right.  So I think that the best way to go about things is to just simply follow along the order of the status reports.  So the first category here -- and what I'll ask

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

you to do, Mr. Dell'Angelo, is to simply queue your PowerPoint to the different sections.  So it's going to be much more helpful to me if we follow the order that appears in the status report as opposed to just turning to your PowerPoint.  Does that make sense?

MR. DELL'ANGELO:  Yes.  Yes, it does, Your Honor.

THE COURT:  Okay.

MR. DELL'ANGELO:  And I'll say, you know, the PowerPoint really was intended to be an aid -- it's not really kind of an argument walkthrough -- mostly to just draw some out some quotes and statistics.  So I think we can just jump into the JSR, and to the extent that there's something in the PowerPoint --

THE COURT:  Okay.

MR. DELL'ANGELO:  -- that would be useful --

THE COURT:  I'll tell you what, also, I realize that you're going to have to be flipping through different documents. Both of you can remain seated throughout your argument, unless it's more comfortable for you to stand up.  Whichever way you decide to argument, make sure that you're speaking into the mic.

So the first category is entitled "Defendant's General Search Deficiencies," and this encompasses the Items 1 through 5:  Completion of Plaintiffs' Discovery Worksheets, Application of Plaintiffs' Search Term Proposals, Production of Search Term Hits Reports, Inclusion of Plaintiffs' -- Plaintiffs' Custodian

Proposals, and Custodian/Communication Logs and Carriers.

So, I guess, I don't know whether it makes sense to talk about first the search term proposal and the hits reports and the custodians given that this seems to permeate the rest of the issues in question.  Does that make sense to you?

MR. DELL'ANGELO:  Absolutely, Your Honor.  I think that's exactly right.

THE COURT:  All right.  So why don't we start there, and then we can move onto the discovery worksheet and Item Number 5, which is the custodian/communications logs.

MR. DELL'ANGELO:  Okay.  Thank you, Your Honor.

So I'll take them in order with search term proposal, as they appear in the JSR.  And I think the search term proposal, the hit report, and the custodian proposal all kind of fit with under -- under an umbrella that I just want to kind of lay out at the outset because I think it kind of drives all of them, which is, you know, recently the parties stipulated to moving the discovery deadline from January 2026 to August 15th, 2026.

In the JSR the defendants identify the parties' stipulation at ECF 189 that preceded that and with respect to some arguments about the timing of the motion to compel and that sort of thing about search terms.  But one thing that's not -- that doesn't come out in the JSR is in ECF 189 there is a line that says that the deadline to exchange or provide search terms,

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

custodians, and additional sources is October 1st, 2025.  So we haven't even hit that date yet.  And then of course discovery is now running out into August.

Notwithstanding that deadline, you know, there's a long and kind of, I think, disputed history about, sort of, how we got here and what we're really trying to do is, sort of, move the discovery ahead.

Now, we did provide an initial search term on March 30th.  The parties -- excuse me -- were continuing to negotiate that.  Plaintiffs' last writing on that was July 3rd, and we got defendants' initial production July 17th as part of that substantial completion production.  And that's really where the negotiations ended on that.

Likewise, we -- you know, there's a long history about, you know, ways in which we felt it was difficult for us to identify additional custodians.  We finally got at least some of the information that we thought was sufficient --

THE COURT:  Let me just stop you there.

MR. DELL'ANGELO:  Yes.

THE COURT:  Do we have a defined number of custodians or do we need to work on that still?  I'm trying to figure out what remains at issue at this point.

MR. DELL'ANGELO:  Sure.  So -- so maybe I can back up then.  I think the big overarching issues that need to get resolved is selecting a set of agreed-upon search terms that the

PATRICIA L. GANCI - (702) 385-0670

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

parties agree on. Because what we have now is a set of search terms the defendants ran, but you didn't find any of plaintiffs'. And then I think Issue Number 2 is an agreed set of custodians. Defendants selected 33 and apparently searched those.

One of the challenges is -- and this is some of the data we just put together in the PowerPoint, but I think I can just make the point, which is a lot of those custodians returned zero documents.

On July 19th, with the information that we finally got, plaintiffs proposed an additional 30 custodians, and we understood in a writing from defendants on July 23rd that those additional custodians would be included. And then we later heard that they were not and would not be.

And then the third is just with respect to hit reports generally. I mean, there is -- the process that we used in the Le case overseen by Magistrate Leen, the defendants' expert there, Helen Moure, and just, you know, the Sedona Conference, lots of cases, talk about the iterative process of exchanging search terms so that the parties can develop a set of terms that, sort of, define the set of documents to be reviewed.

Where we stand is that defendants have never provided hit reports on plaintiffs' search terms. They've recently as part of the meet-and-confer process that Your Honor set out agreed to provide them for their search terms, but we don't have

those.

And, you know, some of the things that implicate, kind of, where I think we need to go, Your Honor, is some of the arguments we've heard is, "Well, plaintiffs' search terms hit on 90 percent of -- or 98 percent of the documents," but we have no idea what those documents are, right.  So if you -- point being, if you have this tiny little set of documents, it's entirely possible that's going to happen, but it also depends -- this is why you go through the process of getting hit reports, refining the terms, and avoiding, you know, some of those issues.  But those are the three big issues that I think we need to resolve.

So, ideally, if we can come up with a set of agreed custodians that include both parties' proposals, a set of agreed search terms that include plaintiffs' proposal, and then get hit reports on those search terms run across the custodians, we can, I think, get a -- the rest of the documents that need to be reviewed and produced in the case.  So those I think are the primary issues in the JSR and the three big ones that really become the gating issue for a lot of the other things.

THE COURT:  Understood.  Quick question, I believe the defendants at one point -- I can't remember if this is in the response to the motion for sanctions or where, but you can help me out if I'm misstating what's in the record.  I believe they said that there was a specific deadline for you to raise this issue by the Court and that you missed that deadline.  Can you

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

address that?

MR. DELL'ANGELO:  Yes, that is an argument that they make.  I think if you look at that stipulation -- I believe they're referring to 189 --

THE COURT:  Okay.

MR. DELL'ANGELO:  -- which is the one that I identified for you.  I -- the timing just doesn't line up in terms of how that process would have really worked.  So there was kind of an iterative process laid out in that stipulation that we negotiated as -- because the defendants had asked for an extension of the substantial completion deadline which was originally April, and then we moved it out into July.  So there was this kind of interim negotiation period before the substantial completion.

But then there was some intervening factors dealing with Judge Boulware as he was handling some of these discovery issues.  So a lot of those deadlines, frankly, became moot, right.  So you were supposed to -- essentially the timing no longer worked, but importantly I think one thing we really want to look at in that stipulation is, again, you have this October 1 deadline that allows for search terms, custodians, right, that kind of comes out after that.

THE COURT:  Understood.  All right.  Anything else with regard to this specific issue?

MR. DELL'ANGELO:  No, Your Honor.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

THE COURT:  All right.

Go ahead.

MR. CHIU:  Thank you, Your Honor.

THE COURT:  And it's Mr. Chiu?

MR. CHIU:  Mr. Chiu, yes.

I think I just want to step back here and just kind of give the Court a little bit of context of why we're here.  The issue with the search terms and the custodians, really just stepping back to why we're here today, plaintiffs had originally started by proposing over 3,000 search terms back in January. We tried to engage them with the issue of running those terms. We couldn't run them because they were so voluminous.

Many of the terms similar to the ones they have, again, proposed now with 4,000 contains single-word searches like "UFC."  And we told them, "Look, this hit on over 98 percent based on what we could even run after working off the syntax."

Instead of actually engaging with us on a meaningful proposal to reach search terms that could actually run at that time on an agreed number of custodians, and I'll deal with that --

THE COURT:  Let me just, sort of, stop you right there. So I understand both of you are pointing the finger at each other and saying --

MR. CHIU:  Yeah.

THE COURT:  -- that you're not willing to meet and

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

confer.  I'm not going to spend --

MR. CHIU:  Sure.

THE COURT:  -- 45 hours trying to figure out which letter said what and who responded to what.  My question to you is this.

There is some -- some sort of impasse regarding --

MR. CHIU:  Correct.

THE COURT:  -- custodians and search terms.  My question to you is why do you unilaterally decide what search terms to impose and then run all of the requests according to your own set --

MR. CHIU:  So --

THE COURT:  -- of search terms.

MR. CHIU:  So the answer to that is because we had a substantial completion deadline that came and past --

THE COURT:  Well, you could have always come to the Court and explained the situation, right?

MR. CHIU:  We didn't get engagement, and we did end up crafting search terms to all the RFPs that we responded to.  And I don't know if the Court has it, but we did provide the discovery tracker that Judge Boulware --

THE COURT:  Yeah, I don't have it, but I can get it.

MR. CHIU:  Okay.  I can provide a copy.  I brought it today.

Which identifies of the, you know, over 4 million pages

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

of documents we've produced thus far in this case which corresponded to which RFPs.  I think our impasse at this point really is just that it doesn't make sense to start over by running 4,000 search terms across the universe.  We are willing to having substantially complied with numerous RFPs.  We've extended the invitation to plaintiffs to say, "Hey, look, when we came out of the last status conference with Judge Boulware last month, the process for going forward on discovery is we've already produced a lot of information and documents.  Let's get a log of what we've produced in response to what RFPs are out there.  And we'd be willing to engage RFP by RFP.  If there are certain RFPs that have what plaintiffs believe are deficiencies, we're willing to look into that.  We're willing to consider additional search terms aimed at that.  But this kind of wholesale-4,000-search-term attempt to reset, it's not actually workable."

        And rather than, kind of, meet us and work on the process that I think, you know, we understand when we came out of the last status conference with Judge Boulware on this process for going forward where we've already in our view substantially complied, but are willing to look at specific requests, and some of those we talk about in the Joint Status Report like additional FightMetric data, additional compensation information, we're more than willing to do that.  But this idea that we're going to start over with 4,000 search terms across an

unidentified set of custodians when, you know, custodians have been previously agreed to -- we have custodians from all three defendants covering all levels of the company from the highest to the people who are actually involved in the alleged conduct in this case.

You know, we are at a place where to productively move forward we need actual engagement on the actual RFPs and discovery requests which we're more than willing to entertain. But this, kind of, meeting this unilateral, "No, we need to start over from Step 1" just doesn't make sense and, frankly, it's just not workable. I think that's where really the source of the impasse is.

THE COURT: So what you're suggesting is let's just, sort of, figure this out as to any outstanding RFPs?

MR. CHIU: Correct.

THE COURT: Aren't they going to say, "Well, how do we know that we got all the responsive documents to the prior RFPs?"

MR. CHIU: Well, we have a tracker. That was the whole process that we spent a lot of time putting that together, which frankly normally what -- what -- you know, in every complex civil antitrust case I've done, the way we start is plaintiffs send RFPs. We work on search term proposals tethered to RFPs, work on those, move forward. That's -- unfortunately, that's not how this started out, but we're here where we are. We have

produced -- in our view we have substantially complied and we've produced documents responsive to over hundreds of RFPs at this point across three defendants.

But at the same time we are -- we remain willing to work with the plaintiffs to consider specific requests if they're looking at certain requests, and we have engaged with that in -- with respect to certain requests, as identified before.  And we just submit that's a much more productive and effective way to move forward here.  Frankly, it took a while to get here, and I think that's where we thought we ended up after the last status conference.

We've created a tracker.  We think there's a framework for moving forward in that regard.  But I would just submit 4,000 search terms across now 70 proposed custodians, I can just tell you, Your Honor, that I don't know that my discovery vendor could even -- could even do that --

THE COURT:  Okay.

MR. CHIU:  -- because we ran into those problems before, so --

THE COURT:  All right. Quick question.  Have the three super custodians been identified already?

MR. CHIU:  They have, Your Honor.

THE COURT:  Okay.  And who are they?

MR. CHIU:  They are Tracy Long.

THE COURT:  You say Tracy?

18

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. CHIU:  Tracy Long, Richard -- Richard Sullivan, and David Singer -- sorry -- Richard Wells and David Singer.

THE COURT:  Richard Wells?

MR. CHIU:  Uh-hmm.

THE COURT:  All right.  Thank you so much.

Quick question for you and the issue that I need you to address is this notion that we should figure out what search terms to apply to outstanding RFPs as opposed to just search terms as to custodians in general and -- well, why don't you address that first.

MR. DELL'ANGELO:  Sure, and I -- I think that there may be a little bit of a miscommunication on that.

There are some RFPs that are outstanding, like the second set.  Our position is that the production in response to the RFPs for which there has been some response is woefully inadequate.  And, you know, I think Your Honor rightly recognized -- and I just want to be very clear on the record that we sharply disagree with the, kind of, contentions about cooperation, but, you know, we're really here to try to reset and move forward.

We don't see this as restarting discovery.  It's finishing what remains to be done, in our view.  And I think it's important, too, to just get a little context on what has been produced and the search terms.  So there -- there is a proposal.  I believe it's 3,993 terms, right.  But there are

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

strings.  There are all sorts of things that go with that.

But a lot of those terms, Your Honor, include fighter names and include the nicknames for fighters, and there are thousands of those, right, in this case.  And those fighters and the negotiations about them, the matches that were made, how they may have been threatened or coerced, which are allegations, are really central to the case.

So throwing out, sort of, the gross headline number, it sure sounds like it's a lot of terms, but when it's put into context, it's not.  And a lot of those terms get to the, sort of, central issues in the case.

So I think to get to your -- your question, Your Honor, if I could just give you one statistic that we -- we lay out and I'll just give you a little more detail that's in the JSR.

So we're hearing this headline number of something like 1 million documents.  We counted at about 963,000 documents.  Of that, however, 775,000 are just the documents from the Le production which the defendants wanted to put a new number on.  So what we got by our count is 187,000 documents in this case.

However, of those, 131,000 come from one of the super custodians, Tracy Long.  We understand her to be --

THE COURT:  That's the paralegal?

MR. DELL'ANGELO:  Yes, who sends essentially the contracts to fighters.  So what's that leave us?  The sum is something like 56,000 documents across 33 custodians for 10

20

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

years.

And, you know, you take a further step back, the Le case was filed in December of 2014.  So there should be a litigation hold that goes into place because there was a whole lot of discussion in that case about what the retention policies were, and that's fine, sort of past that.  But, you know, since before this case was filed, you got retention.

So with 33 custodians, 10 years of discovery, and what should be lit holds, you'd expect a lot more than 56,000 documents, right.

So I think looking at some of these headline numbers, like, it's too many search terms sort of misses the point.  But -- so what the defendants are essentially asking is we've got three defendants:  Endeavor, TKO, and UFC.  We've agreed because we think it's efficient.  We actually propose -- we said, "Look, the UFC or Zuffa is owned by TKO.  TKO is a publicly-traded company.  Let's treat those RFPs as if it's one entity."  So you've got two, you've got 96 requests in total, two each, right.

And so what the defendants' proposal is is, "Forget your search terms," which we built off of what we tried to do in the Le -- in the Le case.  "Take our tracker," which we have done.  "Go request by request.  Look at the documents that we've produced.  If you think something's missing, let us know what you think is missing, like, you know, try to guess at what may

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

be missing, then create a set of search terms."

What that really tells us is I've got something like 192 sets of potential search terms, right, one for each request for the TKO/UFC defendant and for the UFC defendant. That essentially turns the whole process of discovery upside down, right. And the way to get the corpus is you got a set of custodians. You run the search terms. You get the hit reports, and you get the results, right, as opposed to this process of, like, boiling-the-ocean request by request by request. That's why I think it doesn't work, Your Honor.

THE COURT: All right.

MR. DELL'ANGELO: And, sorry, if I may say. We -- we have -- since we filed the JSR, you know, we have found there is some authority on this, right, where courts -- and I'm happy to give you the citations -- you know, where courts have said -- there's *Wolfclan versus Pierce*, Western District of Washington -- where courts have said this process of request-by-request RFPs or, excuse me, search terms really not an effective way and you run them across the case. So, sorry.

THE COURT: Okay.

MR. CHIU: I just --

THE COURT: 30 second- --

MR. CHIU: Yeah. No. I just want to address one thing. Tracy Long is not a paralegal.

THE COURT: Oh.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. CHIU:  She's actually the vice president of athlete compliance and regulatory, and I know plaintiffs have made many arguments about this.  The reason why the vast majority of documents --

THE COURT:  So the person that's represented as the paralegal in the briefs is not a paralegal.  It doesn't really matter for purposes of today, but I understand the --

MR. DELL'ANGELO:  We stand corrected, Your Honor.

MR. CHIU:  But, you know, and I think the -- the point there is there's a lot of hay made about the number of documents with Ms. Long as custodian.  She's the one managing and keeping track of the contracts and negotiations, which is the central issue in this case, athlete contracts, which plaintiffs allege are unlawfully exclusive.  And that is the reason why she -- you know, frankly, the counts from her are so high.  And that also dovetails with one of the other complaints about is there a central repository for the athlete contracts.  I know we'll get to that later, but Ms. Long is the central repository.  I mean, that is -- that is kind of the explanation there.

THE COURT:  Okay.  Understood.  All right.

MR. DELL'ANGELO:  May I just give you one piece of data on that?  Because I think it's really --

THE COURT:  You may.

MR. DELL'ANGELO:  -- important.

THE COURT:  Let me tell you, it's already 3:30.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. DELL'ANGELO:  Okay.

THE COURT:  And we've not even covered Item Number 1.

MR. DELL'ANGELO:  Okay.

THE COURT:  But I'll give you exactly 15 seconds.

MR. DELL'ANGELO:  I appreciate that.

So by our count from 2017 to roughly the present, there's something like 417 events and 5,011 bouts.  You would expect a negotiation about the match-up, what people are paid, the contractual terms.  There's virtually -- we found it for a handful, and even the few that we can find in the production, they're very incomplete.  I mean, there are big gaps.

So if you'd expect thousands of negotiations, there's literally maybe two handfuls at most in there.  Thank you, Your Honor.

THE COURT:  All right.  So that takes care of Items A(2), (3) and (4).  And we can move onto A(1), which is the Completion of Plaintiffs' Discovery Worksheet.  I believe this was something that was discussed before Judge Boulware at the June 3rd hearing.  Is that correct?

MR. DELL'ANGELO:  Sort of, Your Honor.  So at the June 3rd hearing what -- what Judge Boulware talked about, he issued what we've defined as the Device Disclosure Order that went to mobile devices, and it required a disclosure by the defendants on July 3rd.  A disclosure was made.

The tracker that we're -- we're talking about here in

A(1) of the JSR is something that we created in the wake of that and attached to our September 12th letter, just so we're --

THE COURT:  This is -- I have Exhibit 30.  I believe this is attached to...

My notes say Plaintiffs' Exhibit 30, which unfortunately --

MR. DELL'ANGELO:  Okay.

THE COURT:  -- it's not going to be sufficient to identify it.  But this is what I have.  It's -- it's entitled "Appendix A," and these are the different columns --

MR. DELL'ANGELO:  Correct.

THE COURT:  -- name, phone, make, model, phone number, and applications image --

MR. DELL'ANGELO:  Right.

THE COURT:  -- which seemed to correspond to the June 3rd hearing.

MR. DELL'ANGELO:  And they -- they largely do, Your Honor.  I think we asked for some additional stuff like the carrier, but when we issued subpoenas to the people with -- individual subpoenas to people with mobile devices, we asked for carrier information.  And the response essentially came back, "We're not disclosing anything without a court order."

THE COURT:  Well, because the carrier information was not discussed in the June 3rd meeting, was it?

MR. DELL'ANGELO:  Correct.  I think that's right, Your

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

Honor.

And so with respect to the tracker that we attached to our letter, I mean, and the -- the carrier information, I mean, in our experience, right, if you -- if you look at the tracker -- and we filed this Corrected Exhibit 1 to the JSR -- it's pretty high-level basic information, you know, sort of, accounts, when you preserve the stuff, what apps are on it.  We got some of that in the July 3rd Device Disclosure Order, but we --

THE COURT:  I'm sorry, because I'm getting confused.

MR. DELL'ANGELO:  Yeah.

THE COURT:  So it seems to me that we're talking about two different things.  So do you mind addressing the June 3rd situation first --

MR. DELL'ANGELO:  Yes.

THE COURT:  -- since I have that in front of me right now.

MR. DELL'ANGELO:  Yes.

THE COURT:  This seems to me to be cell phones or at least, like, this is what the appendix contained for different custodians.

MR. DELL'ANGELO:  Yes, it -- it was mobile devices. And we -- after we got the July 3rd disclosure from the defendants, we promptly wrote them back.  We did not get an answer, but the things that we pointed out are about 45 percent

of the custodians that they had identified weren't showing up on the device disclosure.

THE COURT:  I understand what the concerns were.

MR. DELL'ANGELO:  Correct.

THE COURT:  There were some differences between this production and something that you had received in April and there --

MR. DELL'ANGELO:  That's exactly --

THE COURT:  -- was a third thing.

MR. DELL'ANGELO:  -- Your Honor.  Exactly.  And so it really was essentially "please finish the job," right.  It may be, right, just in fairness, maybe it was, but we didn't really get an explanation on that.  So it either --

THE COURT:  But what's outstanding from the June 3rd -- so this -- this Appendix A that I have, is there something you believe is outstanding at this point in time?

MR. DELL'ANGELO:  Yes.  So there are three main categories, right.  There's a hand- -- there are about 45 percent of the custodians who just don't show up on the disclosure.  So if anybody -- anybody who was identified as a custodian is not on the disclosure.

THE COURT:  So your concern here is that they've only identified --

MR. DELL'ANGELO:  About half.

THE COURT:  -- custodians who -- whose cell phones have

been imaged and, number two, that they deemed relevant as opposed to just listing all of them?  Are those the concerns?

MR. DELL'ANGELO:  That -- that may be the -- I mean, yes, but we just don't know why some of these people weren't listed, right.  So that may very well be correct.  It may be something else.  I think we just don't know.

There was -- as I think Your Honor identified, there was an earlier disclosure in April.  Before Judge Boulware ordered a disclosure, there was a voluntary disclosure, but some of the information in July in our view just conflicted with what we were told in April and we kind of explained that in our letter and just asked that that be explained.

And then we also just found -- you know, there are publicly-available sources, right, that talk about some of the communication platforms that the custodians use.  And we identified some of those and said, "Hey, we're looking at the public record and it says Custodian X uses this platform, but it's not showing up on your device tracker.  Either it should be listed or can you help us understand what the difference is?"

So it's really just this process.  It's really like it -- it's what we're doing with discovery generally.  It's, like, finish, you know, what we started on that device disclosure.

And what we added as part of this process was asking for some things that they've agreed to give, right.  Like, with

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

respect to cell phones on the meet and confer as part of this process we asked for, you know, how many messages does each custodian have, right. Because that tells us a lot, right. If -- because there are about 158 text messages and chats that we can find --

THE COURT: Is this Number 5, the communication log?

MR. DELL'ANGELO: Yeah, that's sort of --

THE COURT: Okay.

MR. DELL'ANGELO: We're putting them together, Your Honor, because I think there's a lot of overlap.

THE COURT: Just making sure.

MR. DELL'ANGELO: Yes.

THE COURT: I'm just coming into the case, so I have a lot to learn.

MR. DELL'ANGELO: It's a lot. And I appreciate and -- that clarification, Your Honor.

But we found something like about 158, so let's say than fewer than 200 text messages or chats.

And so if it's the, you know, 183 or 56,000 or however you want to do it, you know, less than 200,000 documents, again, for 33 custodians for 10 years with the number of devices showing up on the tracker, the number doesn't seem to square with what we've seen in -- you know, in the Le case and other cases generally.

So one of the things we asked for as this process is

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

can you just give us the total number of texts and chats for each device. I think we have an under- -- an agreement with the defendants they were going to provide that. We haven't received it yet, but I -- I expect that if they've agreed to provide it, they will.

So there are a few things, but, you know, as part of this process we also asked for the carrier information because that is also helpful for us, you know, to sort of understand the progression of things, right, both with -- to, sort of, validate things and potentially seek additional discovery. So that's one of the other things that's outstanding as part of this process.

THE COURT: Okay. For my own edification, does this correspond to particular requests for production?

MR. DELL'ANGELO: The carrier information or --

THE COURT: All of this.

MR. DELL'ANGELO: Well, the carrier information corresponds to requests in the subpoenas that we served on each of the individual -- individual subpoena recipients.

And I don't believe that there is a request for production that specifically asks -- actually, the subpoenas I think asked for things like mobile number, carrier, what platforms you use. There's not a request that says "Tell me the number of e-mails that you have," for example, which is one of the things that we have on this listing that we provided in the September 12th letter. But this is also, like, really

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

fundamental information that parties typically exchange, right, where they'll say, "We collected Custodian A's e-mail.  They had 58,000 e-mails.  We ran the search terms," you know --

THE COURT:  So are there -- again, I'm confused.

MR. DELL'ANGELO:  Yes.

THE COURT:  One is cell phones or --

MR. DELL'ANGELO:  Yes.

THE COURT:  -- cellular devices.  And then we have some other, sort of, chart that talks about e-mails, custodian names, e-mail address.  Where is that?

MR. DELL'ANGELO:  So it -- Corrected Exhibit 1 to the JSR, it's the first attachment.

THE COURT:  Was the last thing you filed yesterday?

MR. DELL'ANGELO:  That's correct.  And so it appears, Your Honor, at ECF 256, Page 23, is where it starts.  I have extra copies if you'd like me to hand them up.

THE COURT:  Oh, that would be great.

MR. DELL'ANGELO:  Okay.  May I approach?

THE COURT:  Yes, please.

MR. DELL'ANGELO:  Thank you.

COURTROOM ADMINISTRATOR:  Thank you.

THE COURT:  So Page 33.

MR. DELL'ANGELO:  Do you guys need a copy?

MR. CHIU:  No, I got it.

MR. DELL'ANGELO:  Oh, okay.

Sorry.  I was just asking if they need a hard copy.

So, yes, Page 23.

THE COURT:  Oh, 23.

MR. DELL'ANGELO:  Yes.  So this is ECF 256, Page 23 of 123.

So there are a few categories.  The first is just Litigation Hold --

THE COURT:  One second.

MR. DELL'ANGELO:  Sure.

THE COURT:  Let me get there.  Yes.

MR. DELL'ANGELO:  Right.  So in the first one, Litigation Holds, if you're there, Your Honor.

THE COURT:  Uh-hmm.

MR. DELL'ANGELO:  I think this is information that we understood that the defendants had agreed to provide, that was our understanding at least, but that we do not yet have.  Then the next page is just the Device Listing, which is really -- is just a -- I think a modest expansion of what is the Device Disclosure Order, but also tracks what is in our subpoenas, right.  This is the stuff that we asked for the individuals from the subpoenas where they said essentially, "Go get a court order.  We're not giving you any information."

And as you continue on, there is just basic information for e-mail, just, you know, who's -- who's the custodian, what's the e-mail address, when did you image the account, you know,

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

how many e-mails are in there, and then kind of breakdown by year. I mean, to -- to us, this is the stuff that we routinely exchange, right. Parties just essentially say, "Here's what the universe looks like." We were trying to get -- as part of this reset trying to just, like, let's get the data, understand what we're dealing with, and it would inform a lot of things, right. Because -- and maybe I'll just give you a little bit of a concrete.

If they say "I've got this custodian," we started preserving day one that we filed, you know, the Le case, for example. We've been holding their e-mail for 10 years. And they have, I don't know, 3,000 e-mails. That might say we might then want to have a discussion about, you know, was preservation ripe? It seems like very few e-mails for 10 years. If they say, "It's this large number," but then we run your search terms, initials is -- you know, I have a slide for this, but, you know, some custodians will have, like, eight documents. And we'll say, "It seems like there's a mismatch. Let's figure that out."

But this is the kind of really basic data that, you know, when you're collecting and producing documents, you just know. And the exchange of this information really in our experience facilitates kind of getting -- moving this process along.

THE COURT: Okay. Understood.

So let me first turn to you, Mr. Chiu.  So let's start with the cell phone devices.  The Question Number 1, I'm looking at this exhibit which is currently under seal.  Does this include only imaged cell phones?  That's Question Number 1.

MR. CHIU:  This is the -- their original -- the July 3rd disclosure?

THE COURT:  I can tell you -- I mean...

MR. CHIU:  Are we looking at their proposed chart?  I'm sorry.

THE COURT:  So it's Appendix A.  It's Exhibit 30, which has been filed under seal.  I want to say this is part of the plaintiffs' motion for sanctions.  Is that correct?

MR. DELL'ANGELO:  It is, Your Honor.  Is it a July 3, 2025, letter?

THE COURT:  I just printed the exhibit out.  So I don't know what it's attached to.

MR. DELL'ANGELO:  I see.  Okay.

MR. CHIU:  So the --

THE COURT:  So -- but if you can confirm for me whether it's Exhibit 30 to your motion for sanctions.

MR. DELL'ANGELO:  Oh, you know what, I do have the motion for sanctions.

But if it's -- I believe if it's Appendix A, I'm looking at it, it looks like what is attached to the defendants' July 1 disclosure.  That's Appendix B, actually.

(Counsel conferring.)

THE COURT:  I'll tell you what, maybe we can identify it this way.

MR. DELL'ANGELO:  Okay.

THE COURT:  The very first name that appears on the chart is Tracy, last name starts with a B.  I don't know whether I can say that on the record or not given the field.

MR. DELL'ANGELO:  Batchvarova?

THE COURT:  No.

MR. CHIU:  I have it as Docket 217-32.

COURTROOM ADMINISTRATOR:  Can you speak up --

THE COURT:  I'm sorry.

COURTROOM ADMINISTRATOR:  Can you speak up?

THE COURT:  Like I'm a cousin... (indiscernible.)

MR. CHIU:  Sorry.  I don't have it in front of me.  But if we're talking about the July 3rd disclosure, right, of the -- of the devices and numbers for individual custodians, yes, those are the ones that through -- pursuant to the discussion on June 3rd with Judge Boulware, you know, defendants with respect to various custodians provided a catalog of the devices that have been imaged and collected.  And a lot of that reflects, kind of, the work that we normally do of talking to people --

THE COURT:  My question to you is, does this list include only custodians and all of the other information that's in the different columns as to phones, cell phones, or cell

devices that were imaged?  In other words, are there non-imaged cell phones that may contain additional information that's responsive to this request?

MR. CHIU:  Those -- those reflect devices that have been imaged to -- for -- for custodians who we understand have responsive information, right.

THE COURT:  And how did you determine that?

MR. CHIU:  By doing an investigation, right, through preservation.

THE COURT:  So you talked to a certain number of custodians?

MR. CHIU:  Correct.  The custodians -- and those comprised of custodians to which we had previously agreed to.

THE COURT:  When you say custodians that we previously agreed to, are these -- because I understand that there's 33 --

MR. CHIU:  There's the 33.

THE COURT:  -- on your side.

MR. CHIU:  Correct, the 33.

THE COURT:  So you talked to these 33 custodians, and based on the responses that you received, you put together this chart.

MR. CHIU:  Correct.

THE COURT:  Okay.

MR. CHIU:  I will add that since then, for example, and with respect to the chart they provided, our understanding

coming out of the last status conference with Judge Boulware was that there was no issue with the disclosure because that was ordered.  We provided that.  We have since also continued to produce text messages and information from some of those custodians' devices.

And so this idea of, like, we're going to start over again and ask for all this information is -- is, frankly, a new request.  So that's kind of where we are.

THE COURT:  So I don't -- let me just see when was the reply to this motion.

So let me ask, Mr. Dell'Angelo, are there any issues that are still pending with regards to the chart that was provided to you by the defendants as to the cell devices?

MR. DELL'ANGELO:  Yes.

THE COURT:  Yes.

MR. DELL'ANGELO:  So to share our perspective, very shortly after we got the device disclosure -- and I did find it, Your Honor.  It's Appendix A.  It does begin with Tracey Bleczinski.  I think that's maybe what you were looking at.

THE COURT:  Yeah, we're trying not to say the last names on the record.

MR. CHIU:  Thank you.

MR. DELL'ANGELO:  Okay.

So I think that name appears elsewhere, but I understand, Your Honor.

Yes.  So the issues that I identified, you know, the 45 percent of the custodians that they identified are not listed on the disclosure, as we understand it.  There's a conflict between some of the information from the April and July disclosure.  And, again, there's some sources that we've identified that -- from third -- from public sources.  We understand some of the custodians use this communication platforms that don't appear on here.

So those three issues at least remain for us.

THE COURT:  Okay.  Mr. Chiu?

MR. CHIU:  Your Honor, just respectfully, I think our understanding coming out of the last status conference with Judge Boulware was that this issue was put to bed.  We made the disclosure.  That issue was litigated.  They raised in their motion for sanctions this issue of the incomplete disclosure.  It came up at the hearing.  We -- we addressed it.  They didn't request we want this for 33 more custodians.

So from our perspective we had complied.  We continue to produce documents that are -- you know, we find from those devices.

THE COURT:  Can you --

MR. CHIU:  So this is kind of a new thing.  So I --

THE COURT:  Understood.  Is this August -- when was the last hearing before Judge Boulware?

MR. CHIU:  August 26th.

2:21-cv-01189-RFB-BNW,  2:25-cv-00914-RFB-BNW,  2:25-cv-00946-RFB-BNW

THE COURT:  26.  I'll take a look at the transcript.

MR. CHIU:  Thank you, Your Honor.

MR. DELL'ANGELO:  Yeah, I mean, I guess, Your Honor, we didn't -- did not understand that issue to have been decided.  I think that motion is still technically pending.  But, you know, the upshot is we have some very, like, obvious discrepancies.  And, you know, we understood Judge Boulware essentially to say, like, as part of this process we're going to get to the bottom of it, but just to kind of retrace --

THE COURT:  I'll take a look at the transcript.

MR. DELL'ANGELO:  Yeah.  Understand.  Okay.

THE COURT:  Yes.

MR. DELL'ANGELO:  Thank you, Your Honor.

THE COURT:  Okay.  And so that's the cell devices.  And then we have this other list.  Do you want to address that, Mr. Chiu?  This other charge, I'm sorry, the one that appears at Page 23 of Exhibit 1.  So the one that starts with Litigation Holds.

MR. CHIU:  Sorry.  Exhibit 1, Page 23, yes.

Yeah.  So again, Your Honor, I think, you know, this is -- this is improper discovery on discovery.  I mean, again, it's a wholesale start-over.  "Hey, you know, what did you do, you know, with respect to your process?"  We've agreed upon custodians.  They haven't raised an issue of preservation.  I would submit that this is the sort of stuff that is asking

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

frankly for the disclosure of privileged and attorney work product information.

Detailed information about our collection processes and whatnot?  Again, just uncalled for.  And our view is that we are beyond this -- beyond this phase to, kind of, just come back and say, "We need a disclosure of all this information."

And, again, stepping back, I think coming out of that August 26 conference, our understanding was we would provide this tracker, which we have, of the custodians, the RFPs, the search terms, and it's a map of all the work that we've done to -- as part of discovery.  To ask for this sort of information, there's -- there's a lot of case law that says this is the, sort of, improper discovery upon discovery that generally -- unless there is extenuating circumstances, generally, you know, parties are not disclosing because it frankly encompasses work product and privileged information.

THE COURT:  So maybe so with regards to the Litigation Holds, but what about the rest of the charts?  I mean, we have, let's see, non-e-mail communication, application listing.

MR. CHIU:  Yeah.  I think, again, Your Honor, our understanding was all that was subsumed in the disclosures we had made pursuant to the last court order.  And those devices, again, those are tethered to the custodians, what devices they have, what applications they use.  And then of course their e-mails and work files we have collected and -- and are

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

producing whatever's responsive from -- from those files.

THE COURT:  Okay.

Anything else?

MR. DELL'ANGELO:  Yeah.  So, again, we have -- we have these open questions.  I understand Your Honor will look at the transcript, but I -- as we understood it, Judge Boulware left it as these are open questions, work with the magistrate, and the reality is there are just significant gaps in a lot of this information, like, Litigation Holds, for example.  Zuffa and TKO agreed to provide, provided some of it in April, and, you know, has now, sort of, morphed to, "That's totally inappropriate information.  You're not allowed to have it.  And as to Endeavor, you're not getting any of it."

But, again, these are, you know, really asking for very high-level information to help us all figure out, sort of, what's going on here.  I mean, you know, we -- and this is I think Exhibit 51 to our sanctions reply, but, you know, we created this list, and I have it again, of just more than half of the custodians of the 33 that they selected have zero documents, right.  So either there's something wrong with the collection, the search terms that they chose.  I presume that these are relevant custodians.  I would expect them to know their business, but something is wrong.  Either things weren't preserved, the terms aren't working, the review process isn't working, but it's -- it's inconceivable that more than half of

the custodians have not a single document.

THE COURT:  All right.

Get back to my sheet here.  Okay.  So I think that takes care of Section A.

MR. DELL'ANGELO:  Yeah.

THE COURT:  Let's move onto Section B, which is the "Linear Review of Text Messages and Chats."

MR. DELL'ANGELO:  Yes.

THE COURT:  Yes.

MR. DELL'ANGELO:  So, again, I think this is customary in most cases because text messages and chats use shorthand, idioms, slang.  They're not really generally susceptible to search terms -- to search terms.

And so in the Le case the parties agreed to do a linear review of text messages and chats.  We have a citation to the Joint Status Report in Le here.  There was a part -- there's this sort of gap period of documents that's between Le and Johnson, 2015 to 2017.  We'd had a discussion with them early on before we really got to a discussion about Johnson. Ms. Phillips, the defendants' counsel, as we understood the letter, had agreed to do a linear review of chats and texts, and we expected we'd continue that discussion and essentially as part of this review process.

So, again, whether it's a million documents or the 180-some thousand that actually relate to -- to Johnson here

that are kind of the new documents, for all of these custodians and this disclosure and all of these mobile devices, there are by our count I think it's 158.  It's hard to -- but I'd say for safety, to be conservative, fewer than 200 text messages or chats from apps that we can find.

And one of the things that we ask the defendants as part of this meet-and-confer process is, "Did you apply search terms," right.  And we understood them to say, "Yes."  And this would be, you know, a fundamental reason why responsive communications would not show up, right.

I mean, if Your Honor were to look at Judge Boulware's class certification decision and some of the evidence in Le, you know, there's one text message between Mr. Fertitta and Mr. White that became, you know, quite famous in that case where Mr. Fertitta said something -- I'm paraphrasing, something like, "We need to take these F'ers' oxygen until they tap out."  And as I questioned him about -- Mr. Fertitta about that in his deposition, essentially the testimony that we got and, you know, Judge Boulware relied on is this wasn't a discussion about the defendant putting a competitor out of business, key allegation in our case.

There's not a set of search terms that's going to hit on a text message like that.  That's why you need to read the custodians' text messages.  It was done in the last case.  Plaintiffs did it in all the documents that we produced.  We

think it's a fairly standard process and are asking that the defendants do it here.

Including just doing what we believe they at least in part promised to do with respect to the gap period, but, you know, there's no reason to not apply it to the remainder.

THE COURT:  All right.

Mr. Chiu?

MR. CHIU:  Yeah, Your Honor, I think on this issue I think we're still in discussion with plaintiffs as we --

THE COURT:  You're still in discussion with plaintiffs?

MR. CHIU:  With plaintiffs, as we noticed -- noted in our papers.  I mean, we are willing to conduct more than a search-specific review of -- of texts if --

THE COURT:  I'm sorry.  What is it that you're willing to do?

MR. CHIU:  To do an expanded rather than, you know, apply search terms.

THE COURT:  Oh.  Okay.  So apply search terms is not what you're willing to do, but actually do a linear review?

MR. CHIU:  I think we have been in ongoing discussion prior -- you know, when they filed --

THE COURT:  I'm just trying to, sort of --

MR. CHIU:  Yeah.

THE COURT:  -- see if we can move the ball --

MR. CHIU:  Yes.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

THE COURT:  -- forward.  So what is it that you're willing to do?

MR. CHIU:  I think we're -- you know, we have applied search terms.  I think we're willing to consider for certain custodians a more expanded review.  I think linear review of all texts for all the custodians is incredibly burdensome.  Again, I think applying search terms and then expanding out that way is something we're willing to consider for certain key custodians as well.

I think the one thing I will just kind of note, this constant reference to what happened in the Le case --

THE COURT:  Listen, it's fine.

MR. CHIU:  Okay.

THE COURT:  Yeah.  I'm not the jury.

MR. CHIU:  Yeah.  But just in terms of trying to explain the difference, I think, in volume and trying to extrapolate --

THE COURT:  In your papers, I read it.  Yeah.

Okay.  So I guess on that point, Mr. Dell'Angelo, is there a world in which you could, sort of, narrow the number of custodians as to which linear review would need to take place?

MR. DELL'ANGELO:  So I think what you heard here today is exactly what we heard on the meet and confer which is, you know, we'll consider it.  Maybe there's some limited whatever.  That prompted my question which we understood they agreed to do

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

is tell us what communication devices, how many texts and chats per custodians so that, Your Honor, we're not buying a pig in a poke, right. We had this issue in the Le case where we picked, whatever, 10 custodians. Three of them ended up having zero documents, and the defendants said, "Too bad."

You know, it -- that was what it was. But, you know, for us to give fair consideration to a proposal that does something like that, I think we need to know -- understand what we're looking at.

THE COURT: Understood.

MR. DELL'ANGELO: We've heard a lot about volume, but I have no insight into the volume, so --

THE COURT: Okay.

MR. DELL'ANGELO: Yeah.

THE COURT: Mr. Chiu, is that something that you're willing to do? Can you provide a list of devices and how many communications there are per device so that plaintiffs can indeed perform some sort of analysis to narrow down the number of custodians?

MR. CHIU: I -- I think we have offered to do that.

THE COURT: Okay. So is the answer yes?

MR. CHIU: Yes.

THE COURT: Okay. And when can you do this by?

MR. CHIU: Two weeks.

MR. DELL'ANGELO: Your Honor, may I just add one piece

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

of clarification?  In the exchange that the parties had at Exhibit 1 and 2 and 3 and 4 about this issue, we talked about it on the meet and confer.  We asked for the number of text messages and chats by app, right, or platform.  We understood them to say, "Okay," recognizing there may have been a miscommunication.  The letter we got back was, "We will give you the volume."  And our response was, "We just want to be clear, do you mean we'll tell you that there's 1,000 texts or there's five megabytes?"  Because five -- telling me that there's five megabytes of text messages --

THE COURT:  My understanding --

MR. DELL'ANGELO:  -- is kind of meaningless.

THE COURT:  -- and, Mr. Chiu, you correct me if I'm wrong, you are willing to provide to the plaintiffs in two weeks a list of all the devices and as to each device which custodian it belongs to and the number of communications per device.

MR. CHIU:  Yeah, I think our understanding is we told them we would provide the volume.  I -- I can't sit here --

THE COURT:  That's fine.

MR. CHIU:  I just --

THE COURT:  I mean, so long as we all have an understanding --

MR. CHIU:  Yeah, I --

THE COURT:  -- it doesn't matter what happened.

MR. CHIU:  Right, I --

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

THE COURT: As of right now, you're willing to provide them the number of communications, not megabytes.

MR. CHIU: Right, but tech- -- I just don't want to represent to the Court, you know, tech- -- what's technically feasible based on the analysis of the device, right. Like, I -- I can't sit here and tell you, you know, my vendor can say it's, you know, a text message a day between two people. Like, I just -- I don't want to -- I don't want to be in a position where I'm committing to something --

THE COURT: Understood, but to the extent that your vendor can --

MR. CHIU: Correct.

THE COURT: -- do that, do you oppose it?

MR. CHIU: No.

THE COURT: Okay.

MR. DELL'ANGELO: And I think that's fine. I just -- the last piece I think that would be helpful, but I think we talked about was just the date range that that applies to, so...

THE COURT: And what's the date range that you're asking for?

MR. DELL'ANGELO: Well, we have a -- I mean, our discovery period runs from mid 2015, June '15, to more or less the present, but really it would be for whatever they have it for, right. Because not every custodian -- you know, some join the company later. Some may have left. So it's, "what have you

48

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

collected," "what do you actually have," would be, you know, what we'd expect them to provide.

So I guess really what we're asking for is the applicable date range for what they've collected and they're providing the data for. Because, again, telling me I have 1,000 text messages -- is it for one month or 10 years -- is just very different context.

MR. CHIU: Yeah, I think the only -- the only issue there is we had previously worked out the date ranges, and we're going back to 2017 which is when the Johnson case was first filed. We've dealt with the gap in terms of -- of documents and text messages, but that's, you know --

THE COURT: My question is, what can -- to the extent --

MR. CHIU: We'll provide that information --

THE COURT: -- that your vendor can identify the dates, is that something that you oppose doing?

MR. CHIU: No.

THE COURT: Okay. All right.

MR. DELL'ANGELO: Thank you, Your Honor.

THE COURT: All right.

That's B. Let's move onto C, Categories of Unproduced Responsive Documents. And here we have four subcategories: fighters' contracts, debt issuance documents, fighter metric data, and broadcast deals. So go ahead. Why don't we start

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

with the fighter contracts between 2015 and 2017?

MR. DELL'ANGELO:  Right so.  As -- as we understand it -- so just for context, there are really, sort of, two types of contracts.  There are what we call PARS.  They're Promotional and Ancillary Rights Agreements.  That's signing a fighter to the UFC.  Then when the fighter gets a fight, there's agreements that follow that, like a bout agreement or whatever.

So we're looking for all the contracts for that period.  Our understanding is at least, again, as we had this discussion in the Le case that there is kind of a central file where the company keeps all of the contracts.  I think what we heard, if I understood Mr. Chiu earlier today, is that central file now is Ms. Long's e-mail, it seems.  But --

THE COURT:  Not the paralegal.

MR. DELL'ANGELO:  Not a paralegal, a vice president.  So, again, I stand corrected.

But really what we're trying to get to, Your Honor, because getting a complete universe --

THE COURT:  But let me just stop you there.

MR. DELL'ANGELO:  Yeah.

THE COURT:  With regards to this specific custodian, you said that you received how many contracts?

MR. DELL'ANGELO:  Let me take a look.

So we're in the process of putting that together because we're essentially pulling them out of e-mails; whereas,

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

you know, normally what you'd expect is sort of a central file with "Here's all the contracts," and then we need to match them with fighters and bouts.

So I just want to make sure I don't give you the wrong number.  But I think we have...

(Plaintiffs' counsel conferring.)

MR. DELL'ANGELO:  So, yeah.  Okay.  I've got it here.

We -- we've counted thus far 2,818 contracts for the period from July 1, 2017, on.  We estimate that there should be something -- somewhere around 3,500, and those came -- from what we understand they're marked in the tracker as being from a central file.  So I think we would need to close that loop, and then there's what we've been calling this gap period, May 2015 to June 2017, where we don't seem to have any.  And, again, our ask, we thought was pretty simple, is could you go to the central file.  Just give us a complete set.

Having a complete set of the contracts is vitally important to both sides, frankly, and to the expert work that needs to be done here.

And I think the response that we got back was essentially, "Look at the tracker, go look through every document, and assemble a set."  In theory, that's possible, I think wildly inefficient.  But be that as it may, part of the problem is I can have no assurance if I actually ended up with a complete set.  And so if there's a central file where these

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

things exist and, you know, given the fact that there was one in Le and the gap period we're talking about essentially is, you know, just kind of cresting into the Le period, we thought the really efficient way for both sides was collect them from the central file and provide those.  So that's what we're looking for.

THE COURT:  Okay.

Mr. Chiu, is there a central file?

MR. CHIU:  My understanding is that when we go and collect these contracts in the past, we've gone to Ms. Long who's kind of the keeper of them.  With respect to producing the contracts, we have -- with the exception of that two-year gap, 2015 through 2017, we have produced all the contracts up to 2024.

The -- this idea that, like, it's insufficient that they're attached to a custodial file which are Ms. Long's files because she's the one handling them, I just -- I'm unaware that we -- you know, that plaintiffs are saying, "Oh, we shouldn't have to dig through the custodial files."  We've produced all the contracts.  They are -- they are either in the form in which we pulled them or they're part of Ms. Long's e-mail and custodial file because she's the one handling and -- and, you know, when they're signed --

THE COURT:  She's the only person.

MR. CHIU:  That's my under- -- she is, kind of, the

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

person that we go to when we've ever had to -- you know, she's the keeper of the contracts in her role.  And so this idea that, like, it's insufficient that -- you know, to produce contracts because they're attached to an e-mail to the very person that handles them, I just -- you know, I'm unaware of, you know, a defendant having to take an additional burden to go separately pull it again and reproduce it.  I mean, they have it.

THE COURT:  As to the gap period, what can you represent?

MR. CHIU:  That we've produced the contracts as part of the custodial files.

THE COURT:  Okay.  So the 2,818 contracts, that includes the gap period?

MR. CHIU:  My understanding is that's correct.

THE COURT:  All right.

MR. DELL'ANGELO:  Yeah, so -- but by our review and count, none of the 2,818 contracts that have been produced apply to the gap period.  It may be that, you know, we're off by one or two somewhere, but I -- I don't think any of them apply to that.  I mean, we've worked pretty hard on those.

The other thing I'd say is the rules are also pretty clear that you produce documents in the manner that they're, you know, maintained in the ordinary course of business.  So if there's a central file, that is the way you're maintaining them in the ordinary course of business, unless the way this massive

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

publicly-traded company does is just uses Outlook as a filing system.  I don't think that that's probably how it's done.

But, you know, we've gone through the process of looking through those.  We've done what they've asked us to do.  It's been inefficient.  It will continue to be inefficient.  But one of our big concerns overriding all this is -- well, two.  One is what we think is missing from the gap period and, two, we could review every single one of the 180-some thousand Johnson documents.  And I can make a spreadsheet and list every contract and link it to the document.  But I still don't know if that's a complete set, right.

So that is part of the problem that we're trying to solve for.  And so one would expect that if you maintained them in a central file in the ordinary course of business, you'd just produce that.  I mean, it seems like this is a dispute that really doesn't warrant the Court's time, but here we are.

THE COURT:  Okay.

Moving on, debt issuance documents.

MR. DELL'ANGELO:  Yep.  So debt issuance documents in the prior case were extremely important.  We have asked for those debt issuance documents.  We understood that we would receive a complete set.  There are certainly some in the production.  We have gone through the tracker, but we also wrote the defendants a letter.  We gave them a detailed list of "here are all the debt issuances that we can -- that we're aware of

54

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

for which there's no document produced."  And, really, there's just this delta that we're trying to get our hands on, so getting the documents and the relevant communications.  I mean, it's really as simple as that, Your Honor.

THE COURT:  Mr. Chiu.

MR. CHIU:  Yeah, Your Honor, we have produced a number of debt issuance documents I think as part of the correspondence with plaintiffs.  The ones that they apparently publicly identified and asked for, they're incorrect.  So, you know, from our perspective we have, you know, searched for and collected and produced the relevant debt issuance documents to the defendants in this case.

So I -- I don't -- you know, that's where we are on this.

MR. DELL'ANGELO:  Yeah, I think -- so this is the first time we're hearing this, right, from the letter from I think July.  So I -- we're a little constrained to respond, right.  So --

THE COURT:  This is the first time that you're hearing that they've produced it?

MR. DELL'ANGELO:  No.  We identified the ones that have been produced.  This is the first time we're hearing that the list that we provided them of additional debt issuances is somehow incorrect or that there's no documents with them.

THE COURT:  Got it.

MR. CHIU:  Yeah, I mean, I think we're willing to reconsider, but, like, I think we have produced what we have with respect to that RFP.  And --

THE COURT:  Which RFP is this, by the way?

MR. CHIU:  I may have it.

MR. DELL'ANGELO:  Right.  So maybe I could just add some perspective to this.  So some of the things that we found --

MR. CHIU:  RFP 18.

MR. DELL'ANGELO:  Sorry.

THE COURT:  Was that, I'm sorry, the first set?

MR. CHIU:  First set, yeah.

THE COURT:  Go ahead.

MR. DELL'ANGELO:  So I apologize, Your Honor.

So, you know, some of the documents that we did find in the production refer to things like a lender presentation, right.  And as you read those, you realize there are other lender preservation -- or presentations.  There were other, sort of, debt-related issuance documents that just don't appear in the production.

So you, kind of, have two issues.  There's the list that I think before now we hadn't heard anything about there may be nothing to exist, but there are also just the related documents for the debt issuances that they have produced something for that, you know, are just plainly incomplete.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

THE COURT:  All right.

Anything else from you, Mr. Chiu?

MR. CHIU:  No, Your Honor.

THE COURT:  All right.  Let's move onto Number 3, which is metrics.

MR. DELL'ANGELO:  Right.  So this is the FightMetric data, again, Your Honor, really some of the most central information in the case.  The dispute seems to be one I think it's of semantics, right.  We understood that the FightMetric data would be produced.  Now we're hearing the answer's no.  And as we understood the objection was the objection to the RFP asking for FightMetric data was that the defendants wouldn't produce data or information beyond the FightMetric data, right.  So what we're really trying to do is just get the FightMetric data.

THE COURT:  Okay.  And the RFP is RFP Number?

MR. DELL'ANGELO:  I need to find that for you, Your Honor.

MR. CHIU:  77, Your Honor.

MR. DELL'ANGELO:  Thank you, Your Honor.

THE COURT:  77, and this is second set, right?

MR. CHIU:  Correct.

THE COURT:  And this is the one that you believe that they had abandoned?

MR. CHIU:  Correct.

THE COURT:  I understand that's not your position, but that's what they're representing in their briefs, right?

MR. DELL'ANGELO:  Yes.

MR. CHIU:  Yes.

THE COURT:  Okay.

So before I go to this issue, can you address the issue as to why you did not abandon this request.

MR. DELL'ANGELO:  It's like proving a negative, Your Honor.  So, we propounded requests.  They objected.  At least if you're looking at the FightMetric one, we understood that there wasn't objection to providing the FightMetric data, but only stuff beyond it.  So one would reasonably expect that we would get the FightMetric data.

THE COURT:  Understood.

THE DEFENDANT:  Not sure that there's -- you know, at that point I don't think there was anything more to talk about at least on that.

THE COURT:  Okay.  All right.

So, Mr. Chiu, go ahead.  So their presentation here is that there's an RFP.  The objection is we will -- no issues with the fighter metric data, but we're not going to provide anything beyond that.  I have not read the RFP.  I'm just repeating what I've heard here in court.

MR. CHIU:  And I think, no, we objected to those RFPs.

THE COURT:  You objected to all of it?

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. CHIU:  Yeah, and we found --

THE COURT:  Okay.  And you're saying they did not move to compel, therefore, that's that.

MR. CHIU:  Yeah, and on certain of them we said we were going to meet and confer.  We've never gotten responses on that second set.  A lot of the fighting --

COURTROOM ADMINISTRATOR:  Speak up, please.

MR. CHIU:  Sorry.

We -- we never got responses on that second set.  And we've since moved on, and we've also in correspondence again, as we -- as we indicated in the report, you know, to the extent they could tie those requests to an unabandoned set of RFPs, again, we're willing to go and consider them.  But that's where we are.  I mean, we had a discovery schedule.  They had those second set of RFPs.  They never moved on them.

THE COURT:  Do you have the RFP in front of you?

MR. DELL'ANGELO:  I'm not --

THE COURT:  Otherwise, I can find it I'm sure somewhere.

MR. DELL'ANGELO:  Yeah, I'm not sure that I do, Your Honor.  I think we could pull it up, but I --

THE COURT:  I'm just interested in knowing what the objection is because we can just settle this right here.

MR. DELL'ANGELO:  Okay.  One thing we could do is pull it up if you'd like to -- we could maybe move to a different

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

subject.  If you want to wait, we could pull it up.

THE COURT:  That's fine.  It's 4:11.  Does anybody need a restroom break?

No?  All right.

So you can go ahead and move onto a different subject, and we can come back to this.

MR. DELL'ANGELO:  Okay.  Thank you, Your Honor.

And so the next one in our list here is just documents related to broadcast deals.  Again, there's this, sort of, argument that we don't entirely follow that some of these may be duplicative, but what you've got is there's requests to TKO, Zuffa, and Endeavor.  So there's, sort of, parallel requests to all three.  As to Endeavor, I think the answer came back there are no documents.  You know, maybe that's right.  But we're still waiting to understand what -- you know, what's going on with Zuffa and TKO.

But there's, sort of, two levels to this.  There are requests that ask for broadcasts -- documents related to broadcast deals and communications, excuse me, more broadly. And then there's specific requests about just this ESPN deal which was this, kind of, you know, massive $1 billion, kind of, company-changing deal.  So there's the request specific to that. And I think what our understanding is what's happening is there's, sort of, two things saying, you know, to some extent they're duplicative, but then conflating the two.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

And the upshot is, again, we're really just trying to get -- you know, these broadcast deals are important to the case.  We're just trying to get the documents about the broadcast deals and --

THE COURT:  Which RFPs are these?

MR. DELL'ANGELO:  So I... let's see.  Broadcast deals, RFPs 57 and 87.

THE COURT:  Okay.

MR. DELL'ANGELO:  And, you know, we do discuss this in some detail in our letter at Exhibit 1 to the JSR as well.  And that appears at ECF 253-1.

THE COURT:  Okay.  All right.

Mr. Chiu, are these also part of the RFPs that you're suggesting have been abandoned?

MR. CHIU:  No.  And my understanding is RFP 57 we have responded to.  And, again, as part of our correspondence, we have indicated as part of -- I have the tracker here.  I recognize the Court might not have it, but we've produced a number -- there have been a number of productions that include documents responsive to this RFP as well as, I believe, it's 85.

THE COURT:  You said, 57 and 87?

MR. CHIU:  87, yeah.

Correct.  87.

50 -- sorry.  55 ... 57 is our understanding about the RFP that goes to broadcasters -- documents and communications

relating to agreements between you and any broadcaster or professional MMA events.  That's RFP 57.  You know, we've produced five separate volumes of productions that contain documents responsive to that RFP.  And, again, we've -- as part of our meet-and-confer correspondence we've asked the plaintiffs to look through the production we've identified for you.  What do you think is missing?  And we'll entertain that.

But, again, just, you know, with this wholesale we think it's deficient.

THE COURT:  What's your response to 87?

MR. CHIU:  87.

Yeah.  I -- I don't have -- for some reason on the tracker I don't have 87.  So I don't have it right now, but if it's not there, it may have been part of the second set that was abandoned.  But I don't -- I don't want -- you know, our understanding is the broadcast is -- is encompassed in RFP 57 and we have --

THE COURT:  Okay.  So what's 87?

MR. DELL'ANGELO:  87, I believe, is -- I'm just -- let me scroll down to that, Your Honor, before I...

87 is documents and communications relating to former structured revenues the UFC received from its broadcast rights, including without limitation documents and communications relating to the structure of Pay-Per-View revenues received by the UFC and paid by ESPN following the UFCN -- UFC's 2019

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

broadcast rights deal with ESPN.  So 87 is the ESPN-specific RFP.

And, Your Honor, just to be clear, you know, we -- the answer wasn't or the response wasn't "we don't have it," right. It was, again, ECF 253-1, our September 12 letter, at Page 9, there's a section about broadcast deals.  And it says, "Plaintiffs have been unable to locate in defendants' production the UFC's domestic broadcast deals, including but not limited to UFC's deal with ESPN, which is responsive to RFPs 57 and 87." And then, you know, there's some more discussion of that.

So we didn't just say, "Hey, we don't have it," right. Like, we looked.  We wrote them a letter.  We were I think specific about what it is we thought wasn't there.  And that's what we're here talking about.

And... and when Your Honor's ready to talk about FightMetric, I do have that RFP up, but I...

THE COURT:  The fighter metric?

MR. DELL'ANGELO:  Yes.

THE COURT:  Yes.

MR. DELL'ANGELO:  So that's Request Number 77.  77 asks for a complete set of data the UFC maintains comprising fighter and bout statistics, including the data previously maintained by FightMetric and the record book as referenced at -- and then there's a UF -- there's a URL, http:/statleaters.UFC.com.

And then there's an objection that follows.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

THE COURT: Yeah. What's the objection?

MR. DELL'ANGELO: It's long. Would you like me to read it?

THE COURT: How long is it? Where can I find it?

MR. DELL'ANGELO: The defendants attached it to their response to the motion for sanctions.

THE COURT: Okay.

MR. DELL'ANGELO: I can -- we can certainly pull it and provide it to Your Honor. It's about 15 lines or so. It's a fairly generalized objection, but what I don't read it to say is we're not giving you the FightMetric data.

THE COURT: So it's the defendants' opposition to the motion for sanctions. What exhibit is it?

(Plaintiffs' counsel conferring.)

MR. DELL'ANGELO: So their response to the motion to sanctions is ECF 224. Let me find you the -- try to find you the exhibit number.

THE COURT: And, Mr. Chiu, if you have that handy, you can give it to me.

MR. CHIU: I don't have it handy, Your Honor.

THE COURT: Okay.

MR. DELL'ANGELO: Okay. So I am getting there, Your Honor. If you'll just bear with me.

Okay. I believe it's Exhibit -- would be Exhibits 3 and 4, if I'm reading this correctly. It says, "On November

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

13th" --

THE COURT:  If you have an extra copy, I'll take it, too.

MR. DELL'ANGELO:  We can -- can we e-mail it to you?  I don't know that I have a hard copy.  I'm just looking through a list I have.

THE COURT:  We can probably make a copy and give it right back to you so I have everything here with me.

MR. DELL'ANGELO:  Okay.  Yeah, I don't know that I have a hard copy with me is the issue.

THE COURT:  We can make a copy --

MR. DELL'ANGELO:  Oh, I understand.

THE COURT:  -- of your hard copy.

MR. DELL'ANGELO:  Okay.  Okay.

So how would -- how would I...

THE COURT:  Ms. Garcia will take it from you.

MR. DELL'ANGELO:  Okay.

THE COURT:  And then she'll give it right back to you.

MR. DELL'ANGELO:  Right.  What I'm saying is I only have an electronic copy.

THE COURT:  Oh.  I'm sorry.  I thought that you had a hard copy only.

MR. DELL'ANGELO:  No, I -- no, I'm just looking at a list --

THE COURT:  Okay.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. DELL'ANGELO:  -- that has the exhibits.  That's how I was able to --

THE COURT:  I'll find it.

MR. DELL'ANGELO:  Okay.

THE COURT:  All right.

So that was fighter metric.  We had moved onto the broadcast documents.  Anything else on the broadcast documents?

MR. DELL'ANGELO:  No.  And I think, you know, the other thing that just permeates the FightMetric and the broadcast stuff is, you know, Rule 34 requires that if you're withholding something, you need to be specific about what -- what you're withholding.  But I think, otherwise, we've -- we've covered it.

So that would take us to the confidentiality designations, I believe.

THE COURT:  Yes, I understand that there's been some movement on that and that they de-designated some documents as attorney's eyes only.  So is there still an issue as to improperly designated documents?

MR. DELL'ANGELO:  Yes.  So I think it's the Johnson documents where it's an issue is that -- if I'm understanding correctly.  And by all means, you know, I'd -- I ask the defendants to correct me because I just want to make sure we're all on the same page.  I understand that the Le documents were being de-designated, but my understanding is that there's substantial portions of the Johnson production --

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

THE COURT: Mr. Chiu, is that correct?

MR. CHIU: My understanding is that the -- the greater issue is that we have de-designated some of the Le documents. That's correct. With respect to the Johnson documents, there's a process for seeking to challenge designations under the protective order.

THE COURT: Understood. I'm trying to figure out where we're at in terms of what's been de-designated. So that's the Le --

MR. CHIU: My understanding is certain of the Le -- Le documents.

THE COURT: All right. So to Mr. Chiu's point, I think that they've requested that you identify certain Bates numbers. What's your response to that? Remind me.

MR. DELL'ANGELO: So our response is that it is -- the protocol provides for a very narrow designation. We wrote them a series of letters that said --

THE COURT: No, but they're saying that there are indeed categories of documents, and I can't remember right now what they are, that have to do with highly confidential documents, right.

MR. DELL'ANGELO: Well --

THE COURT: So it's not like they've just put AEO on all of these Johnson documents.

MR. DELL'ANGELO: So my understanding is almost all of

them were AEO'd.  The designation that's permitted is about medical information, and there's a bunch of, sort of, stipulations about that.  We're not finding documents that hit that designation.  So when we got mass -- we got, you know, Production X and it says the whole thing is designated AEO, and you start going document by document by document saying none of this is even remotely close to this designation, we wrote a letter and said, "You've just kind of mass-designated this."  And we seem to be at this, you know, crossroads where it's essentially give us a list of every Bates number that we just produced to you.

We -- this is -- the JSR is the first time we heard that, this process.  If they want a list of every Bates number that they've given to us, we can do that, but, again, mass-designation is really not the way to handle AEO designations when there's a clear confidentiality in order and there's, like, not even a close call on any of these things.

THE COURT:  Mr. Chiu.

MR. CHIU:  Your Honor, there's a process -- the parties agreed to a process under the stipulated protective order for challenging designations.  All we've asked --

THE COURT:  Okay.  So, I mean, if he were to send back a sentence that says, "All Bates stamped numbers blah through blah," that's all that you require in order to move forward with the issue?

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. CHIU:  No, I think that --

THE COURT:  I'm just asking you.

MR. CHIU:  No, I think our position is that would be -- that would run afoul of the process that's contemplated, which is as you go through and there's specific things that clearly Mr. Dell'Angelo believes doesn't meet the standards, right, usually you -- you -- "hey, this document, we don't think meets the standard.  You know, we're going to challenge it under the protective order."  There's an escalation process.

I mean, the parties agreed to a process for doing this, and that's all we're asking for.  I -- I do think that, sort of, massive saying "your entire production, go back and look at it all" --

THE COURT:  No, my question to you is how burdensome is it to look at the production on the Johnson documents and say, "Bates number starting here and ending here."  I mean --

MR. CHIU:  Correct.

THE COURT:  -- it seems to me it's, like, one sentence.  So what's stopping this from happening?

MR. DELL'ANGELO:  So the thing is, Your Honor, we sent them a letter that said, "You gave us this volume.  You've designated the entire thing AEO.  We looked through it.  We're not seeing AEO stuff.  You shouldn't be mass-designating" --

THE COURT:  They come back in their reply and they said, "But wait.  There's these categories that do qualify as

AEO.  So designate the ones that you believe are not AEO."

How burdensome is it for you to do that?

MR. DELL'ANGELO:  It's not burdensome provided what I think Mr. Chiu is saying is for the 180,000 documents that plaintiffs believe have been over-designated, we now want to have a discussion or you need to write me a letter that explains why every one of them doesn't.  It's a gross misuse of the process to just mass-designate stuff that doesn't even remotely qualify --

THE COURT:  But what I'm hearing him say is not that, but, rather, Bates blah through blah --

MR. DELL'ANGELO:  Okay.

THE COURT:  -- are improperly designated.

MR. DELL'ANGELO:  Yeah.

THE COURT:  Is that correct?

MR. CHIU:  Yes.

THE COURT:  Okay.  It seems like we have some --

MR. CHIU:  Some specification --

THE COURT:  -- sort of understanding as to --

MR. DELL'ANGELO:  Right.

THE COURT:  -- this issue.

MR. DELL'ANGELO:  This is the question we asked and didn't get a response to, but okay.  We've -- maybe we've solved it.  So thank you, Your Honor.

THE COURT:  Okay.

Let's see.  I think the only issue that remains, and I'll let you to the extent that I've missed anything on your side because I know that I'm following their order, is the issue of the special master.  So both of you seem to believe that a special master is appropriate in this case.  There's seems to be some disagreement as to the specific role and, perhaps, who should pay for it?

MR. CHIU:  I don't know that we've -- we've -- I mean, I can imagine --

THE COURT:  Okay.

MR. CHIU:  -- what the plaintiffs' position is.

THE COURT:  Well, they've said it in writing.  So, yes, and so you should pay for it.

So go ahead and tell me what essentially is -- is it that you want the special master to do.

MR. DELL'ANGELO:  Sure.  And so I think just so we're clear from the outset, to the extent that there's agreement, I think there's agreement about the nomenclature.  And I think that's probably where they say --

THE COURT:  I see.

MR. DELL'ANGELO:  -- the agreement ends, just so we're not misunderstanding.

What plaintiffs ask for in their motion for sanctions and the appointment of the special master is we essentially said, "Judge, we are at a point where this process is so broken

and there are -- you know, we can't get our custodians.  We can't get our search terms.  We can't get information about what may even have been preserved.  The document counts that are coming back are -- are so indicative of either stuff has been destroyed or hasn't been collected or whatever, this isn't working."

And one way that you can do this -- and we cite a bunch of cases in the sanctions motion.  Magistrate Judge Leen has done it -- is you hire an independent special master that actually goes into the defendants', you know, business essentially and does this process.  It identifies sources of documents.  It talks -- that's --

THE COURT:  And Judge Leen did this not in the Le case, but in a different case, right?

MR. DELL'ANGELO:  In a different case.

THE COURT:  *Small* case -- I think *Small* or something.

MR. DELL'ANGELO:  I can find you that citation.

THE COURT:  No, you have it in your papers.

MR. DELL'ANGELO:  Yeah.

THE COURT:  I saw it.

MR. DELL'ANGELO:  Yeah.  Right.

So it's not -- you know, it is an established procedure.  There's a bunch of cases we found and cited where, you know, judges and magistrates have done the same thing.  Essentially said, you know, if -- if what we're getting, right,

appears to be highly unreliable and we are having this death by 1,000 cuts over every issue, one way to do it is appoint an independent person who goes into the business, identifies sources, identifies custodians, collects documents, and that's the set that gets reviewed and produced.  That essentially --

THE COURT:  Why couldn't a special master just do this without having to go into their business and essentially say, "We propose these custodians.  We propose these custodians.  These are who they are," and the special master can say, "Well, based on this information these are the custodians who are relevant"?

MR. DELL'ANGELO:  I think as long as we are -- that special master is making sure that they've identified the sources and the things have been and are preserved or to the extent things haven't been preserved we're just solving for that, I think that that is a very doable way of doing it, if I'm understanding Your Honor.

THE COURT:  On that point, is there agreement?  On the -- look, let me just rephrase.

If there were to be a special master who had to decide as to the custodians and each of you were to provide a list of the different believed custodians and what their roles are, would you agree to a special master deciding who the relevant custodians would be in this case?

MR. CHIU:  Yes, I think to the extent that's -- you

know, the master's acting as a referee in the normal course.  I think to your point, we have a fundamental disagreement as to what the special master means.

THE COURT:  No, understood.

MR. CHIU:  Yeah.

THE COURT:  So what I'm suggesting is, and I've had this happen with me in a different case where --

MR. CHIU:  Yeah.

THE COURT:  -- both parties submitted their list of custodians, what their roles were, and I had to decide who the relevant custodians were.  Is there an agreement as to that part of things?

MR. DELL'ANGELO:  I think that that's --

THE COURT:  I understand that that's not your -- your best solution, but would that work?

MR. DELL'ANGELO:  I -- I believe that would work, Your Honor.

MR. CHIU:  Yeah.  Yes.

THE COURT:  Okay.  Understood.  Okay.

MR. CHIU:  Just stepping back, Your Honor, I think we -- we dealt with this special master issue at the August 26 hearing.  I would encourage you to look at that --

THE COURT:  I'm going to look at the transcript.

MR. CHIU:  Judge Boulware definitely rejected the idea of what plaintiffs are proposing, which is essentially not a

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

special master, but more of a monitor to kind of step in the shoes of counsel on the defense side.

THE COURT:  Understood.

MR. CHIU:  And obviously we object to that.

THE COURT:  Okay.

So, and I think that I interrupted you trying to get some sort of concessions here.  So go ahead.  I'm sorry for the interruption.

MR. DELL'ANGELO:  I -- I appreciate that, Your Honor.

I may have lost whatever --

THE COURT:  I think I lost my train of thought as well.  So I think that we're talking about eventually what you would like the special master to do.  So you want the --

MR. DELL'ANGELO:  Oh, yes.

THE COURT:  -- special master to go in.  I said, "Oh, maybe that's not the way that this is going to work out.  Would you agree to this other process?"  Both parties said, "Yes."

So short of the special master going into their business and doing all of this, what else would you want the special master to do?

MR. DELL'ANGELO:  To assist with the identification of sources of relevant information and the negotiation of the search term process.  And, you know, and when -- when I'm talking about, just repeating myself a little bit, with respect to identifying sources, again, ensuring -- you know, sorting out

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

preservation and ensuring that it -- it, you know, essentially is done going forward.  But, you know, there are some, I think, questions that eventually we're going to need to figure out about preservation.

But I think --

THE COURT:  And what is that?  Because I'm not familiar with those issues.  What is it that you need sorted out?

MR. DELL'ANGELO:  So, you know, I think mobile devices are the biggest concern that we have.  So maybe I'll get -- try to get specific with you for a moment, is if a custodian has a mobile device, that mobile device maybe during this ten-year period, you know, I don't suspect and I think the device disclosure -- I mean, one of the issues with the device disclosure where we're seeing discrepancies is we're seeing that somebody has an iPhone 16.  IPhone 16 hasn't existed for but a year or two, right.  So we're not really seeing in some instances what are the prior devices.  Do you have them?  Have they been imaged?

And then getting a little more granular, if -- if a custodian is using WhatsApp -- I don't know if the Court's familiar with it, but, you know, that's an end-to-end encrypted communication service that essentially defaults, as we understand it, or the -- in the settings to essentially not preserve communications.  There's a number of steps that you have to take.  And just -- this is one of the reasons why when

we're asking for apps and, you know, message totals and stuff the time period matters because, again, if you start using WhatsApp in 2023 and the first WhatsApp message you have is in 2024, there may be a preservation issue.  These are the sorts of things that I think a referee or a special master could and should sort through very, you know, readily to just get the universe of what we're dealing with.

THE COURT:  All right.  Mr. Chiu, on those two issues regarding the -- the special master identifying the source of the -- the sources of relevant information, preservation issues, and search terms.

MR. CHIU:  Yeah, I think, you know, our -- our concept of wanting a special master originally was essentially to have something like what the Court is doing now, which is actually just being more engaged in kind of refereeing disputes as they come up.  I think --

THE COURT:  I'd much rather you get a special master.

MR. CHIU:  I can sense that.

You know --

THE COURT:  I mean, honestly, I'm happy to do this.  I would have to talk to Judge Boulware, but, I mean, we would need to meet probably like every two weeks and just like, sort of, hash over issues and just move quickly.

MR. DELL'ANGELO:  Yeah, we -- we -- we did JSRs and monthly in-person hearings with Magistrate Judge Leen that often

77

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

took hours, so...

MR. CHIU:  Yeah, you know, but this idea that there's some need or basis for the special master to kind of take on the specific role of essentially investigating what --

THE COURT:  Well, I understand your point.  I get that.

MR. CHIU:  Yeah.

THE COURT:  But, I mean, you otherwise don't object to -- I mean, whether it's a special master or not, it would be me otherwise, right.

MR. CHIU:  In concept, no.  No.

THE COURT:  Okay.  Understood.

Okay.  So I think that the only issue that remains with the special master is who it would be if there's going to be a special master appointed and who's going to pay for it, right?

So, I mean, like, the who could be decided based on just like a string of maybe five names and seeing whether there's any kind of overlap as to those.  Could even be Judge Leen, right.

The other question is who would be paying for this. Your position is that the defendants should do it.  Mr. Chiu?

MR. CHIU:  I mean, our position it should be -- it should be -- the cost should be borne by both sides.

THE COURT:  And why should it not be borne by both sides, Mr. Dell'Angelo?

MR. DELL'ANGELO:  Because in this instance the special

78

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

master, a monitor, would be doing what defendants normally do in their regular course when you have, kind of, a finite set of disagreements that you work out without having to go through this, kind of, somewhat unusual process.  So essentially it puts -- by the defendants in our view not really doing what the rules and case law require, essentially shifting the cost onto the plaintiffs of doing their job for all intents and purposes.

MR. CHIU:  I'll just note, Your Honor, this issue was litigated.  Mr. Dell'Angelo made the same pitch for plaintiffs' version of a special master at the August 26 hearing before Judge Boulware.  That was rejected.

There's no basis that's been raised here for a special master of that type to stand in the shoes of defense counsel or be a monitor thereby justifying their cost.

THE COURT:  We're just discussing the issue of payment at this point.  I hear you loud and clear.

MR. CHIU:  But that's the basis for I think why they're trying to argue that the defendants should bear the entire cost of the special master.

THE COURT:  All right.  Is there anything -- I know I followed the order in which the issues appeared for plaintiffs.  Is there anything that I've missed, Mr. Chiu, that you would like me to address?

MR. CHIU:  No.

THE COURT:  Okay.

PATRICIA L. GANCI - (702) 385-0670

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. CHIU:  Thank you.

THE COURT:  Mr. Dell'Angelo, anything else that you would like me to address?  I was just, like, I don't know why I asked you that.

MR. DELL'ANGELO:  While I have you -- no, I'm kidding.

No, except that I just like -- would like to be clear about one thing.  I think we have sufficiently covered the second RFPs, and we've kind of given you the detail at Page 6 of the JSR.  So I believe that's sufficiently covered, but if Your Honor doesn't think that it is, we'd be happy to --

THE COURT:  Let me just write this down.  So this is Page 6.

MR. DELL'ANGELO:  Yes, Your Honor.  This is Category D.

THE COURT:  And what's the document number?

MR. DELL'ANGELO:  So this is the JSR, 253.

THE COURT:  Okay.

MR. DELL'ANGELO:  At ECF Page 6, Document Page 5, Section D.

THE COURT:  Okay.

MR. DELL'ANGELO:  So, again, I think we -- we talked about this a bit at the outset.  I just wanted --

THE COURT:  I'll take a look at it.

MR. DELL'ANGELO:  Okay.

THE COURT:  And I'll take a look at the -- at the last hearing that we had before Judge Boulware.

All right.  Well, that's it?

MR. DELL'ANGELO:  It is.

THE COURT:  Excellent.  Thank you so very much.  I'll go ahead and take a look at all of this one more time, listen to this hearing again, and take a look at the documents that I need to take a look at.  And then I will consult with Judge Boulware as to how he would like me to go ahead and make my recommendation.  And you will hear from me hopefully shortly.  All right?

MR. DELL'ANGELO:  Thank you, Your Honor.

MR. CHIU:  Thank you, Your Honor.

THE COURT:  Thank you so much.

(Whereupon the proceedings concluded at 4:36 p.m.)

--oOo--

I, Patricia L. Ganci, court-approved transcriber, certify that the foregoing is a correct transcript transcribed from the official electronic sound recording of the proceedings in the above-entitled matter.


 /s/ PATRICIA L. GANCI         October 1, 2025
   Patricia L. Ganci                  Date