1

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| KAJAN JOHNSON, et al., | ) | Case No. 2:21-cv-01189-RFB-BNW |
|---|---|---|
| MIKHAIL CIRKUNOVS, et al., | ) | Case No. 2:25-cv-00914-RFB-BNW |
| PHIL DAVIS, et al., | ) | Case No. 2:25-cv-00946-RFB-BNW |
| Plaintiffs, | ) | Las Vegas, Nevada |
| vs. | ) | Thursday, November 20, 2025 |
| | ) | 10:07 a.m. |
| ZUFFA, LLC; TKO OPERATING COMPANY, LLC f/k/a Zuffa Parent, LLC (d/b/a Ultimate Fighting Championship and UFC); and ENDEAVOR GROUP HOLDINGS, INC., | | STATUS CONFERENCE |
| | | ***C E R T I F I E D  C O P Y*** |
| Defendants. | | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

THE HONORABLE RICHARD F. BOULWARE, II,
UNITED STATES DISTRICT JUDGE

APPEARANCES:      See next page

COURT REPORTER:      Patricia L. Ganci, RMR, CRR
United States District Court
333 Las Vegas Boulevard South, Room 1334
Las Vegas, Nevada  89101

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

APPEARANCES:

For the Plaintiffs:

**KATRINA STARK, ESQ.**
CLAGGETT & SYKES
4101 Meadows Lane, Suite 100
Las Vegas, Nevada 89107
(702) 903-1353

**MICHAEL C. DELL'ANGELO, ESQ.**
**PATRICK F. MADDEN, ESQ.**
BERGER & MONTAGUE, P.C.
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000

**JOSEPH SAVERI, ESQ.**
THE JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1505
San Francisco, California 94108
(415) 500-6800

For the Defendants:

**J. COLBY WILLIAMS, ESQ.**
**SAMUEL MIRKOVICH, ESQ.**
CAMPBELL & WILLIAMS
700 South 7th Street
Las Vegas, Nevada 89101
(702)382-5222

**AARON T. CHIU, ESQ.**
LATHAM & WATKINS, LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
(415) 391-0600

**AGBEKO C. PETTY, ESQ.**
DUNN ISAACSON & RHEE, LLP
401 Ninth Street NW
Washington DC 20004
(202) 240-2900

**JOSEPH AXELRAD, ESQ.**
**ROBERT MEDINA, ESQ.**
**ADAM B. PETERSON, ESQ.**
LATHAM & WATKINS, LLP
10250 Constellation Boulevard, Suite 1100
Los Angeles, California 90067
(424) 653-5500

PATRICIA L. GANCI, RMR, CRR

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

LAS VEGAS, NEVADA; THURSDAY, NOVEMBER 20, 2025; 10:07 A.M.

--oOo--

P R O C E E D I N G S

THE COURT:  Please be seated.

COURTROOM ADMINISTRATOR:  Good morning.  We have three matters set for status conference, first being 21-cv-1189-RFB, *Johnson versus Zuffa, et al.*; Case Number 25-cv-914-RFB, *Cirkunovs v. Zuffa, et al.;* and 25-cv-946-RFB, *Davis v. Zuffa, et al.*

Counsel, please make your appearances, beginning with the petitioners.

MR. DELL'ANGELO:  Good morning, Your Honor.  Michael Dell'Angelo from the law firm of Berger Montague on behalf of the plaintiffs.

MR. MADDEN:  Good morning, Your Honor.  Patrick Madden from Berger Montague on behalf of the plaintiffs.

MR. SAVERI:  Good morning, Your Honor.  Joseph Saveri on behalf of the plaintiffs.

THE COURT:  Good morning.

MR. CHIU:  Good morning, Your Honor.  Aaron Chiu of Latham & Watkins on behalf of defendants.

MR. AXELRAD:  Good morning, Your Honor.  Joseph Axelrad, Latham & Watkins, also on behalf of defendants.

MS. PETTY:  Good morning, Your Honor.  Agbeko Petty of Dunn Isaacson Rhee on behalf of defendants.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. MEDINA:  Good morning, Your Honor.  Robert Medina of Latham & Watkins on behalf of defendants.

MR. PETERSON:  Good morning, Your Honor.  Adam Peterson, Latham and Watkins, also on behalf of defendants.

MR. WILLIAMS:  Good morning, Your Honor.  Colby Williams, Campbell & Williams, on behalf of defendants.

MR. MIRKOVICH:  Good morning.  Samuel Mirkovich, Campbell & Williams, on behalf of defendants.

THE COURT:  Good morning.  We have a few matters to go through here.  Let me pull up my notes.

(Pause.)

THE COURT:  So I've reviewed the submissions of the parties in this case.  I know that you all have presentations that you'd like to make, although the presentations seem to me to be duplicative of what's already been put into the submissions.  So I'll give you an opportunity if you want to add something that's not in a submission, if somehow there's an update you'd like to give me, you can do that now.  But I don't need to go through presentation of material that's already been well-documented in your very extensive filings in this case.

Mr. Dell'Angelo, I'll start with you.

MR. DELL'ANGELO:  Thank you, Your Honor.  Good morning.

I guess the one thing I would note is we -- we tried to just detail something that was in our November 7th statement, and it's one of the two materials that we e-mailed to the

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

spreadsheet -- excuse me -- that we e-mailed to the Court yesterday.

THE COURT: I'm sorry. Say that again, Mr. Dell'Angelo.

MR. DELL'ANGELO: It was one of the two materials that we e-mailed to the Court yesterday. It was a spreadsheet in PDF form entitled "Defendants' Produced PAR Agreements, July '15 to the Present." And I just note that, Your Honor, because what we tried to do was just provide a very detailed analysis of a matter that we discussed regarding the negotiation documents in the statement.

And what this spreadsheet attempts to show, what we did, Your Honor, was we attempted to identify every single PAR agreement in the production thus far. It's in that mass of about 153,000 documents from -- produced from Ms. Long's files, but we went through the entire production. We detailed 2,813 PAR agreements that were -- that we identified from July 15th [sic] to the present.

We added a demarcation line on Page 26 for October 7 -- beginning October 7, 2020, to the present. We've indicated that in orange. And what that attempts to show is the period -- October 7, 2020, as best we can tell, is about the period when Zuffa began implementing arbitration clauses. And then what we did in the far -- so we -- we indicated it by fighter and the Bates number for the PAR agreement in the production, and then

the next column is the effective date.

And lastly and most importantly, why we did this, there are about 1,400 agreements in that arbitration period.

THE COURT:  Right.  You want to draw my attention to the blank column.  Is that what you're telling me?

MR. DELL'ANGELO:  Yes, that there are not negotiations -- we could not identify anything that constitutes a substantive negotiation regarding the PAR agreements listed.  So that -- that's, I think, the one big piece of additional information that we'd like to address.

THE COURT:  Okay.  Thank you.

Mr. Chiu.

MR. CHIU:  Good morning, Your Honor.

You know, as the Court knows, I think our -- our demonstratives, kind of, reflect what was in the submissions.  I think there are, kind of, two points that I just want to draw to the Court's attention that are additional.

Number one, in response to, you know, Mr. Dell'Angelo's attempt to point to -- the Court to these thousands of PAR agreements for which they claim that there are no negotiating documents, first, that is incorrect.  We have searched for all of that and produced what is -- what --

THE COURT:  So are you saying that there are actually Bates numbers for these documents that they have that you haven't provided?

MR. CHIU:  We have searched for and provided the e-mails and everything that is related to the PAR agreements.

But, number two, I think --

THE COURT:  So hold on.  But I want to clarify this, Mr. Chiu.  Because for Mr. Cirkunovs, there's Bates numbers, but for other people, I don't -- and I haven't seen -- and I've gone through all of your exhibits -- any negotiations, none, right?

MR. CHIU:  No, Your Honor.  What we've -- we have searched for and collected, when the PAR agreements get exchanged with e-mails, everything we have has been produced.

THE COURT:  No, I'm not talking about that.  I'm talking about -- I'm not talking about just the transmittal of the agreement.  The production regarding Cirkunovs is indicative because it talks -- it shows what happens when there's a --

MR. CHIU:  Correct.

THE COURT:  -- a negotiation.  I don't -- I haven't seen anything, at least from what I see in the record, for anyone else besides him.

Is that correct?

MR. CHIU:  No, it has been produced, what we have. And --

THE COURT:  Because I have -- well, I looked in your filing.  I didn't see --

MR. CHIU:  Yeah, and --

THE COURT:  -- any other --

8
2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. CHIU:  And let me address that, Your Honor, because as we said in our filing, the motion to compel arbitration that is at issue before the Court is about Mr. Cirkunovs' claim.

THE COURT:  Okay.  So let me address that right now. You're going to argue to me, right, and I find -- I've already said it's relevant, is the issue of UFC's monopsony or not, right.  I find that to be relevant.

So the issue of how they negotiated is relevant under Nevada law.  The issue of the market position, I find, is relevant under Nevada law, right.  The issue of the extent to which, right, again, there was take-it-or-leave-it tactics that were used, right, repeatedly with fighters is relevant.  So if your position is that we have it and we're not providing it, that's one thing.

MR. CHIU:  That's not our position.

THE COURT:  Okay.

MR. CHIU:  But I think --

THE COURT:  I'm just saying this because I want to make clear about the fact that I read that in your -- in your submission, right.  And I was puzzled by that because I've been very clear, Mr. Chiu, that I find that the market position of UFC, the issue of its monopsony power or not, the issue of its monopoly power and the output market or not are all relevant to a determination of whether or not the arbitration clause is enforceable.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

So I am confused by this argument that somehow only Mr. Cirkunovs' negotiations are relevant when I've previously said that that's not true.

MR. CHIU: Your Honor, respectfully, we disagree. We think the law says otherwise.

THE COURT: I appreciate that, but I've already -- I'm ruling that way and I've ruled that way previously, right. And so -- because, Mr. Chiu, you all are certainly going to argue to me that UFC doesn't have a monopsony, right? I assume you're going to argue that to me, correct?

MR. CHIU: Correct.

THE COURT: Right. So then if you're going to argue that, how is it you can argue that to me, but then not provide any information about it? Because it's absolutely relevant as it relates to the arbitration clause. Because if I were to find, for example, that there was in fact competition, as you all argue to me, that in fact there weren't barriers to entry based upon current market conditions regardless what happened previously, that would be an argument that would support me finding that, in fact, this is an enforceable arbitration clause, there wasn't unequal bargaining power as defined under Nevada law. And so to the extent that UFC had some level of monopsony power, it wasn't sufficient such that the arbitration clause wouldn't be enforceable.

So I'm not sure how it is that you're going to argue to

me that that's not relevant information when that's clearly relevant and you're going to argue it to me, UFC's market position.

MR. CHIU:  Your Honor, two -- two responses to that. First is, again, the claim at issue here that we're seeking to compel to arbitration is Mr. Cirkunovs' claim.  Even if Your Honor believes that this issue of monopsony power is relevant to the unconscionability determination -- which we respectfully disagree.  We think, under the Supreme Court's precedent in *Rent-A-Center* and other Ninth Circuit precedence, if that were correct, an arb- -- an antitrust claim would never get sent to arbitration because in every antitrust case where there's a contract that's being challenged as unlawful or anticompetitive, that's when this arbitration issue arises.

THE COURT:  So you mean to tell me that if there was a 100 percent monopsony, like a mining town, right, that that wouldn't fall into an unconscionable contract?  Because I don't --

MR. CHIU:  There is not one case that plaintiffs have cited or we have found --

THE COURT:  No, no.  My question I'm asking you is, are you telling me that if there literally was a 100 percent monopsony in a labor market that that wouldn't matter and be dispositive or potentially dispositive of the issue of the enforceability of an arbitration clause?

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. CHIU:  I think you would have to look at how it was applied to the specific, let's say, employee at issue.  And I think that's a key distinction.  Because with -- again, Mr. Cirkunovs is the only plaintiff in his -- his claim is the only claim that is subject to the motion to compel arbitration. So this idea that you need evidence -- and, again, we'll get to that because we have produced it, we have searched it, we have committed to producing it -- but the idea that you need evidence of thousands of other fighters and with respect to their negotiations to determine whether with respect to Mr. Cirkunovs, right, the negotiation over the promotional agreement faced -- he faced unconscionable circumstances, that doesn't bear on his claim and the enforceability of the arbitration agreement that he agreed to.  That is what is before the Court.

THE COURT:  So what would they have to show, Mr. Chiu, in your view, to establish, right, an unconscionable arbitration agreement?  Think of the circumstances --

MR. CHIU:  That law is very clear, Your Honor.  There are two prongs.  There's procedural unconscionability --

THE COURT:  No, I know that.  I'm saying in this case specifically, what facts do you think they have to show to demonstrate that?

MR. CHIU:  Well, you've seen the evidence with Mr. Cirkunovs' negotiation --

THE COURT:  No, no.  I'm asking you again.  What facts

do you believe they have to show in this case, right -- and I'm not saying that you think that they exist, but what would be the facts, if they did exist, that would establish, right, an unconscionable contract, procedurally and substantively?

(Court reporter interruption and admonition.)

THE COURT:  Go ahead, Mr. Chiu.

MR. CHIU:  For example, you know, under the Nevada law that talks about what is procedurally and substantively unconscionable, circumstances where there was no opportunity to review the contract and the arbitration provision, that goes to procedural unconscionability.  A situation, unlike Mr. Cirkunovs' situation, where a contract is sent over and under some circumstances of duress or whatever, it's asked to be returned or there's no ability to go back and forth, which is not the case with Mr. Cirkunovs, as you've seen in the evidence.

Situations where the law says, for example, you hide the arbitration provision in an otherwise lengthy agreement and it's not conspicuous, you can't see it, you can't review it.

In a case like this, a situation where there is no movement between the fighters or there's no ability to negotiate re-upping the contract.  That didn't happen here.  Those are the sorts of situations where the law starts to say, you know, look, there may be unconscionability issues here.

And on the substantive piece, right, which plaintiffs don't even challenge, the substantive unconscionability

2:21-cv-01189-RFB-BNW,  2:25-cv-00914-RFB-BNW,  2:25-cv-00946-RFB-BNW

standards under Nevada law talk about things like forcing the plaintiffs to bear the costs of arbitration, right, things like that that are not present in the arbitration agreement here, right.

          And I think that the idea that if -- if a defendant had a 100 percent monopsony share that that is de facto --

          THE COURT:  I didn't say it's de facto.  I'm saying I think that would be relevant, but the question is, do you think that would be relevant to the Court's analysis as it relates to the unconscionability of the arbitration clause?

          MR. CHIU:  We disagree, Your Honor.  We think --

          THE COURT:  You think that it's not -- it wouldn't be relevant at all, you're saying.

          MR. CHIU:  I think when you look at the unconscionability test, the way it would come up in a circumstance is actually in the negotiations.  Did -- did the negotiating party have the ability to go sign somewhere else?  Did they have the ability to walk away from the contract --

          THE COURT:  Yes, but if there's a 100 percent monopsony, they wouldn't have that and they would know that, right.  So --

          MR. CHIU:  That's not the case here, though.

          THE COURT:  I was talking about this, sort of, in terms of the hypothetical, but also in terms of that being a relevant factor.  So I take your point that you're saying, even if it's

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

relevant, there are other factors and other facts that they would --

MR. CHIU:  Absolutely.

THE COURT:  -- that they would have to establish and you think are not present here, but you think that in the context of the arbitration discovery, right, you think it doesn't matter what happens with other fighters, it only matters what happens with one fighter, even though this is a class action.  I mean, there's also a class action waiver, so that's a separate issue.  We're not really getting to that, but --

MR. CHIU:  Well, Your Honor, there's been no class certified yet in either Johnson or in this case.

THE COURT:  Yes, but they're filed as a class action, so I have to treat them that way.  I mean, I can't ignore the fact that they're filed as a class action, right.  Class actions have different approaches as it relates to discovery and other matters.  So it's not simply the case that you have one person, right, and we don't look at anything else as it relates to the class.

Now, I know that the class, in terms of the discovery, focuses certainly on class representatives and that's how these cases proceed, but it sounds to me like you're saying that what happened with any other fighter doesn't actually matter in terms of the Court's determination about the enforceability of the arbitration clause for the class.

MR. CHIU:  That's not what I'm saying, Your Honor.

THE COURT:  Okay.  Go ahead.

MR. CHIU:  What I'm saying is that in this posture, currently the claim that we are seeking to move to compel the arbitration is that of Mr. Cirkunovs.  Yes, he's a class representative, brought a case on behalf of a putative class.  The class has not been certified yet.  All the Court needs to do at this phase is to determine whether Mr. Cirkunovs' agreement with Zuffa to arbitrate any and all claims arising out of his promotional agreement should be compelled to arbitration.

And all the relevant precedence and the law state you have to look at the circumstances of how he entered into his promotional agreement because that is the only operative claim that is before the Court in the Cirkunovs case.  And that is the only claim that we are seeking to move to compel the arbitration.

There is nothing in the law that would suggest you can look at absent class members or -- before a class has been certified that bears on the enforceability of Mr. Cirkunovs' agreement with Zuffa.  That is the arbitration agreement that is at issue and subject to the motion to compel arbitration.

THE COURT:  But, Mr. Chiu, if that were the case, then what would happen in all of these class actions if there's an arbitration agreement?  Potentially -- let's assume that it's enforceable or not enforceable -- each named plaintiff would be

going through this, sort of, on a serial basis, right.  And that, first of all, is not, how I see it, how the law works in the context of class actions where there might be, right, an arbitration clause.

Because if I were to find the arbitration clause to be enforceable, it would apply to the class and you'd ask me to apply it to the class, right.  You wouldn't say, "Okay.  Well, it only applies to Mr. Cirkunovs.  They can bring in a new named plaintiff, and we can do this each time."

Are you saying they could do that?

MR. CHIU:  They could, and they would try to seek to certify a class.  Look, Your Honor, we're not talking about contracts that are form contracts.  These are individually negotiated with terms with individual fighters.  That brings in another issue with this case, right.  That's why this is putting the cart before the horse if you're saying, "Look, we have to look at all the class members."  There's no class that's been certified here.  The only claim and issue that's before the Court is Mr. Cirkunovs' arbitration agreement.

THE COURT:  So your position is that what they need to do is find a class member where the arbitration clause was unenforceable and then they could proceed, but they have to establish that for an individual class representative.

MR. CHIU:  Correct.  I mean, the -- look, Your Honor, we would have -- we would argue, right, if they brought a

separate case and they found someone else who they think the circumstances of the negotiation gave them a better shot at arguing -- arguing unconscionability, right, and let's say Mr. Cirkunovs' claim was compelled to arbitration, we would argue, right, based on the circumstance, yeah, I mean, that should inform the Court's analysis.

But it is an individualized analysis by claim, right. We're -- there's no certified class yet.  This is not a situation where, for example --

THE COURT:  But what you're proposing, the class could never be certified, because what you would be asking me to do is in each case decide that and then only limit my ruling to that case, right.  That's what you're saying to me.  You'd say -- Okay.  If they were to find someone, who --

MR. CHIU:  That is --

THE COURT:  -- who actually satisfied the class, you would still argue to me, "Well, that only applies to this person.  And so, therefore, they can't certify a class because they'd have to prove that for everyone else."

MR. CHIU:  And the law and the FAA recognize that. That's the very point of entering into an arbitration agreement --

THE COURT:  Yes, but if it's unenforceable, you can't use it.  So I can't assume that it's enforceable because if it's unenforceable, right, then there is a class, right.  And so the

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

question isn't whether or not it's solely just enforceable.  The question is, if it's unenforceable, right, how would that work in the context of the class action?  And I don't see how it works in a class action where you're essentially saying to me each class member would have to demonstrate this, and we could go through this literally for years with each new named plaintiff potentially being swapped out based upon my finding.  So --

MR. CHIU:  Your Honor --

THE COURT:  -- I don't agree with that.  I don't agree that that's what the law requires.  I appreciate that.  So let's move on from there because I don't want to go back --

MR. CHIU:  Just --

THE COURT:  -- Mr. Chiu, I don't want to go back and forth on this issue, right.

MR. CHIU:  Just one more issue on this, Your Honor.

THE COURT:  No, Mr. Chiu, I don't want to go back and forth on this issue.

So I want to go back to actually what started this conversation was the issue of what else you want to point out as it relates to discovery in this case.

MR. CHIU:  I think with all the -- the categories that plaintiffs have raised, as indicated in our submissions, we've submitted all -- you know, exemplars of evidence that speak to every one.  You know, on the issue of Mr. Cirkunovs'

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

negotiations, you know, in our submissions, we've -- we've provided the Court with the e-mail exchanges, his text messages with the various individuals at Zuffa that negotiated his contract.  That -- the compensation in his contract, the renewal of his contract.  You know, in our view, you know, plaintiffs have this evidence.  They have what they need to respond to the motion to compel arbitration.

THE COURT:  So I want to address the issue of missing years of text messages for Mr. White and Ms. Long.  Even if we were talking about Cirkunovs, why are there missing years, years, of texts where we know those individuals were involved, and you admitted they were involved, in negotiations of contracts?  I mean, we don't know if we have a complete record, even for Mr. Cirkunovs, because we have missing time for potentially relevant people.

And I'm looking at the device disclosure chart.  The last one that was provided, I think, was -- updated was in October.  I want you to address that because there's a spoliation issue here which I also need to address which is raised by the plaintiffs.

MR. CHIU:  Your Honor, we -- on the -- on the text messages, two points on that.  First is, as plaintiffs' own filings show, they have the other piece of the texts.  So as we --

THE COURT:  That's not what I'm talking about.  I want

20

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

you to address the issue of missing years of texts for Mr. White and Ms. Long, in particular, like, years of missing texts.  How is that possible, Mr. Chiu?

MR. CHIU:  Your Honor, we are -- on the -- on the Mr. White -- Mr. White's texts, we are continuing to look for those.  We have indicated that to plaintiffs, and we're continuing to search for it.  And that's -- that's what -- that's the answer there.

THE COURT:  How is that not spoliation?  Right.  He is an individual who clearly is involved, as you've identified, with negotiating contracts, as is Ms. Long, right.  And between them, literally I have six, seven, eight years of missing texts, like, no texts at all.

How is that not a spoliation issue when they were clearly under a litigation hold?

MR. CHIU:  Your Honor, we disagree it's a spoliation issue.  I don't think plaintiffs have shown it.  We are -- as we've discussed before --

THE COURT:  Mr. Chiu, Mr. White is the head of the organization.  Ms. Long is part of the negotiation.  How are missing texts for individuals who are part of the negotiation not relevant even if we're talking about Mr. Cirkunovs?  How does that not raise a spoliation issue when since 2017 these individuals, but particularly these individuals involved with negotiations, would be on notice of preserving this information?

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

So are you saying that there wasn't a litigation hold during the time period when these texts are missing?

MR. CHIU:  I'm not saying that, Your Honor.

THE COURT:  Okay.

MR. CHIU:  We've had a litigation hold in place.  We are continuing to search for those texts, and it's an ongoing process.

THE COURT:  Well, I appreciate that.  I mean, that's the best that you can say.  I appreciate it, Mr. Chiu.  They're not your phones, your text messages.  And so, again, I just have to ask that because obviously they raised that.  That's a significant issue in this case regarding the negotiations.

Hold on just a moment.  I have one other question for you, Mr. Chiu.

(Pause.)

THE COURT:  So to that issue, Mr. Chiu, I want to ask you this question.  How can I decide, right, this case when there are clearly missing relevant texts for periods and you have no idea where they are, when they will show up?  You're arguing to me that we have a complete record of Mr. Cirkunovs, but you actually can't say that because there's missing information.  Individuals who are clearly involved with negotiations have years of missing texts.

So how is it that the Court shouldn't consider that an issue of spoliation and what should I do about that?

MR. CHIU:  Your Honor, the permissible scope of arbitration-related discovery is narrow.  Our position is that based on what we have produced and we're continuing to look for, plaintiffs have all they need to respond to the motion to compel Mr. Cirkunovs' claim.

THE COURT:  But what I'm saying to you --

MR. CHIU:  With respect --

THE COURT:  But, Mr. Chiu, like, you don't know what was in those texts.  You have no idea, as you stand here today, whether or not the missing years of texts regarding Mr. White and Ms. Long involve Mr. Cirkunovs.  You can't tell me that, right?

MR. CHIU:  Your Honor, I can tell you that what we have is and what we've produced are -- is the negotiations and the e-mails around the time Mr. Cirkunovs negotiated and renewed his contract.  That's what we've --

THE COURT:  But you have --

MR. CHIU:  -- produced before.

THE COURT:  But you have no idea if there are other missing texts.  You don't know that.  You're right.  You have information that you provided, right.  But as it relates to at least those two individuals, and potentially there are other issues regarding search terms that we don't need to talk about now, you can't tell me that you've provided a complete record for Mr. Cirkunovs because you have missing years of information.

Now, you can argue to me that based upon what you're presented, it would appear that the negotiation is complete, and I appreciate that's what you're saying to me that it doesn't seem to be any indication that there is more.  But you can't tell me, right, because you don't know because you haven't seen them, whether or not those individuals who are clearly involved with negotiations have relevant texts, right?

MR. CHIU:  Your Honor, our position is that based on the record, based on what we've found, we believe that that record with respect to Mr. Cirkunovs' negotiations is complete. I will add a couple of more things.

The first is Mr. Cirkunovs himself, if -- to the extent he negotiated, those would be in his possession as well.  And in response to a motion to compel arbitration, plaintiffs always and many times come forth with a declaration or exhibits, things like that, saying, "In my negotiation, this is evidence that supports an unconscionability argument."

So this idea that they're without and it's not complete with respect to negotiations as to specific periods of time to renew a contract -- it's not the entire class period, right. It's not the entire length of the case.  These are distinct periods of time where there's a negotiation that goes on and then they execute the contract.

That's why it's limited.  That's why arbitration discovery, Courts time and time and again recognize it's limited

because it is focussed on a discrete issue of the negotiations and whether a valid agreement to arbitrate was entered into.

And so we would submit that based on we've produced, what we've looked for, what the plaintiffs have with respect to Mr. Cirkunovs' claim, there is a complete record.  There is more than enough for plaintiffs to build an opposition and respond to the motion to compel arbitration and for the Court to make the determination as to whether, with respect to Mr. Cirkunovs' claim, it should be compelled to arbitration.

THE COURT:  Okay.  All right.  Thank you, Mr. Chiu.

Mr. Dell'Angelo, I'll give you an opportunity to respond to that.

MR. DELL'ANGELO:  Thank you, Your Honor.

First, let me just say that returning back to our negotiation chart, and I do think it's -- it's an important segue --

THE COURT:  Well, I want you to start with where Mr. Chiu left off as it relates to Mr. Cirkunovs and negotiations.

MR. DELL'ANGELO:  Sure.

THE COURT:  You obviously raised an issue about missing years of texts for Mr. White and Ms. Long and also just about how the search terms that were used themselves also didn't yield information.

MR. DAVIS:  Right.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

THE COURT:  Right.  I want you to address that as it relates to Mr. Cirkunovs and also as it relates to other individuals and why you think it would be relevant for the Court's consideration regarding the arbitration clause.

MR. DELL'ANGELO:  Happy to do that, Your Honor.  Thank you.

So I'll start with the Ninth Circuit's decision in *Hansen*, and here's what it says and I'll quote at Page 670.  It's 1 F.4th 667.  I'm sorry, at Page 672.  It says, quote, The District Court must hold any motion to compel arbitration in abeyance until the factual issues have been resolved, close quote, and that a District Court, quote, is not authorized to dispose of a motion to compel arbitration until after factual disputes have been resolved, close quote.

Now, we obviously have some significant factual disputes.  To answer your question directly, Your Honor, they did finally on November 14th, right, for a motion to compel arbitration that was filed on May 23rd and a substantial completion deadline of July 17th produce a few text messages among the defendant and Mr. Cirkunovs.  What is missing from that production and from the entire production that we think is directly relevant, and Your -- Your Honor got it exactly right, are all of the internal discussions, right.

So as -- as the Court noted, for example, on Page 9 of our -- of our statement of November 7th, there's this chart

showing these big gaps where Mr. White and Ms. Long's phones are just missing communications.  Those fall right into these arbitration periods.

So we may have communications that Mr. Cirkunovs engaged in, but we do not have or we have no certainty -- because what we heard is that we have exemplars, there are individual negotiations, they're continuing to search, right. What we don't have is what they were saying among themselves, right, whether it's about Mr. Cirkunovs or any other plaintiff -- excuse me -- fighter or negotiation.

And that kind of gets to the -- the larger issue Your Honor was asking about in terms of, like, what -- what do we need to show.  Because part of what we are showing, yes, there's a negotiation, and it's theoretical negotiation with Mr. Cirkunovs, but part of what we are attempting to show is that the market power that they have, the dominance that they have, continued in the same way that this Court found that it did in *Le* where there was a refusal to negotiate, that threats were used, coercion was used, eliminating rivals, that some of the threats were used in a way either you weren't going to fight at all and, therefore, couldn't make a living or the way your bout was structured, that it would result in physical harm.

And -- and if the Court remembers, I think one way to think about this -- so what we're saying is those conditions in their totality are exactly what could show procedural

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

unconscionability because, A, you know that you can't negotiate --

THE COURT:  So, Mr. Dell'Angelo, let me ask you this question.  So do you think the Court at this point has to find that specifically Mr. Cirkunovs was subject to those same conditions?

MR. DELL'ANGELO:  I'm sorry.  I...

THE COURT:  You're arguing to me, right, that the factors which I have previously found for a different time period --

MR. DELL'ANGELO:  Yeah.

THE COURT:  -- continued as it relates to negotiating -- negotiation tactics, bout opponent choices, all these other issues that I had previously found continued.  My question to you is, do you think it's required at this stage for essentially Mr. Cirkunovs to declare or to say in a deposition, "That also applied to me in my negotiations," right, and that would resolve this?  Do you think that's, one, necessary?  And, two, is that something that would happen here?

MR. DELL'ANGELO:  So I -- I don't think that the Court -- just to kind of break it down, I don't think that the Court needs to find every one of those things, right, that it found -- to still find that there was a sufficient environment where someone like Mr. Cirkunovs or any other fighter after October 7, 2020, would say, "I can't really negotiate this thing

successfully" or "I know better than to try."  It would certainly aid our claim and I think it would aid the Court's finding that the motion to compel should be denied and that there's procedural unconscionability if Mr. Cirkunovs were to declare or otherwise testify that it was his understanding that those conditions existed and, you know, that dictated or drove his decision with respect to the contract.

And I will tell you, you know, just to kind of zoom out a little bit, if you think to a situation like we had in *Le*, if you remember one of the named plaintiffs, Mr. Fitch, there was this issue about the video games.  I think it's a really telling story because it's -- it essentially drives what we're talking about here.  Mr. Fitch was, you know, a very successful fighter with the UFC.  He was under contract with them, and he fought at the AKA gym in San Jose.

The UFC decided that it was going to launch a video game, and what it determined was that the agreements that it had with fighters at that time didn't include the video game rights. So they went out to the fighters and said, "Sign this addendum for no consideration and we get your right -- likeness rights for the video game."  Mr. Fitch resisted.

And essentially what happened and what the evidence in the *Le* case showed or would have shown is that the UFC threatened Mr. Fitch's entire gym and said essentially, "If you fight at that gym, you'll never fight for the UFC unless he" --

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

I'm paraphrasing -- "unless he sign" -- "Mr. Fitch signs the agreement," right.  So that's sort of the same thing.

THE COURT:  Okay.  I'm not talking about the old case, though --

MR. DELL'ANGELO:  Yes.

THE COURT:  -- Mr. Dell'Angelo.  I'm talking about the current case, and the current issue before me is the issue of the arbitration clause and what would have to be established, right.  And I agree with the defendants that it's not full merits discovery.  I disagree with them that the issue of the UFC's market power on the input and output side is not relevant as it relates to discovery, and I disagree that negotiation tactics as relates to the fighters are not relevant.

The real focus I wanted you to have relates to this argument about if it's -- if it didn't actually occur in all respects regarding Mr. Cirkunovs, then the Court has to find the arbitration clause enforceable as to him and you have to find a new named plaintiff.

MR. DELL'ANGELO:  I don't -- I do not believe that you need to find all of those things to make a determine- -- determination of procedural unconscionability.

THE COURT:  Well, what do you -- what do you believe that the Court would need to find and what you think the evidence and the record would demonstrate as it relates to unconscionability, procedural and substantive?

MR. DELL'ANGELO:  Well, so -- so, first of all, we've seen nothing that suggests that anything has changed since the Court's finding in 2023.  But --

THE COURT:  Well, that's not really -- so I have to say, I'm not persuaded by that.  You have to -- this is a new case.

MR. DAVIS:  I understand.

THE COURT:  Right.  You can potentially use some of that information as an example of history.  I'm not saying -- but, right, they could have completely changed how they approached negotiations.  I can't assume that negotiation tactics that I found previously continued --

MR. DELL'ANGELO:  Right.

THE COURT:  -- after the class period in those other cases.

MR. DELL'ANGELO:  Yeah.  Understood, Your Honor.

So I think what you would have to find is that there is sufficient indicia of market power, lack of -- lack of alternatives for the fighters, a -- essentially a take-it-or-leave-it environment with respect to these contracts, and, you know, those sorts of things -- and I don't know that it needs to be everything.  So, for example, if they have stopped threatening fighters to give them fighters that would -- bouts that would cause them physical harm as a way to coerce them, I -- but you found all of the other things from -- you know,

that they continued to engage in the other tactics, I don't think that that would be the fulcrum that would tip procedural unconscionability in defendants' favor.

Right.  And I suppose at the end of the day, the way you show those and -- and one of the key ways that you show those things are through the negotiations.  I think that becomes the touchstone, the negotiations with and the internal discussions about.

THE COURT:  And I want you to address briefly the spoliation issue as it relates to these text messages, but also, I mean, there are other messages, direct messages, Instagram messages that appear to be gone or missing.  I want you to address that issue as well, Mr. Dell'Angelo, and how you think the Court should address that.  I know you've identified a three-step process, but --

MR. DELL'ANGELO:  Yep.

THE COURT:  -- that you think that the Court should follow in this case.  And I want to understand what it is exactly, as it relates to the arbitration clause issues, the Court should do regarding that spoliation issue.

MR. DELL'ANGELO:  Sure.

So -- and I do appreciate Your Honor raising those.  We have been asking the same types of questions that Your Honor has, and I think what -- what that has resulted in, in part, you know, we tried to reflect at Exhibits 2 and 3 to our statement

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

as well as that chart -- sorry -- Exhibits 2 and 5 as well as the chart on Page 9 that shows the missing phones.  So --

THE COURT:  And I'm sorry.  I just want to clarify one thing.

MR. DELL'ANGELO:  Right.

THE COURT:  I did see, again, the defendant, UFC, did provide text messages regarding Mr. Cirkunovs.  And I'm sorry.  When did you say you received those?

MR. DELL'ANGELO:  I believe it was November 14th, so it was the day of the statement that defendants' filed their response.

THE COURT:  So prior to them filing the response, had you seen those?

MR. DELL'ANGELO:  No, Your Honor.  Now, I will say there were some documents in the production that mention Mr. Cirkunovs that had been produced earlier, but they weren't the negotiate- -- the, quote, negotiation documents that you were asking about.

THE COURT:  Okay.  All right.  You can go back to the other issue you were --

MR. DELL'ANGELO:  Yes.

THE COURT:  -- discussing.

MR. DELL'ANGELO:  So -- so to address your question, we -- so there's an April disclosure that was voluntary from the defendants about mobile devices.  There was the court-ordered

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

July device disclosure.  And then -- that Your Honor ordered.  And then the magistrate ordered another disclosure that was in October, I believe October 13th, that the defendants have provided.

The issue that we have is that in many ways to the extent that the defendants are saying what they -- what mobile devices they have identified, what's on those devices, what they've actually preserved, and what they have collected or imaged from them, and what they have produced, it's -- it's like a Swiss cheese.  We actually tried to make a chart, and it's very difficult to even line up what's what.

So what I would recommend, to answer your question, Your Honor, is let's set a short timeline, whatever you think is reasonable, one week, two weeks.  Have the defendants take those various disclosures.  We've also -- I think as we indicated in the statement, we found several e-mails where there were cell phones -- where in the e-mail signature of key -- key employees there was a cell phone number that didn't appear in any of those disclosures.  Have the defendants on some short timeline give you a -- give plaintiffs and the -- and the Court a comprehensive list of those devices and say definitively what they've identified, what -- what has been preserved and when, what they've collected, what the volume is, and what they've actually produced and identify --

So, like, if you look at Exhibit 2 to our statement,

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

we've got all of these communication platforms.  There's text chats.  There's WhatsApp.  There's Discord.  There's Twitter.  There's Instagram.  And I think we've shown in a bunch of our papers that we know that these communications are happening on some of these platforms.  I'll say as an aside, Your Honor, I think we're in the process of discovering yet another platform that one of the key defendant employees used to communicate has been -- at least there's been some measure of spoliation that will eventually get to the Court.

But with that kind of disclosure, I think if we have a full, transparent, fulsome disclosure, we can then assess essentially what may have been spoliated, and then the Court can make a decision about how to proceed.  Because I think if you, like, again look at that graphic on Page 9 of our statement, it shows that a key person like Mr. White is missing -- appears to be missing communications for a key arbitra- -- key time relevant to the arbitration agreement.

THE COURT:  Well, let me focus on this issue.

MR. DELL'ANGELO:  Yeah.

THE COURT:  And is it your position that you believe that particularly when it comes to Mr. White and Ms. Long that those are key gaps as it relates to evidence because they were involved with the negotiations for the bout agreements and PAR agreements?  Not necessarily all of them --

MR. DELL'ANGELO:  Yep.

THE COURT:  -- but they were certainly involved.

MR. DELL'ANGELO:  We most certainly do, and for exactly that reason.  And I think what you heard about the negotiation chart, that demonstrative that we provided to the Court yesterday, what -- what we understand the defendants to be telling you is when they say, "If you look at that column that says 'PAR Bates' with the Bates numbers, those are the negotiations."  Because what they really are, almost exclusively, are transmittal e-mails that come to or -- come from or go to Ms. Long.

Okay.  Now, there is a document in the production that I could point you to, Your Honor, that -- where Ms. Long explicitly says, "I don't have authorization to make changes to these contracts."  But be that as it may, it's their position that those are negotiation documents and they're negotiations.  So if Ms. Long is, in fact, a negotiator and those are the negotiations, the fact that her text message are missing, very important.

And this is very important.  What you will see in a handful of those documents in the "PAR Bates" column, they -- they include e-mails from time to time from an individual at Zuffa who is actually doing the negotiation, then e-mailing Ms. Long, saying essentially, "Here are the terms to put in the contract," right, or forwarding an e-mail exchange that may reflect the negotiation.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

So how else might that information get to Ms. Long?  By text message, right.  And if I don't have Mr. Campbell's or Mr. White's or Mr. Maynard's or Mr. Shelby's for any number of periods, as you can see in Exhibit 5 to our statement, then I need Ms. Long.

THE COURT:  So, Mr. Dell'Angelo, the question becomes in this case --

MR. DELL'ANGELO:  Yes.

THE COURT:  -- as opposed to the other cases, how is that relevant with respect to the arbitration clause issue?

MR. DELL'ANGELO:  Two reasons.  One, as the Court identified, the defendants cannot say definitively whether or not the missing documentation or the potentially spoliated documentation includes communications about Mr. Cirkunovs or the negotiation with Mr. Cirkunovs or him just taking the contract as it is.  But, secondly --

THE COURT:  So what would you then be asking me to do?  Let's assume for the moment I were to find that those texts and messages are gone.  They should have been preserved and they weren't, and they were deleted or allowed to be deleted.

What would you then argue to me as it relates to the arbitration clause?

MR. DELL'ANGELO:  I would argue to you, Your Honor, that you do not -- that there's not a sufficient record to make the determination that goes in -- in defendants' favor that the

spoliation may be entirely ripe because what they're trying to do is both hide the issue of arbitration, but essentially how they negotiate generally --

THE COURT:  You would essentially say to me, "They can't enforce the arbitration clause because they deleted messages that they should have preserved and we know these individuals were involved in the negotiations."  That's what you'd ask me to do, right?

MR. DELL'ANGELO:  I would.  And I would add, Your Honor -- and this is the second point I was going to raise before, but it dovetails to exactly what you're asking about -- is, you know, some of the other discovery that we're asking for here, right, are document requests -- I believe it's 8, 9, and 10 -- that we propounded long before this issue -- before the Cirkunovs case was even filed -- that ask about the arbitration clause, discussions about them, why you implemented them, et cetera, right.

So that, too, is missing.

THE COURT:  Well, again, I had already previously found that the fact that they decided to use arbitration clause, to me that wouldn't be relevant to a determination of the enforceability, right.  It's actually a reasonable business decision that they might say, "Well, given what happened with the class action, we would want to have arbitration clauses and a class action waiver."  I don't know why that would be in any

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

way supportive of an argument that the arbitration clause or the class action waiver's unconscionable.  I mean, that --

MR. DELL'ANGELO:  Well --

THE COURT:  -- that's a business decision that's not improper or unlawful.

MR. DELL'ANGELO:  It -- that -- that's one possibility, but I would submit that there are other possibilities for why that arbitration clause may have been implemented and how they thought about it.  And so how they thought about it might be one, like, this is one more thing, you know, that --

THE COURT:  But how would they -- okay.  Other than saying, "We wanted to use it to limit our liability," right, and "we think that the cost of litigation as it relates to going into Federal Court, as we learned from that case, the *Le* case, is not worth it.  And so we want to insert an arbitration clause in our contracts."  I've seen no law that would indicate that somehow the choice to insert an arbitration clause is at all relevant to a determination of liability.  So you're saying that somehow it -- it might relate to unconscionability, but I don't see how.

MR. DELL'ANGELO:  Well --

THE COURT:  I mean, what would be an example of something that they might say about it that you think would be relevant for my consideration of the arbitration clause?

MR. DELL'ANGELO:  So -- so the following, right, the

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

*D.R. Horton* case --

(Court reporter interruption and clarification.)

MR. DELL'ANGELO:  *D.R. Horton*, it's in -- cited in Footnote 1 of our statement, you know, it -- it talks about -- explains procedural unconscionability, and one of the things it -- it talks about is unequal bargaining power, right.  So what -- what we're suggesting about the internal discussions about these arbitration clauses, generally, right, you could have the defendants saying, "Hey, there's this last bit of daylight," right, "and we're going to take that away, too," right.  It's just -- it's sort of the last way -- it's the last one-way ratchet of these, you know, otherwise exclusive long-term contracts, you know.  It's things like that, right.

But the reality is we just don't know because I think what's pretty clear is they're purporting to continue to search for documentation that should have been preserved as far back as 2014 and we still don't have it.  And no matter how many times we've asked and when the Court has demanded a disclosure and the magistrate has demanded a disclosure, we're not getting, you know, full --

THE COURT:  Well, look, they're admitting -- Mr. Chiu said, "We've looked, we don't know where it is," right.  But the issue for me, right, relates to what the impact of that is --

MR. DELL'ANGELO:  Right.

THE COURT:  -- right, you know, in terms of spoliation

and what I should do about it and what the impact is, particularly here procedurally, regarding the arbitration clause.

MR. DELL'ANGELO:  Right.

THE COURT:  So that's why I asked you that question regarding the missing texts and other communications.

MR. DELL'ANGELO:  Yes.

THE COURT:  The other argument that you raise relates to the use of search terms by the defendant regarding agreements and negotiations such that their terms are yielding a fairly small amount of relevant information, and you think that that's improper here because you believe, based upon running your prior search terms in the prior case against the same or similar data, that there is more information out there.

MR. DELL'ANGELO:  Yes.

THE COURT:  So, again, how would that relate to the arbitration clause analysis here?  So let's assume for the moment I agree with that, right.  The question is its relevance for my consideration regarding the motion to compel arbitration.

MR. DELL'ANGELO:  I'm sorry, Your Honor?

THE COURT:  So why does that matter for the motion to compel arbitration?

MR. DELL'ANGELO:  Because --

THE COURT:  What specific information do you believe is missing based upon them using search terms that have a low yield

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

of relevant documents?

MR. DELL'ANGELO:  Well, the -- the -- the document that we began our discussion with today, you know, the chart of negotiations, is a -- is a great starting point.  So their search terms don't include fighter names.  The whole case is about fighters.  Some of the most significant evidence in the case would be, was in the last case and you would expect it to be here, discussions about and with fighters using their names, their nicknames, et cetera.  Those are completely absent from the search terms.  Cirkunovs in a way is proof of concept of that, right.

So we didn't actually get the, quote, negotiation documents that they produced on November 14th.  They got those, right, because they did and they're doing -- what they're saying they're doing is they actually finally searched for his name, but they're not even searching for, like, every iteration of his name.  And so you -- you kind of expand this problem out:  the search terms don't have any fighter names, they don't have most of the competitor names, and they're designed in such a way where, you know, five terms are getting about 70 -- 68 or 70 percent of the documents, and most of those are coming from Ms. Long's files.

And so what it's telling you is to the extent that there are -- there are documents or information that are necessary to decide this motion, the search terms are almost

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

intentionally designed -- I'm not going to describe intent, but they are designed in such a way that they do not capture relevant information.  And an easy way to see that, I mean, one of the analyses that we provided Your Honor is we took some of the most significant documents from the *Le* case, right, like Mr. Shelby's, "I give him a" -- you know, "I lowball him the first time," and Mr. Fertitta's, you know, "Take their oxygen," and so on and so on.  You know, these sort of really substantively --

THE COURT:  Well, I --

MR. DELL'ANGELO:  -- they just don't get captured, right.

THE COURT:  Well, okay.  I know what -- that's why I asked you the question.

MR. DELL'ANGELO:  Yeah.

THE COURT:  I've reviewed what you said that you did.

MR. DELL'ANGELO:  Yeah.

THE COURT:  And I just wanted to figure out, again, why it would be relevant here as it relates to the arbitration clause determination.  Okay.

Let's see here.

Thank you, Mr. Dell'Angelo.  I don't have any more questions for you.

MR. DELL'ANGELO:  Thank you, Your Honor.

THE COURT:  Mr. Chiu, again, I want to make sure I'm

understanding your argument regarding, sort of, the arbitration clause and information. Let's say, for example, Mr. Cirkunovs were to say, "I didn't feel like they really negotiate. Yeah, I said this, but given what they had said, given what I knew, given what -- the market, right, I felt it was a take-it-or-leave-it, right. And I felt that way, right." I assume you would argue to me, if you look at the communications, he's actually negotiating, correct?

MR. CHIU: Correct.

THE COURT: Okay. And so as it relates to the issue of the enforceability of the arbitration clause, you're saying even if individuals were aware of a completely dominant market position, if they nonetheless sought to negotiate, that would be indicative of that. So I guess my question to you is, if you're looking at their statements as being indicative of that, but then they're also saying something separate, how would I resolve that?

Let's just say for the moment, for example, Mr. Cirkunovs were to be deposed and he said, "Look, I didn't feel like I had any choice. Yeah, I asked that just to see what would happen," you would still argue to me that that -- I should discard -- I should disregard that because he actually asked the question. And I'm saying that because it goes to a fundamental problem as it relates to factual issues regarding the enforceability or not of the arbitration clause in terms of what

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

evidence the Court should consider, right.

So let's assume that actually happens.  Mr. Cirkunovs gets deposed and says, "Look, they're the only game in town, right.  On multiple occasions I had heard Mr. Maynard or Mr. Campbell or Mr. White or whoever, sort of, basically go off on me and say, look, you want to go somewhere else, go somewhere else, right.  Take it or leave it."  Let's assume that he said that, right.  How would I in that context resolve that factual dispute as regarding the enforceability of the arbitration clause?  Because part of what you're asking me to do is look at these individual negotiations, but is that a credibility determination or what would I look to to resolve that?

MR. CHIU:  I think it would be a mixed question of fact and law.  Your Honor would look at the evidence before you.  We would argue, nevertheless, under the applicable precedence under the FAA and Nevada law, even if he'd felt a certain way, if you look at his contemporaneous negotiations with Mr. Maynard, who is the person negotiating and texting with him about renewing his contract, that undermines his credibility now, you would make that determination.  We would then argue even notwithstanding that, as a matter of law, that doesn't establish the procedural and substantive unconscionability under Nevada law.  So it's a mixed question of fact and law.  But that's how this gets teed up.

THE COURT:  Well, first of all, this -- again, I go to

the issue about, sort of, how this gets resolved because in other cases, obviously, Mr. Chiu, that's what would actually frequently happen if there wasn't a class action.  If there's an individual, for example, plaintiff and an individual defendant, the Court would look at the circumstances surrounding the signing of the arbitration clause.

And so what I understand you to be arguing to me is that if the Court were to make, let's say, a credibility determination that in fact he felt that way, under the law, that's not enough.  It's a sort of -- it's an objective assessment of his subjective state of mind and the circumstances surrounding his ability to negotiate.

MR. CHIU:  That would be our argument, yes. Absolutely.  And I think the -- I guess I have two points in addition to that, Your Honor.

If you look at the Supreme Court case law, *Rent-A-Center* is a case that, you know, Your Honor cited and numerous other cases, the Supreme Court has made very clear when you're determining kind of whether a valid arbitration agreement exists, you are looking -- under Section 2 of the FAA, you are looking to the specific agreement to arbitrate even if there is a challenge to the entire contract, right, and that's kind of the situation here.

And I think that speaks to, kind of, your question of that would -- we would argue that law kind of bears on this

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

question, right.  The Court's focus needs to be on whether -- yes, notwithstanding -- if we have a situation where Mr. Cirkunovs, let's say, testifies or puts in a declaration and says, "Look, I felt like UFC was the only game in town, but I nevertheless agreed to it," and we say, "Look, there's evidence that he didn't protest and he nevertheless re-upped his promotional agreement," we would argue, "Look, under the relevant binding precedence under the FAA, the Court has to focus specifically, notwithstanding that, that he still nevertheless willingly agreed to the arbitration provision." And if the answer is "yes" based on the Court's determination looking at the record, then it goes to arbitration.

THE COURT:  So then I go back to the question that I had to you before which is, in the context of it being unconscionable, are you saying that what they would have to show is an explicit text or message that said, "Take it or leave it. We're not entertaining any questions.  We're the dominant player here, so you choose"?  Right.  You're saying if there was something like that, that would be closer potentially to unconscionability than asking questions back and forth.

MR. CHIU:  That would be one argument.  I think our -- our position would still be that is not -- under Nevada precedence, there's --

THE COURT:  Because, Mr. Chiu, I'm trying to figure out when you would say that there's, like, a contract adhesion

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

because it sounds to me like you're basically saying if I say yes to the contract, that's all that matters.  And I don't think that that's the law either, right.  You haven't really identified a set of circumstances where you think it would be, right, unconscionable, right.  You're saying to me, "Look, if a person says 'I agree,' that's it.  The Court's analysis ends."

I don't agree with that.  Otherwise, right, you would never find anything unconscionable.  Everything would be -- or enforceable because someone signed the contract, right.  It can't be that simply signing the contract or agreeing to it is enough, right.  Otherwise, you wouldn't have a contract of adhesion.  All contracts of adhesion are entered into, right.  So the question is, what would be the facts that would establish that here?

MR. CHIU:  I think the --

(Defense counsel conferring.)

MR. CHIU:  I mean, if you had situations where, you know, in the text messages or something where Mr. Cirkunovs is, you know, under some sort of -- you know, Mr. Dell'Angelo tried to refer -- refer to the *Le* case, an issue where there's an actual threat or there's a -- you know, an exchange where it's like, "Yeah, you have no other choice.  You have to take it or leave it.  These are the terms."  That's not what happened here. I think we would be closer, maybe.

THE COURT:  Okay.

MR. CHIU:  But to your point, Your Honor, again, under Nevada law, contracts of adhesion have been enforced, right. Contracts of adhesion with arbitration clauses have been enforced.

THE COURT:  Right.  But in order for this standard to actually have any meaning, Mr. Chiu, there has to be a case where, in fact, it's un- -- right, it's unconscionable. Otherwise, it's a nonexistent standard, right, which I don't assume.

MR. CHIU:  No, I agree.

THE COURT:  So there has to be a scenario where that happens.  I'm not saying this is the scenario.  I agree with you Courts have enforced contracts where there is clear unequal bargaining power.  That certainly is not -- I mean, it's a factor, but that's not the touchstone of --

MR. CHIU:  Right.

THE COURT:  -- an unenforceable contract.  Otherwise, you would have almost all of the arbitration clauses would be found to be unconscionable.  But on the other side, there has to be a situation where there are -- in fact, it is unconscionable. And, again, I'm trying to figure out from you, although I know you are not conceding in any way that that's here, what you think that would look like here so that I can measure that against the standard.

And it sounds to me like what you're saying is, there

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

would have to be some communications or other negotiations that would establish it was a take-it-or-leave-it situation more explicitly, one; two, there would have to be some way to establish that he didn't have any choice.  So, in other words, he couldn't go down the block and choose a different organization.

Anything else that you think would have to be demonstrated for there to be a finding of unconscionability?

MR. CHIU:  I mean, there's many -- there are other factors to the unconscionability determination, right.  So if you're just talking about this adhesion piece, I think that's what we're talking about, but there are other things that they would need to show.  There's procedural and substantive --

THE COURT:  Right.

MR. CHIU:  -- unconscionability, and so there would be other factors that we would argue are not present here, right, with respect to how the arbitration clause exists in the agreement.  The terms of that, that goes to this whole substantive unconscionability piece.

So the negotiations is one piece of it -- of a number of factors that under Nevada law the Court would have to look at, looking at the record, to make that determination.

THE COURT:  But --

MR. CHIU:  So I don't want to be -- you know, I understand the Court is focussed on, like, the negotiation

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

piece, but --

THE COURT:  I'm not focussed on that.  What I'm trying to -- what I'm trying to get at, Mr. Chiu, is figuring out what would be, in your view, an unenforceable contract in terms of the facts that it would present.  Because I agree with you the reality of it is in most cases and, in fact, most of the cases where I've had arbitration agreements, I've enforced them.  It's unusual for them not to be enforced, right.  That is certainly not the norm.

However, this case is definitely not the norm either, and it brings up some unique economic circumstances, right.  I've not had -- well, I have one other cases involving a monopsony, but that, I think, adds a unique wrinkle here.  But I think I take your point that you think they'd have to have more here.

I want to ask you another point, which is it does seem to me that it's highly relevant what the market position is of the UFC because, for example, if there was a report that indicated there are five competitors who all had equal shares of the market, it would seem to me that you would certainly argue to me that it's not possible for this to be an unconscionable contract where there are clear and known alternatives, right.

So my -- I go back to this question of why isn't market position relevant.

MR. CHIU:  Because market position -- Your Honor, when

51
2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

you look at the case law, there is no case -- we've looked -- there's no case that has found or made this determination on the enforceability of an arbitration provision on this idea that the defendant is alleged to have any sort of market power.  And I get your point that --

THE COURT:  Mr. Chiu, here's the thing.  Mr. Chiu, this case has always sorts of new aspects to it.  I appreciate that, right.  But there had been no case where a monopsony class had been certified.  And I understand that, but the fact of the matter is I have to take the cases on their unique set of facts because the law also says that to me, too, which is to say, right, each case is unique as relates to the circumstances of the arbitration clause.  The Court has to look at that, right.

And I don't understand how in this case it wouldn't matter how dominant UFC's position is in the input and output market.

MR. CHIU:  It wouldn't matter because the law's very clear when you look at the elements of what amount to an enforceable agreement to arbitrate, you're looking at the circumstances of the individual and the parties and how they came to that agreement.

THE COURT:  So you're saying that a lack of choice doesn't matter?  Because I'm not sure I understand that, right.  Because you would certainly argue to me, as I said, if there are five other competitors who had equal market share that there are

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

five other competitors that were known.  So I don't understand how you're arguing to me that it's not relevant -- I'm not saying dispositive, but it's not relevant to the Court's consideration what the market position is of the UFC even in the context of the particular arbitration clause.

MR. CHIU:  Yeah, Your Honor, I think, again, our position, if that were the case, any time a plaintiff alleges some sort of market power, that could be the issue that holds up the determination of arbitrability.  That's not --

THE COURT:  Okay.  But, Mr. Chiu, you're misunderstanding.  I am not saying that it would be dispositive, but you seem to be arguing to me that it doesn't actually matter, that it's not even relevant, right, for my consideration.  Because that's what I'm focussed on.  I'm not saying that it's a dispositive issue that if there were, as I said earlier, a 100 percent monopsony, like a coal town, that that would mean necessarily those are unconscionable arbitration clauses.  I'm not saying that.

My question to you is about the relevance of this in terms of the arbitration clause analysis.  Because you seem to be suggesting to me that it's not even relevant.  And that's important as I look at the discovery and what needs to be provided or not for my determination.

So why is it not relevant to the analysis?

MR. CHIU:  It's not relevant because, again, when you

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

look at the case law as to what -- what courts look to when making the determination as to whether an arbitration agreement is enforceable, they look to things like substantive and procedural unconscionability.  Okay.  And the idea that -- so just simply because a defendant is alleged to have a certain market share, if that doesn't translate into how the negotiations went, whether the plaintiff willingly nevertheless agreed to a -- to a contract, right, to an arbitration provision, knew about it, had the chance to review it, and signed it, it's not relevant.

THE COURT:  Yes, but you seem -- so then you seem to be saying to me the touchstone is the fact that a person entered into the contract and that they willingly did so, and that unless you can really show that there was some sort of, like, essentially done at gunpoint that the clause is unenforceable, I don't think the law is that extreme.  I'm trying to figure out, like, where the law is as it relates to a situation where someone's signing literally a -- a contract literally at gunpoint versus the level of coercion that is suggested in both procedural and substantive unconscionability.

And so...

MR. CHIU:  I mean --

THE COURT:  Again, I'm not -- I'm not clear why you're saying that this wouldn't be relevant.  I'm not saying, again, it's dispositive, but you seem to be saying that it doesn't

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

matter.

MR. CHIU:  Because I think where -- Your Honor, I think the issue is that plaintiffs keep asking for -- number one, we have produced and I think -- as in our filings, we have produced, at least within Zuffa's possession, documents that speak about this idea of market share and competitors and whatnot.  And, of course, we dispute that there was no competition throughout this period.  Competition has only increased.

But setting that aside, you know, again, it -- when you look at the -- the precedence, they focus on the circumstances of the negotiation and whether the parties willingly entered into the agreement.  That is what is dispositive and that is what matters for determining whether the agreement to arbitrate is enforceable.

Now I, understand, you know, the plaintiffs are trying to suggest, well, market power is relevant.  It's not unless it actually impacts the negotiation.

THE COURT:  But Mr. Cirkunovs clearly would have known, right -- I'm not saying -- I mean, it doesn't seem to me that you can reasonably argue to me that he wouldn't know that UFC was the dominant player in the market.  I mean, that's obviously part of what they're going to say.  I don't hear you saying that he wouldn't have known that.  So that goes into the specific, right, negotiation.

MR. CHIU:  Right.  And -- and our position would be, and under the law, if he nevertheless knew that and agreed to an arbitration clause, it is enforceable.

And I just want -- I want to direct the Court to a passage in the Supreme Court case that I mentioned, *Rent-A-Center*, where the Court was very clear that -- and this is at Page 70 of this opinion, and it's cited in our papers.  And the Court has relied on this case in other decisions enforcing arbitration agreements.

But it says that because Section 2 of the FAA states that a written provision to settle an arbitration -- "by arbitration a controversy is valid, irrevocable, and enforceable without mention of the validity of the contract in which it is contained.  Thus, a party's challenge to another provision of the contract or to the contract as a whole does not present a Court from enforcing a specific agreement to arbitrate.  As a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."

And so in this case, the Supreme Court has made very clear you are looking to the circumstances of the agreement to arbitrate.  In every antitrust case --

THE COURT:  Yes, but hold on, Mr. Chiu.  You can't have it both ways.  You can't say, "Look at the negotiations regarding the contract in total," which is what you provided, but then say, "We're only looking at the arbitration clause."

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

Because what you're going to argue and have argued to me is if you look at the negotiation of the contract itself, which included the arbitration clause, right, that that indicates an ability to negotiate.  So, right, I mean, you're actually asking me to consider the negotiations regarding the contract itself, too, right?

MR. CHIU:  Yeah, but as it relates -- but this is the point as to why this idea of alleging monopoly power in an antitrust case or monopsony power is irrelevant.  Because in every antitrust case where an arbitration provision comes up, there is a contract and the contract is being challenged, right.  The contract is either alleged to be unlawfully exclusive or it is being used to -- as part of a course of monopoly conduct.  Every case in which there's an antitrust claim that gets sent to arbitration, there is a contract.

There is no Court that has ever held that you look at the allegations with respect to the contract being unlawfully exclusive or that it reflects that the defendant has monopoly power and monopsony power to bear on the question of whether there was a valid agreement to arbitrate.  In all those cases --

THE COURT:  But, Mr. Chiu, here's the issue, right, and we don't need to go round and round about this.  If you look at the standard, they use terms like "unequal bargaining power."  They use terms like "take it or leave it."  So it's -- right, they talk about that, right.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

And those are all cases where they found, right, a contract or clause to be unenforceable where the person signed it, right. So it's not the case that simply signing it is enough, right. The Courts, including the Nevada Supreme Court, have looked at issues of take-it-or-leave-it negotiations. So I'm not sure why you're saying that that isn't the case. There are more recent cases than the case you cited which I think talk about, right, the fact that take-it-or-leave-it negotiates are clearly relevant to the enforceability of an arbitration clause. So why would you say that to me that they're not relevant?

MR. CHIU: I didn't say that.

THE COURT: Okay.

MR. CHIU: I said the issue of power, right. The merits issue of power, does that translate into a true take-it-or-leave-it. That's a very different scenario, right.

THE COURT: How else am I -- but, Mr. Chiu, how else am I suppose to evaluate take it or leave it? Because, again, I go back to this question where you say if there are five different grocery stores on the same street, right, one saying "take it or leave it" is certainly different than if there's only one game in town and you say, "You have to leave here, right, this grocery store, and you can't buy food anywhere else." Obviously that matters. So I'm not sure why you're arguing that to me.

MR. CHIU: Why it matters is you still have to look at does that actually translate. This idea of, oh, there's one --

one game in town, does that actually translate into the negotiation and whether the plaintiff nevertheless, knowing that, agreed.

THE COURT: Okay. But, again, we don't have to go back and forth. Obviously, I appreciate your position. I just disagree. It is not the touchstone of these cases in determining the enforceability of the contract whether or not the person actually entered into the contract. Because obviously there are clear case law where the clauses were entered into and the Courts found them not to be enforceable.

So here's what we're going to do. We're going to take a break because I'm going to come back now, given what the parties are arguing, I'm going to make a decision about what we're going to do as it relates to the evidence in this case and what's relevant and some of the discovery issues here. So we'll take about a five-, 10-minute recess and we'll come back.

COURTROOM ADMINISTRATOR: Please rise.

(Recess taken at 11:24 a.m.)

(Resumed at 11:47 a.m.)

THE COURT: Please be seated.

So I've considered the arguments and the submissions of the parties. And I'm just going to make a few findings here. First, I do find that there is a factual dispute between the parties with respect to the circumstances of the negotiation of the arbitration clause itself, and I do find that the

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

negotiations themselves with respect to both the class members and Mr. Cirkunovs is relevant to the Court's inquiry with respect to the motion to compel arbitration.

I also find that the internal discussions between UFC individuals involved with the negotiations, and that's approximately the six people identified by the parties regarding that issue, are also relevant to the Court's consideration with respect to the arbitration clause. Because the Court finds that they would have to determine whether or not, in fact, there was a pattern or policy as it relates to take-it-or-leave-it tactics or other tactics that the Nevada Supreme Court has found to be the basis for unconscionability.

I also find that the market position of the UFC as it relates to its monopsony power and actually monopoly power in the output market is relevant to the Court's inquiry as to the enforceability of the arbitration clause. This includes the percentage of fighters that were controlled or under contract from the UFC.

This also includes, for example, the promotional events that were produced by the UFC in comparison to other alleged competitors.

Now, I want to address the issue of discovery violations, and I'm making some very specific findings here. First, the Court finds that the defendant, UFC, has violated this Court's orders regarding discovery and disclosure in this

case.  Specifically, the Court finds the defendant has and continues to violate this Court's order as it relates to the device disclosure regarding relevant custodians, particularly those involved with the negotiations.  The Court had previously ordered specific and detailed disclosure of device information regarding relevant custodians, but in particular those individuals who have been identified with negotiations, and the Court finds that this is still not complete or done.

The Court finds that this is an ongoing pattern of discovery violations dating back as far as July of this year when defendant failed to meet the Court's deadline as to disclosure.  In addition to this disclosure misconduct, which includes the current issue of the disingenuous use of search terms that have led to limited or minimal disclosure of relevant material, even when it is clear that such material must exist, for example, as documented by the plaintiffs in their briefing, the failure to use appropriate search terms to capture relevant documents related to the arbitration and the negotiation of the arbitration clause in terms of the PAR agreements, the negotiation of the arbitration clause or its part of the negotiations for bout agreements, the use or lack of use of compensation for bouts as a means of coercing the use of the arbitration clause, and the fact that these sources of information or these pieces of information simply have not been identified.  The Court simply doesn't find it credible that

there were literally thousands of contracts here and there has been no production or meaningful production of negotiations regarding these contracts.  There is no justification or explanation for this defiance of the Court's orders.

The Court finds it necessary to take potential remedial action under Rules 26 and 37 with respect to this ongoing pattern of discovery violations.  The Court finds that this ongoing pattern of discovery misconduct has led to continuous delay of the production of relevant material for the purpose of the resolution of the motion to compel arbitration.  For example, even as indicated today, the production only on November 14th of information regarding Mr. Cirkunovs' negotiation of contracts in this case.

At the previous hearing, the Court identified information relevant to the arbitration in order to process for its expeditious production.  The Court set an expedited schedule review based upon the defendants' representation that it could and would provide relevant material identified by the Court. However, while the defendant purports to seek an expeditious resolution of the arbitration clause, the Court finds that the record is clear that it has engaged for months in a pattern of discovery disclosure failures that have and continue to unnecessarily delay the Court's ability to resolve the arbitration issue.

The Court also finds that the plaintiffs have presented

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

and that the Court has confirmed today significant indicia of spoliation of relevant evidence with respect to the Court's resolution of the arbitration clause. For example, the fact that there's been no production as relates to Mr. Cirkunovs or other fighters of text messages, messages, or anything involving Mr. White or Ms. Long for years, despite the fact that they were under a litigation hold, is deeply troubling to the Court. This information should have been preserved, and there is clear indication in the record that the defendant was aware of its obligation and was aware that this evidence should have been preserved and it was not.

The Court, therefore, finds it necessary to order a spoliation hearing in this case to determine the extent and level of the deletion or destruction of evidence in this case.

The Court will also order that the individuals who are involved with the negotiations whose information is missing -- that would include at least Mr. White, Ms. Long, and additionally Mr. Campbell and Mr. Maynard -- will be required to testify at the spoliation hearing to explain what has happened to these missing or lost or deleted messages, e-mails, or correspondence. The Court will consider a request by the plaintiffs for these individuals to be first deposed prior to the spoliation hearing specifically on the issue of missing messages/texts that are relevant to the Court's determination of the arbitration clause.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

The Court is going to order the plaintiffs to provide a proposed list of search terms that it believes will actually capture this information, as indicated in its briefing, by December 1st.  The Court will then set a hearing, and we'll confirm the date of that, to discuss when and how the defendants will be required to conduct a search of the relevant sources pursuant to the proposed search terms by the plaintiffs.  And the defendants will also have an opportunity to suggest edits or modifications to the search requests.

Of course, the defendant will notify the Court if at some point it discovers the missing text messages or direct messages or messages on social media.  The Court finds from the record that clearly such messages existed at some point as it relates to negotiations regarding fighters' contracts and, to date, those messages have not been produced or provided and the defendant, UFC, has represented that it does not know where these messages are and does not have them in its possession, and that the individuals who were involved with the negotiation of these contracts who may have missing messages, texts, or e-mails at this point don't know where they are either.

The Court needs to ascertain what the consequence will be for the potential finding of spoliation and for these discovery violations.  So we're going to come back the week of -- either the week of December 1st or the week of December 8th to go through the schedule that we're going to set.

MR. DELL'ANGELO:  Excuse me, Your Honor.

THE COURT:  Yes.

MR. DELL'ANGELO:  The magistrate has scheduled a hearing for December 4th.  So I think the parties will already be here at that time, if it's helpful to the Court.

THE COURT:  Well, I'm going to communicate with Judge Weksler about my findings today because obviously it will impact what happens in front of her.  So that might be a date that we could use.  I don't know.  I'll look at my calendar.

MR. DELL'ANGELO:  Okay.

THE COURT:  We could use that date.

Now, what we need to do in this case is, again, set forth a list, Mr. Dell'Angelo, of what the plaintiffs are requesting.  As indicated by my order, right, the Court finds the defendants have not engaged in good faith production of discovery in this case.  So what I'm going to need from the plaintiffs is a clear list of the information that it will seek be produced in this case as relates to, for example, search terms and things like that.

Now, you've already identified certain issues in this case.  Now, I will be clear -- let me be clear about this.  Not all the issues in your submission I find necessarily to be relevant.  But the market data, I find to be relevant.  That includes the granular data with respect to compensation for fighters for their relevant time period.

Now, Mr. Chiu, I don't know the extent to which and how much that data is available.  I was a little confused because it seemed like defendants were saying, "We don't have it," even though, again, you objected to its production, but you're saying you don't have some of it.  Can you tell me what it is that you do and don't have?  Because I will consider potentially some modification of my order based upon what defendant has or doesn't have regarding data.

In the previous case, that information was provided, right.  There were clear contracts that indicated amounts and what was paid, right.  I don't know that that exists here, but I thought that there were contracts that were produced here.

So when the defendants were saying, "We don't have some of the granular compensation data," I wasn't sure what it is you were referencing.

MR. CHIU:  Yeah, so, Your Honor, our understanding is we have produced all of the contracts.  The contracts are what contain the compensation data, right.  My only understanding of what plaintiffs are complaining about with respect to compensation data is with respect to the promotional agreements, there's usually a show component and a win component, right.

(Court reporter interruption and clarification.)

MR. CHIU:  A show and a win.  So that the breakdown, that's contained in the contracts.

Now, this idea that -- you know, in terms of

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

granularity, what I understand is we have produced what we have and keep.  So the -- they have the contracts.  The contracts have the compensation data for all the fighters.

THE COURT:  Okay.  Well, let me ask -- thank you, Mr. Chiu -- Mr. Dell'Angelo.  So explain to me what it is, then, that you're missing.

MR. DELL'ANGELO:  With your indulgence, Your Honor, may I have Mr. Madden address that?  He has intimate knowledge of the data.

THE COURT:  Yes.  Mr. Madden, you need to get in front of the microphone, please.

MR. MADDEN:  Yes.  So our understanding is that there's several components of compensation that the UFC has paid fighters over time and that this data is all housed in central systems, not in the contracts themselves, and if you only have the contracts, you don't actually have all the information that you need.

THE COURT:  So what information, Mr. Madden, are you saying...

MR. MADDEN:  Sure.  So in the *Le* case, we had a data set that they produced at the beginning and at the end of the discovery period in *Le*.  And that had the show payment, the win payment, discretionary bonuses, Fight of the Night bonuses, Performance of the Night bonus, KO of the night bonuses, submission bonuses, an other column, letters of agreement, which

can be quite substantial.  They can be hundreds of thousands of dollars in addition to what is on the contract.  And then there's Pay-Per-View points.  There's also a column for signing bonuses that I don't have in front of me as that actually being populated anywhere, but they maintain --

THE COURT:  So, Mr. Madden, hold on a moment.  Was this in a spreadsheet?

MR. MADDEN:  Yes.

THE COURT:  So they just produced the spreadsheet to you.

MR. MADDEN:  In -- in the *Le* case, the output of their system, we said, "This is what we need for these dates."  And so what you have is you have a structured data system behind the scenes.  Someone goes and they push a button and they say, "These are the fields that you need."  And so they produce an output in the form of a spreadsheet.

So it is a spreadsheet, but it's not like it's just something that they had lying around that they're like, "Oh, we have that from over there.  Let's go get it and produce it."  Instead, they went to someone who has access to the system that contains the data and they obtained the data.

This is -- this is something that happens in every case where there's structured data.  Someone has to go and get it.

THE COURT:  So, Mr. Chiu, does this data exist for this relevant time period?

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. CHIU:  So, Your Honor, we have produced what exists, and we've responded to the plaintiffs' interrogatory --

THE COURT:  Okay.  Hold on.  What he described in the previous case, this structured data, does that exist for this current case?

MR. CHIU:  My understanding is that we have produced, and I have examples here of what they have, of these sorts of spreadsheet that provide compensation data and the -- the additional level of granularity they've asked for, which is a new request because previously they had said to us that they are fine with what we produced to them, is -- what we've produced is what we have.

THE COURT:  Do you have -- can you reference for me where in the record I can look at that document?  Did anyone attach it?  I don't know if I saw that to any of -- as an attachment to any of the --

MR. CHIU:  I don't, but I have copies of it here with me if the Court would like to take a look of an example.

THE COURT:  Yes, if you could show it to Mr. Madden --

MR. CHIU:  Sure.

THE COURT:  -- and then I'd be happy to look at it.

(Counsel conferring.)

THE COURT:  If you could --

MR. CHIU:  I provided a copy to them.

THE COURT:  You can approach, Mr. Chiu.

MR. CHIU:  Okay.

I can provide the Court with a Bates range.

THE COURT:  Mr. Chiu, do you have your own copy of this?

MR. CHIU:  I do.

THE COURT:  So, Mr. Madden, do you have an example of what was previously produced that I could look at, the spreadsheet?

MR. DELL'ANGELO:  I do.  I have it -- it's just for -- I've narrowed it just for one fighter, and I've taken out some of the columns that were duplicative.  But I can hand up what I have.  I'm happy to give a copy to them.

COURTROOM ADMINISTRATOR:  Sorry.

MR. DELL'ANGELO:  And I would also note, Your Honor, that Exhibit 26 to our filing is an output of a system that contains some of this data.

THE COURT:  What I'm trying to ascertain, Mr. Madden, is how readily accessible the data is.  Obviously I don't think it would be appropriate to order the defendant to manually recreate information that it doesn't already have in a structured data set.

So, Mr. Chiu, you've seen the document that Mr. Madden handed to me.  Are you saying that the UFC no longer keeps this information?

MR. CHIU:  Sitting here, I -- I can't represent to the

PATRICIA L. GANCI, RMR, CRR

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

Court, you know, what the process of this was, whether it was something created.  My understanding is based on what I just provided to the Court in terms of the compensation data that we pulled and collected, that is what we have and have produced to the plaintiffs.  This is in their possession.  So we can go back and -- and check, but I think what we have done in this process is collect and produce what we have.

THE COURT:  Well, and I know that some of this is more than was requested by them.  So I'm not saying that I would necessarily order you to provide all that, but obviously it matters, Mr. Chiu, in terms of the burden on your client.  If this is in a database, right, it may take someone time to issue the reports, but that's different than having to manually create it --

MR. CHIU:  Right.

THE COURT:  -- which I would not order your client to do.  And I recall from the case previously, as in the example the plaintiff is describing, there's going to be some missing data as it relates to the system anyway.

But I want to know, Mr. Chiu, whether or not this information still exists in terms of it being collected.  It's hard for me to imagine that this isn't information that isn't somehow collected and maintained by your client, but it just may be in a different form at this point.

MR. CHIU:  Yes.  So what we understand, we've been

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

looking into this idea of the breakdown of the show and win. Our understanding is that that was -- that would require, kind of, a manual process to break it down.

THE COURT:  So you don't -- they don't keep it this way anymore, because this is not manual.  This is basically -- looks like a report from a spread- -- excuse me -- from a database.

MR. CHIU:  I can't -- I can't represent to the Court whether this was manual or an export --

THE COURT:  Well, I appreciate that because, again, this is somewhat new at this point because you all just showed this to me today.

MR. MADDEN:  Your Honor, if I may.

Exhibit 26 to our filing, we provided an example of a document we found in their production that is attached to an e-mail from Ms. Deborah Cook to Denitza Batchvarova.  The Excel spreadsheet is called "Fighter Payments Total by Fighter."  And in this document -- so this was in 2020.  We don't have any other version, but in this document, there are specific breakdowns between the show and the win purse.

For example, for Mr. Donald Matthew Grice in -- in Exhibit 26, there's a statement for FX3 show purse and FX3 win purse at 6,000 and 6,000.  This is data that they had as of 2020.  So it is not like it cut off magic -- like, when the *Le* discovery period ended.  They had it in a structured data system.

So it's not clear to me -- and we identified this document to them in letters, and we've identified their hub system as a place where it's describing letters of agreement needing to be accurate in that system.  We believe that this data is still maintained.  We've been asking them for it.  We've been pointing them to places to look.  And maybe the answer is that in addition to the other witnesses Your Honor has ordered, Ms. Cook appears to be their data person, perhaps we should be able to ask questions of her.

THE COURT:  Well, let's separate spoliation out from other information.

MR. MADDEN:  Okay.

THE COURT:  Right.  To me the spoliation issue is significant because I find it directly relevant to the issue of the arbitration clause.  There's missing data.  That has to get resolved, right.  And that's -- the Court is going to prioritize that because the Court finds that to be central to the issues regarding the arbitration clause.

I was simply asking about this compensation data because I do find the market position is relevant, but what I'm going to ask the parties about is what would be your positions regarding what information is relevant to the Court's determination of the market power of the UFC in the context of the negotiation of the arbitration clause.

Now, I know, Mr. Chiu, your position is it's not at all

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

relevant.  I know you've preserved that, but I disagree with that.  So I'm going to ask plaintiffs to outline what they think, and then I'll ask you to comment on that, Mr. Chiu.

Because, Mr. Madden, again, it seems to me what would be potentially relevant would be the market position, obviously, of the UFC as it relates to fighters, the types of fighters, for example, that were under contract.  Now, some of that actually is this FightMetric data which UFC has, but that's, right, a public -- publicly accessible information.

MR. MADDEN:  Yes and no.  It is on a -- a website, but there's built-in, you know, programming that makes it difficult to scrape and it's not accurate.  They have it.  They absolutely -- they're the ones who maintain FightMetric now. They are the ones who have all of the data in a readymade data set that, again, they can just push the button and give to us, but they've been refusing to do it.  And now they're investigating whether they can.

THE COURT:  Well, okay.  Let's back up.  As it relates to the market position, to me what's relevant, which I'm going to order be produced, are the number of fighters under contract each year, what percentage of the market that represents, against the FightMetric data.

Now, if the defendant has that data, they can simply -- I'm going to order them to provide it because they can provide it as part of this production.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

And I asked about the compensation data because I wanted to understand how accessible it is because I think that that's a less relevant factor, potentially relevant, but a less relevant factor.  Now -- unless there's going to be an argument, and I think there's been some discussion in these cases, about the use of certain types of payments also in the context of negotiation or coercion as it relates to resigning PAR agreement or signing a bout agreement.

So for right now, I'm simply just going to order that the defendants find out whether or not they have this data without producing it yet.  But that's what I am going to order as it relates to the market position, which I find is relevant to the consideration here.

As it relates to the negotiations -- I don't have any more questions about the data, Mr. Madden, so if you want to switch.

MR. MADDEN:  Thank you, Your Honor.

THE COURT:  So, Mr. Chiu, I'm not going to order you to at this point do anything other than please find out if you still have this information.  And then we can have a conversation about what is produced.  Again, I'm not sure that I will ultimately order this be produced in this form at all, but I might order something that's a little bit more than what you all have provided but not as complete as this.  But please find out before we next meet what that looks like.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. CHIU:  We will do so.  My understanding, just -- I just want to be clear that the idea that there was a spreadsheet attached to an e-mail suggests it came from a central system, you know, that -- I don't want the Court to think that just because there's an Excel with -- that could have been manually put together.  So we will investigate.  But my understanding is that the additional granularity that they've asked for, we have looked into that.  It's currently not something we can just hit a button on a database and export.  It's something that would be manually put together, but we will double-check and --

THE COURT:  But the question, then, is how -- it was clearly kept previously.  And so -- in a database, and so --

MR. CHIU:  Yeah, I don't -- I can't represent that.  I don't think the Court should just assume that based on an Excel spreadsheet like this that someone didn't, you know, in the *Le* case actually manually put it together.

THE COURT:  I'm pretty sure it wasn't done manually, Mr. Chiu, because there was extensive back-and-forth in the discovery there, and I think that was -- one of the issues was about the burden of production.  And my understanding is this was information that could be provided from a structured set. It might have been the case, Mr. Chiu, that there were multiple databases and this was then put into one.  So that might be why there's missing data, for example.  So you might want to look at whether or not it's an issue of it being in separate databases,

right, and how that would be exported.

Now, as it relates to the production regarding negotiations and -- with the fighters and internally, again, I'm going to ask the plaintiffs to provide me with a list of or their proposal as relates to search terms.

Now, Mr. Dell'Angelo, I want to be clear that as it relates to the arbitration clause-related discovery, this is about the negotiations with the fighters.  This is about internal conversations about negotiations and any policy related to that.  And this also includes internal conversations or documents related to the market position of the UFC.

MR. DELL'ANGELO:  Understood.

THE COURT:  You have other, I believe, related categories, right.  You actually have these issues here that are identified in your brief.  So let me go through -- if you all want to pull this up, we can go through this right now in terms of what I'm ordering to be further produced from the defendant. It's the -- look at the plaintiffs' brief, it's the chart that's in blue.  And we're just going to go through that right now.

Mr. Dell'Angelo, it's my understanding that you don't have an explicit identification of who was negotiating contracts during certain periods of time.  Is that correct?

MR. DELL'ANGELO:  That's correct.  It's the who and at what time.

THE COURT:  But you have evidence of negotiations by

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

these various individuals.  I think there's six individuals, correct?

MR. DELL'ANGELO:  Yes, and I think -- and I think they're -- so, as I understand it, the answer that we have is Dana White, Tracy Long, Hunter Campbell, Mick Maynard, Sean Shelby, Ike Epstein.  So that's six.  But the defendants' answer and I think one of the reasons why we have some -- have had some dissonance on this also said, quote, among others and that it may not be a, quote, complete list.  So -- but those are the six that we're aware of.

THE COURT:  Well, if we have more complete search terms, then you would find that one way or the other, correct?

MR. DELL'ANGELO:  I think that's correct.  I think it's a separate implication for devices potentially, but, yes, Your Honor.

THE COURT:  Well, the other issue, Mr. Dell'Angelo, what I want you to do when you present this proposal to me is I want to know what sources that you're suggesting that they search.

MR. DELL'ANGELO:  Okay.

THE COURT:  Right, because there's devices.  There may be -- I don't know if there's an internal, sort of, document retention system, internal e-mail system, right.  I need to know what it is so that I can rule specifically.

MR. DELL'ANGELO:  We -- we -- with respect to sources

78

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

beyond devices, we will be as specific as we can.  I will say that there has -- we have very little insight into the sources, but I understand -- we will be as specific as we can given what -- with what we have.

THE COURT:  Well, look, there could only be a certain type of source.

MR. DELL'ANGELO:  Sure.

THE COURT:  Like, there are e-mails, there are text messages, there are other messages, right.  And so they have systems that I assume that they represented to you as relates to what e-mail or how they're maintained for UFC employees.

MR. DELL'ANGELO:  No, and I think that -- that's kind of the rub, but we will -- we will do our best, right.  So we can --

THE COURT:  Well, hold on.  I thought we had these custodians or these super custodians and this master list that identified this.

MR. DELL'ANGELO:  Well, we asked a lot of super custodian questions on those types of topics, and we got zero answers.  So what we know, right, are there are mobile devices. We know that there are e-mail systems.  Are there -- are there central systems?  We believe so, but I don't have any detail that I can provide to you that has been provided to us about what those systems are or how kind of departments work.

So as we would in the normal course of discovery, I

2:21-cv-01189-RFB-BNW,  2:25-cv-00914-RFB-BNW,  2:25-cv-00946-RFB-BNW

mean, I can make that kind of proposal to you.  But if you believe or think that we know, for example, or have been told, you know, that, sort of like, "These are the departments and we have central files and we do this," we don't have that information.

THE COURT:  Well, for example, most corporations have some sort of backup system for the e-mails of employees.

MR. DELL'ANGELO:  Right.

THE COURT:  Right.  Now, that may be separated out by a particular office or whatever, but the e-mails are backed up somewhere, right.

MR. DELL'ANGELO:  Yeah.

THE COURT:  And they may have a document retention system.

MR. DELL'ANGELO:  Yes.

THE COURT:  You're saying they haven't even given you any information about that?

MR. DELL'ANGELO:  No, Your Honor, or --

MR. CHIU:  Your Honor, that's just flat-out incorrect.  We've produced documents from 35 custodians.

THE COURT:  Okay.  Hold on.  Wait.  So let's back up for a second, Mr. Chiu, because I know you've produced documents from custodians.  Let me just ask you this question.  Is there a central system as relates to e-mail storage?

MR. CHIU:  When we collect e-mails, we pull it using a

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

vendor.  We've done that in this case.

THE COURT:  I'm sorry.  You pull it using?  I couldn't hear you.

MR. CHIU:  A document -- an e-discovery vendor, right, so that's how all that gets preserved.  And as part of --

THE COURT:  I'm not understanding what that means, Mr. Chiu.  So I guess as I was saying earlier, like, most companies have like a --

MR. CHIU:  An e-mail system.

THE COURT:  -- they have a system that they back up their e-mails in.

MR. CHIU:  Correct.

THE COURT:  And are you saying that you used a vendor to search that system?

MR. CHIU:  Well, how e-discovery works in civil cases is we use an e-discovery vendor to image all the e-mails, right, like collect, and then run search terms and produce what's relevant.  We've done that since the beginning of this case.  So to suggest that they have no idea what e-mails we've searched or collected --

THE COURT:  No.  No, no.  I think that the confusion here, and I want to clarify this, is is there one central system that your document vendor used to extract the e-mails.  So -- or is it the case, right, that you have four or five different systems or there were different systems used over different

PATRICIA L. GANCI, RMR, CRR

periods of time.  So, again, some companies may use a particular system for a certain number of years, and then they use a different backup system for a different numbers of years.

MR. CHIU:  For the relevant period, what we have done is over a course of time, as part of discovery, you do an investigation as to what systems were used.  And if it's relevant for the custodians over the time period, we have collected it all with the vendor to image e-mails, documents, sources of information.  We've been transparent with plaintiffs what sources.  That's why there's fights about this.

But to suggest that they're in the dark as to what custodial sources of e-mail and information or what sources we've searched is just -- is plainly wrong.  They've been getting documents.  We have 35 custodians' e-mails across various defendants.  Those systems are all preserved.  That's how this is done.

THE COURT:  Okay.

MR. DELL'ANGELO:  Wait.  Can I -- may I, just so we're clear about something.

So if -- we've received some text messages from mobile devices, we've received some e-mails, sure, we know those are sources.  But what I think you're asking and what I can assure you that we don't know is we've never been told, for example, "We maintain our e-mail on an AWS system," right.  "We have this document retention or document management software.  We use the

82

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

XYZ software.  We have 10 departments:  marketing, events, accounting, et cetera.  Accounting has central files for one, two, three," right.

So do I know that I got the broadest category e-mail? Sure, that's a source.  But do I know anything beyond that?  No.

THE COURT:  Well, that would only matter, Mr. Dell'Angelo, if somehow you suspected there were sources that they weren't searching that existed, right.  But --

MR. DELL'ANGELO:  Well, that's precisely the issue, though, with --

THE COURT:  Well --

MR. DELL'ANGELO:  -- with the compensation data, for example.  Because we know from before it came from a central system, and now we've been told for months that they're, quote, investigating where it's coming from.

THE COURT:  So here's what we're going to do.  We'll obviously -- I'm obviously going to allow you to search again using your terms.

MR. DELL'ANGELO:  Yes.

THE COURT:  If by extent -- or, excuse me, by that search you encounter other e-mails that you think suggest there's more e-mails that exist that you can't find, then you can let me know.

MR. DELL'ANGELO:  Okay.

THE COURT:  But, clearly, they're searching e-mails and

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

getting hits because they provided e-mails, right.  I mean, there are -- there have been thousands of e-mails provided here. Now, your argument's about the relevance of those.  But there have been thousands of e-mails provided.

So as it relates to that, I don't know that it necessarily matters that you know which system they use so long as they're saying they're searching whatever they have.

MR. DELL'ANGELO:  Sure.  And separate and apart from systems, within, for example, companies or departments, there are sources, right.  And that's all I was really getting to, right.

THE COURT:  Well, no, no.  That's different than, for example, my concern which is, as I said, based on my finding which is about the device disclosure -- that's different -- where they're basically missing devices.  We know they're missing devices --

MR. DELL'ANGELO:  Yeah.

THE COURT:  -- stuff that should have been maintained. What I hear from Mr. Chiu is that "We've searched what we have. We're not saying that there's stuff we're not searching.  Here's what the hits are."  Now you all dispute what is the proper search terms, and I agree with the plaintiffs that they should be broader.  And that's why I'm going to order that those terms be broader.  But I don't find at this point that that's one of the areas, at least as of now, the record indicates, that there

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

is any, sort of, missing server or storage that's not being searched, unlike the devices.

MR. DELL'ANGELO:  Well, I think that there -- there may be something just to be clear about on that, and the contracts -- the contract or the PAR production is a helpful or illustrative point here.

So we asked for PAR agreements, bout agreements.  We've received many.  However, we have asked for a complete set from a central file.  And what we have been told is, "We pulled them from Tracy Long's e-mail.  Those are the contracts."  It's an example of where what we have been asking for and would like certainty about is, is there a central file where you keep all of your contracts, which would be -- sort of in the normal course of business for most large, sophisticated businesses, would not use a single person's Outlook e-mail box as their filing system for, you know, what are probably the most important contracts in the business.

And those are the types -- that's where there's dissonance on the sources, right, where they're saying, "We searched for the contracts.  We went to the, quote, e-mail." And we're saying, "Yes, but is there a separate source for those -- for those contracts like central files?"  We've had a lot of dialogue about that question, but it's illustrative of the types of source issues that I was trying to highlight for Your Honor.

PATRICIA L. GANCI, RMR, CRR

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. CHIU:  Your Honor, I just want to interrupt real quick.  They have all of the contracts from Tracy Long.  She is the keeper of the contracts.  We discussed this with Judge Weksler.  On top of that, we have also separately agreed to go find the central place for these contracts.  So, again --

THE COURT:  So hold on.  I'm sorry, Mr. Chiu.  I want to make sure I'm understanding this.  You're saying that she is the one who keeps the contracts.  And so the contracts are all sent out --

MR. CHIU:  Correct.

THE COURT:  -- by her.  So to the extent a contract went out, she is the person that --

MR. CHIU:  Correct.

THE COURT:  -- you would look through her files because she would have the contract.

MR. CHIU:  When they go find a contract, we go to Ms. Long.

THE COURT:  Right.

MR. CHIU:  Contract.

But in addition to that, what Mr. Dell'Angelo's trying to complain about now, we have separately agreed to go look and see if there's a central file for these contracts.

THE COURT:  Okay.

MR. CHIU:  But as to the contracts, they have all of them.

MR. DELL'ANGELO:  And the point in -- my point in raising that, Your Honor, was not to pick a fight about the contracts, but simply to make the point that there are different sources, like e-mail central files, for types of documents and what we lack insight into.  So I was trying to answer your question very directly when you first answer [sic] it, what do I know about sources and how specific I can be?  I can't be specific about central file --

THE COURT:  Well, first of all, you know that Tracy Long, as a representative, is the one who sends the contracts out.  So you know that you have probably good representation there.  But you don't know whether or not there's some other repository where all the contracts are kept, and they said they're going to look for that.

MR. DELL'ANGELO:  Right.

THE COURT:  Right?

MR. DELL'ANGELO:  Right.  Yeah, and really, at least with respect to the contract point, that was sort of the point of departure, right, where we were saying, "If there's a central file where these are maintained, please pull from there because that is a more complete and reliable source than someone's e-mail."

But then, you know, again, it just gets to the, sort of, larger source question where, you know, we will be as specific as we can, Your Honor, but there just -- there's a lot

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

that we don't know.

THE COURT:  So let me be clear, Mr. Dell'Angelo.  As I said, I made findings about discovery violations.  Those relate specifically to two or a few different areas.  One as relates to this issue of the device disclosures, which I find clearly it should have been updated and clearly there's an issue as it relates to missing information.  Second, I think that the use of the search terms by the defendant are wholly inadequate as a result -- as relates to related materials, as evidenced by the fact that we have no information about negotiations that have been produced, right.

And those are the areas I'm focussed on.  So on your chart, that would be 6 -- 6, 7, 9, 10.  Those are the areas that I'm focussed on.  Those are the areas where I think that, again, there are negotiations.

And, Mr. Chiu, that's what I'm saying to you, look, I just don't find it credible that those things don't exist with the search terms.  I know this is not something you specifically are in charge of, but I will tell you right now I'm very disappointed, which is why I ruled the way I did, with the defendants' production.  And I would expect in the future that it will not involve this type of discovery violation.

Now, I know you disagree with that.  I appreciate that.  And you're not personally responsible for this.  But I am deeply concerned about the nature of this production, specifically in

that area where I believe very strongly that information exists based upon what's already been produced and was late produced on November 14th.  I think the defendants have an obligation to find that and produce that, right.  And the extent of the remedy that the Court may order is going to be directly related to how quickly that happens.  But I want to be very clear about my findings that I made about discovery violations because this is not the first time I've had these issues.

And, again, you've not been involved in this case for all these years, Mr. Chiu, and I appreciate that.  But even in this -- and I'm not talking about, sort of, violations from the *Le* case.  But even in this case going back, there have been issues, and I'm saying that because I want these issues resolved.  And that involves the other issue which I'm going to order, is that I want the devices disclosure chart updated, right, by the defendants by December 1st.  That means a complete list.  Because that list doesn't look complete to me, and maybe I'm missing something compared to what I saw earlier as it relates to -- hold on.  Where's my...

-- all of the platforms and accounts, social media and otherwise, being used by these individuals as it relates to devices.  So I will give you all until December 1st to update that.

MR. DELL'ANGELO:  Excuse me, Your Honor.  Just, I guess, for clarity, I think -- with the disclosure, would your

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

expectation be that the disclosure would indicate the dates when those various communication platforms --

THE COURT:  Yes.

MR. DELL'ANGELO:  -- were in use?

THE COURT:  Right.  When -- what I had ordered previously --

MR. DELL'ANGELO:  Right.

THE COURT:  -- which was, right, which devices are being used, which types of accounts were being used, if there's a Gmail account or some other account, if there's Instagram being used, if there was Twitter or X being used -- all of that should be listed and should have been listed in that chart.  And it's not, right, and it needs to be updated to include that.

And, defendants, you need to go back to the individuals there and get the information.  Because that's not a complete list and that's not a complete list of what I ordered, Mr. Chiu.

Do you have any questions about that?

MR. CHIU:  I -- I have two comments on that, Your Honor, and really it's just our understanding and -- our understanding was coming out of the last conference, we had complied with that disclosure order.  What we had done in the process is we did talk to the individuals as to whether they used these apps for work, right.  And so -- and then on top of that, the information that we disclosed in the disclosure order and then -- we've been through this before with -- before Judge

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

Weksler is what we're able to pull from those devices.  So this idea that there's, like, additional information that we're unable to --

THE COURT:  It's not that, Mr. Chiu.  It's that knowing what was used at the time, even if it turns out that a particular platform doesn't retain messages, right.  I didn't say that you had to produce everything on those devices.  I just simply said, right, you had to identify that, right.  And I -- right, and I had ordered this information previously.  I had never said that there was full compliance with that discovery disclosure order.

And so I -- again, I'm a little confused about you saying that because that's not what I found.  And that's not -- that chart is not what I ordered.  I actually ordered -- I ordered all that information that I'm actually talking about now.  I ordered that previously, and I'm not saying that the defendant has to provide that.  If it's, again, Instagram or some other account that might have been used, but there's no information available, you still have to identify that so that the plaintiffs are aware of that, right.

And so there was -- and I'll go back and look at the multiple conversations that we've had, but I was clear about the need to provide more detailed information and that chart is not in compliance with my order.  So, for the future, I want all of the information about the accounts, the devices, everything,

right, that these individuals have updated.

Any questions about that, Mr. Chiu?

MR. CHIU:  I just want to be clear that we endeavored to comply with the Court's order.  My understanding is that we are only able to pull the data that is available on those devices, right.  And so --

THE COURT:  But you can -- these individuals are -- you're in control.  You can go and ask Ms. Long.

MR. CHIU:  I think the disclosure order, what we put in there, is the product of those conversations.  Did you use this app for -- for UFC-related work?  You know, and that was -- you know, that was the attempt there to kind of provide what we were able to find out.

THE COURT:  So you're saying when you investigated, this is all the information that you retrieved?  Because I -- the plaintiffs have provided information about various accounts. There's the one example, for example, the Instagram message or the direct -- the DM involving one of the fighters that was, quote/unquote, leaked.  I don't know if there's a reference to that account or how that works.

And I'm concerned, Mr. Chiu, because if what you're saying to me is "We investigated, this is the information we got back," that leads to an even greater concern about spoliation of this information because it appears to me from the record that there are a lot more accounts and potential devices that are on

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

that sheet that are simply not being disclosed and I don't know why, right, which is why we're going to have the spoliation hearing.

But I'm going to ask you to go back and update it, and if you come back -- and you can tell me, "Based upon our investigation, this is all we have."  I'm just saying to you based upon what I see in the record, that doesn't appear to be a credible representation.  And, again, this is not a reflection on the fact of whether or not you're asking that question.  But what I'm saying, from your client, that does not seem to be complete or accurate or detailed based upon the record that I have in front of me, which is why I think there's been a violation of my order.  Because I think there was more information and devices that are simply not being listed.  But I will hear from you again when we come back on the 4th, but I would like to have that filed under seal on the 1st.

Mr. Dell'Angelo.

MR. DELL'ANGELO:  Yes, Your Honor.

THE COURT:  Is there something else you wanted to add?

MR. DELL'ANGELO:  No, Your Honor.

THE COURT:  So the other issue, Mr. Dell'Angelo, I want to talk about is the issue of the spoliation of evidence.  I'm going to set a hearing in this case on that, and it appears to me, at least as it relates to the spoliation, there are two clear individuals where there are huge gaps, years of

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

information missing, who will be required to provide information.

Besides those two individuals, Mr. White and Ms. Long, there appear to have been some production for some of these other individuals, but I don't know that I saw the same gaps as it relates to messages for these other individuals.  So I want you to identify for me who you think would be the other individuals who would have to provide testimony.

(Plaintiffs' counsel conferring.)

MR. DELL'ANGELO:  Well, I guess it depends on what the objective of the spoliation.  So the thing is with -- with respect to White and Long, they appear to be very arbitration-specific because of the time period.  There are -- but the problem, I believe, is much larger.

THE COURT:  But, yes, right now I'm focussed on arbitration-specific.

MR. DELL'ANGELO:  Okay.

THE COURT:  This is --

MR. DELL'ANGELO:  Yes.

THE COURT:  If you want to raise it in a separate issue --

MR. DELL'ANGELO:  Understood.

THE COURT:  -- right, the spoliation, we can do that in the other case, but right now I'm focussed on arbitration, right, because the timing of the gaps for them in particular

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

relates to when the arbitration clauses were starting to be enforced, which is of concern to the Court.

MR. DELL'ANGELO:  Yes, and I appreciate that clarification, and it's why I asked.  And I think given that, I think Tracy Long and Dana White are the two key people for that period.  The -- the only other possibility, and I'm looking at this, our Exhibit 5, the second page of Exhibit 5 to our submission, there's a gap for Mr. Shelby on at least one device that begins around mid-2022.  So Long -- Long, White, and to some extent Mr. Shelby.

THE COURT:  And what's the range for that gap?

MR. DELL'ANGELO:  Oh, you know what.  I misspoke, Your Honor.  There's actually two different -- I don't think that that's -- yeah, it's not.  It's Long and White.  So there's two different rows for Mr. Shelby, but it's the same number.

(Plaintiffs' counsel conferring.)

MR. DELL'ANGELO:  Right.  And I guess -- I don't know that this is a spoliation issue, but one thing I would identify is one of the interrogatory answers we got, there was a reference...

(Plaintiffs' counsel conferring.)

MR. DELL'ANGELO:  Excuse me, Your Honor.  I just want to...

(Plaintiffs' counsel conferring.)

MR. DELL'ANGELO:  Yeah.  I think there's one other

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

individual for whom -- whose name appeared where there's not -- there was a device that was never identified.  I can't standing here say that that individual -- that individual's involved in talent relations -- that that ties to arbitration.  So...

THE COURT:  Okay.

MR. DELL'ANGELO:  So I think Long and White are the -- are the two primary ones for the arbitration-specific issues, Your Honor.

THE COURT:  Hold on.  Let me just look at my notes here for a second.

(Pause.)

MR. DELL'ANGELO:  So if I may, Your Honor, just so I'm clear about what I was saying before about that other individual.

So in response to Interrogatory Number 6, an individual who is identified by the defendants as participating in the matchmaking function that would include, as we understand it, the arbitration period is a Christoph Goessing.  And then the disclosures that we have --

THE COURT:  Okay.

MR. DELL'ANGELO:  Yeah.

THE COURT:  And what are the issues as relates to --

MR. DELL'ANGELO:  Well, so he's identified in the Interrogatory Response Number 6 as somebody who's involved in the matchmaking function with Mr. Shelby, Mr. Maynard, and

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

Mr. Campbell, who would all be operative during the arbitration period.

THE COURT:  Right.

MR. DELL'ANGELO:  But from the -- what we don't have is a disclosure that that device had been identi- -- his device had been identified or collected.  So I cannot say standing here that there's a spoliation issue, but what I would say is to the extent -- one way that you could triangulate that is figuring out, you know, does that device exist.  Because to the extent he's communicating with Long or White about arbitration issues --

THE COURT:  Well, that -- okay.  I'm focussed, again, on just what's in this chart.

MR. DELL'ANGELO:  Okay.

THE COURT:  There are two individuals where there's missing information that have been identified as part of negotiations and would be relevant to a decision as relates to the arbitration clause.  And so that's who the spoliation issue will focus on.

MR. DELL'ANGELO:  That's fair, Your Honor.

THE COURT:  Those two individuals.

MR. DELL'ANGELO:  Yep.

THE COURT:  So here's what I'm going to order.  I'm going to order that they will be deposed prior to the Court's hearing related to this issue.  The depositions will be related

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

to the specific issue of spoliation.

Now, I know that you all are probably not going to agree as to the scope of the questions. So before the deposition is taken, we can talk about what that will be on December 4th.

MR. DELL'ANGELO: Okay.

THE COURT: Because I'm going to order the depositions take place in January and then we'll have a spoliation hearing either in January or in February, early February.

MR. DELL'ANGELO: Your Honor, one thing that I think would aid this process that we've asked the defendants for, both in the requests informally and in those individual subpoenas that we sent out when we were, sort of, told that, you know, we weren't going to get devices through the defendant discovery, was the identification of the carriers that -- so like Verizon, T-Mobile, whatever it may be -- that these individuals used. So it would be helpful if the disclosure that the defendants are going to provide on December 1 would provide carrier information. Because --

THE COURT: It should.

MR. DELL'ANGELO: Okay. Thank you, Your Honor.

THE COURT: All right.

Anything else, Mr. Dell'Angelo?

MR. DELL'ANGELO: No, Your Honor. Thank you.

THE COURT: Mr. Chiu, anything else from the defendants

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

at this time?

MR. CHIU:  Your Honor, I would just raise one issue on the disclosure device.  December 1, just with the Thanksgiving holiday next week in terms of just --

THE COURT:  Well, because you have to go back and talk to people.

MR. CHIU:  Correct.

THE COURT:  Oh, okay.  So here's what I will say.  I want it to be complete, obviously, for the next time.  So what we'll do is -- what I want you to do, Mr. Chiu, is at least be able to tell me by the 4th how much longer it will take, right.  Because on the 4th, what we will do is we will go through the search terms and the searches, and we'll -- and I will approve, modify, reject, whatever is before me.  But we'll focus on that for the December 4th hearing.

MR. DELL'ANGELO:  Excuse me, Your Honor.  Michael Dell'Angelo.

May we at least in the meantime get the carrier information?  Because one thing that we can do is issue a subpoena to the carriers, and I think that that -- that information would be very helpful.  I don't think that that needs to wait until December 4th.

THE COURT:  I think that's a reasonable request, Mr. Chiu, particularly as it relates to Mr. Long -- excuse me -- Ms. Long and Mr. White, right.  Those are obviously the focus of

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

the Court as relates to spoliation in particular.  So let's start, Mr. Chiu, with those because I think it is reasonable to expect that the carrier information can, in fact, be provided for the four devices that are identified for those individuals here.  That should not be difficult at all to provide by December 1st.  Actually, I'm not sure it would be difficult to provide for any of these individuals, but those are the individuals that I'm focussed on as it relates to the spoliation issue.  But we still need to have the disclosure be complete.  But let's focus on those first.

All right.  Any other questions about what I've ordered today?  Mr. Dell'Angelo?

MR. DELL'ANGELO:  No, Your Honor.  Thank you.

THE COURT:  Mr. Chiu?

MR. CHIU:  No, Your Honor.

THE COURT:  Hold on just a moment.  You all can take your seats for a moment.

(Court conferring with law clerk.)

THE COURT:  We have to set the time for December 4th hearing.

(Court conferring with courtroom administrator.)

THE COURT:  So I'm going to set you all to come back on 12 o'clock on the 4th and I think -- well, why don't we say 1 o'clock.  You guys are with Judge Weksler in the morning, and then you'll be with me in the afternoon.  And I'll coordinate

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

with Judge Weksler and make sure we're not working at cross-purposes.

Is there anything else that we need to do today, then? Mr. Dell'Angelo?

MR. DELL'ANGELO:  Yeah, I just have a question, Your Honor.

I'm just wondering if we could revisit at least having a tentative deadline for the disclosure.  I know you said that you would ask for an update of when it could be done on December 4th.  My concern is that -- and I completely respect the need for additional time around the holidays, but we only have two custodians.  And then, you know, we come back on December 4th, we're getting into Christmas and we're going to be, sort of, back in the same loop.  So if we're going to be before you in January at a hearing, there's a lot -- a lot that we may need to do to get prepared for that.  So if we could even just set a tentative of December 11th or something like that, it would be helpful.

THE COURT:  Well, so here's what I will tell you, Mr. Dell'Angelo.  I'm focussed on two individuals because that's the issue in terms of the information.

MR. DELL'ANGELO:  Okay.

THE COURT:  The Device Disclosure Order needs to be updated probably for everyone, but I'm focussed on those two individuals because that's where there's missing information.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. DELL'ANGELO:  Right.

THE COURT:  You haven't highlighted yet for me whether or not there's information missing from other individuals or sources that would have information that's not been produced. So from my perspective, I would expect that in December the information would be fully disclosed for Mr. White and Ms. Long, but I would give the defendant a little more time for the other individuals because the focus for me is going to be on those individuals in particular and then also the searches that need to be run regarding the issue of arbitration.

So I'll hear from the defendant -- from Mr. Chiu on December 4th about that, but it is my expectation that as relates at least to Mr. White and Ms. Long, that information would be completed, Mr. Chiu, in December at a minimum.  And then for the other individuals, I would allow for a little more time into the following year, but I want to deal with the spoliation issue as quickly as possible.  And so that should be the priority of the defendant.

MR. CHIU:  Understood, Your Honor.

THE COURT:  Okay.

MR. DELL'ANGELO:  Thank you, Your Honor.

THE COURT:  All right.  I hesitate to ask if there's anything else, Mr. Dell'Angelo.

MR. DELL'ANGELO:  There is not, Your Honor.  I appreciate it, though.

102

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

THE COURT:  Mr. Chiu, anything else?

MR. CHIU:  Nothing further, Your Honor.

THE COURT:  All right.  We will be adjourned on this case.  Thank you.

MR. DELL'ANGELO:  Thank you, Your Honor.

(Whereupon proceedings concluded at 12:59 p.m.)

--oOo--

COURT REPORTER'S CERTIFICATE

I, PATRICIA L. GANCI, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  November 20, 2025.

/s/ **Patricia L. Ganci**

Patricia L. Ganci, RMR, CRR

PATRICIA L. GANCI, RMR, CRR