1

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

KAJAN JOHNSON, et al.,                ) Case No. 2:21-cv-01189-RFB-BNW
                                      )
MIKHAIL CIRKUNOVS, et al.,            ) Case No. 2:25-cv-00914-RFB-BNW
                                      )
PHIL DAVIS, et al.,                   ) Case No. 2:25-cv-00946-RFB-BNW
                                      )
                                      )
                Plaintiffs,           ) Las Vegas, Nevada
                                      ) Thursday, December 4, 2025
        vs.                           ) 10:02 a.m.

ZUFFA, LLC; TKO OPERATING             STATUS CONFERENCE
COMPANY, LLC f/k/a Zuffa
Parent, LLC (d/b/a Ultimate           *C E R T I F I E D   C O P Y*
Fighting Championship and
UFC); and ENDEAVOR GROUP
HOLDINGS, INC.,

                Defendants.
_____

REPORTER'S TRANSCRIPT OF PROCEEDINGS

THE HONORABLE RICHARD F. BOULWARE, II,
UNITED STATES DISTRICT JUDGE

APPEARANCES:        See next page

COURT REPORTER:     Patricia L. Ganci, RMR, CRR
                    United States District Court
                    333 Las Vegas Boulevard South, Room 1334
                    Las Vegas, Nevada  89101

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

PATRICIA L. GANCI, RMR, CRR

2

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

APPEARANCES:

For the Plaintiffs:

**MICHAEL GAYAN, ESQ.**
CLAGGETT & SYKES
4101 Meadows Lane, Suite 100
Las Vegas, Nevada 89107
(702) 903-1353

**MICHAEL C. DELL'ANGELO, ESQ.**
**PATRICK F. MADDEN, ESQ.**
**JEREMY GRADWOHL, ESQ.**
BERGER & MONTAGUE, P.C.
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000

**DANIEL GIFFORD, ESQ.**
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(617) 877-0508

**ITAK MORADI, ESQ.**
THE JOSEPH SAVERI LAW FIRM, INC.
601 California Street, Suite 1505
San Francisco, California 94108
(415) 500-6800

For the Defendants:

**J. COLBY WILLIAMS, ESQ.**
**SAMUEL MIRKOVICH, ESQ.**
CAMPBELL & WILLIAMS
700 South 7th Street
Las Vegas, Nevada 89101
(702)382-5222

**AARON T. CHIU, ESQ.**
LATHAM & WATKINS, LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
(415) 391-0600

////

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

APPEARANCES CONTINUED:

> **JOSEPH AXELRAD, ESQ.**
> **ROBERT MEDINA, ESQ.**
> **ADAM B. PETERSON, ESQ.**
> LATHAM & WATKINS, LLP
> 10250 Constellation Boulevard, Suite 1100
> Los Angeles, California 90067
> (424) 653-5500

LAS VEGAS, NEVADA; THURSDAY, DECEMBER 4, 2025; 10:02 A.M.

--oOo--

P R O C E E D I N G S

THE COURT:  Please be seated.

COURTROOM ADMINISTRATOR:  This is the date and time set for a status conference in cases 2:21-cr-1189-RFB-BNW, Johnson, et al., versus Zuffa, LLC, et al.; Case Number 2:25-cv-914-RFB-BNW, Cirkunovs versus Zuffa, LLC, et al.; and Case Number 2:25-cv-00946-RFB-BNW, Davis versus Zuffa, LLC, et al.

Counsel, starting with the plaintiffs' side, please make your appearances for the record.

MR. DELL'ANGELO:  Good morning, Your Honor.  Michael Dell'Angelo from the law firm of Berger Montague.

MR. MADDEN:  Good morning, Your Honor.  Patrick Madden for Berger Montague.

MR. GRADWOHL:  Good morning, Your Honor.  Jeremy Gradwohl with Berger Montague for the plaintiffs.

MR. GIFFORD:  Good morning.  Daniel Gifford, Cohen

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

Milstein, for plaintiffs.

MR. GAYAN:  Good morning, Your Honor.  Michael Gayan from Claggett & Sykes for plaintiffs.

MS. MORADI:  Good morning.  Itak Moradi for plaintiffs.

MR. CHIU:  Good morning, Your Honor.  Aaron Chiu of Latham & Watkins for the defendants.

MR. AXELRAD:  Good morning, Your Honor.  Joseph Axelrad from Latham & Watkins for defendants.

MR. WILLIAMS:  And good morning, Your Honor.  Colby Williams of Williams & Campbell for the defendants.

MR. MIRKOVICH:  Good morning, Your Honor.  Samuel Mirkovich, Williams & Campbell, for the defendants.

MR. MEDINA:  Good morning, Your Honor.  Robert Medina of Latham & Watkins for defendants.

MR. PETERSON:  Good morning.  Adam Peterson, Latham & Watkins, for defendants.

THE COURT:  Good morning.  So we are here to do a little bit of work today on some of these discovery issues.

And the first thing I wanted to check on on my list of things to discuss is the update to the device disclosure list. Mr. Dell'Angelo, can you talk to me about what information has been provided beyond the carrier information thus far?

MR. DELL'ANGELO:  We received the carrier information for Ms. Long and Mr. White on December 1st timely, I believe, pursuant to the -- your order at the last hearing.  Otherwise,

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

we've not received any additional update since the last hearing, Your Honor.

THE COURT:  Okay.

And, Mr. Chiu, I assume that the remaining carrier information will be forthcoming for the other individuals who are identified, correct?

MR. CHIU:  Your Honor, I think I did want to clarify something with respect to the device disclosure.  Our understanding is that, you know, with respect to Mr. White and Tracy's phone, we've obviously provided the carrier information. We're continuing to run down the gaps in the issues, so we're continuing to investigate that.

With respect to the device disclosures, I think coming out of the last hearing I just wanted to clarify because our original disclosure did have and we have collected and imaged apps, right.  And that was really the issue.

THE COURT:  I'm sorry.  Does that include the carrier information?  Because apps can't -- for example, iCloud has its own app, but it's also the carrier.

MR. CHIU:  Correct.

THE COURT:  So...

MR. CHIU:  So if we're talking about apps, I think our under- -- I think there was a misunderstanding from the last hearing because we did subsequently do a production of information.  That was in response to a dispute we had before

Judge Weksler.  That disclosure did not have the app information because that was about specific information about, for example, how many texts or chat threads there were by device by number, which we produced to plaintiffs.

Our original device disclosure, though, we did look at and image and collect apps, right.  If we're talking about carrier information, we have -- we are in the process of pulling the additional carrier information for the remainder of the custodians on the disclosure.  So I just wanted to clarify.

THE COURT:  Okay.  I appreciate that.

So what I will do is I will give you all until December 15th to finalize disclosure of the carrier information for the remaining people on the device disclosure list.

MR. DELL'ANGELO:  Excuse me, Your Honor.

THE COURT:  Yes.

MR. DELL'ANGELO:  I mean, I think the issue -- one of the issues in addition to the carrier information, however, is there have been three device disclosures:  one just during the meet-and-confer process in April, one pursuant to your order made on July 3rd, and then one pursuant to a directive or order of Magistrate Judge Weksler on October 13th.

The -- part of the issue with those disclosures, though, is they are incomplete.  So for a variety of the custodians --

THE COURT:  So, Mr. Dell'Angelo, what specific

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

information are you requesting that they have not provided?

MR. DELL'ANGELO:  Okay.  I'd be happy to share that with you.  And one thing that we've done, Your Honor, if it would be helpful, is we've actually created a chart that shows all the gaps, so custodian by custodian.  So it -- for example, there is what's the device?  Right.  So for some of the custodians there's a listing of a device.  For many there's no device listed.  For many of them there is a telephone number associated, but for some there are not.

One of the other issues is when did the litigation hold start.  For some of the custodians that information is provided. For many it has been not -- has not been.

When --

THE COURT:  So how would they have identified the litigation hold and when it started?  I'm not sure how it would be device by device.  I mean, it would be for a party, right, but I'm not sure how you would identify that, Mr. Dell'Angelo, by a device, right.

The defendant would have been under a litigation hold right, and I don't know that that begins at a particular, sort of, time for a particular device.  It begins for the party itself and representatives of the party.  So I don't understand that.

MR. DELL'ANGELO:  Well, in theory that's correct.  But I'll tell you that the litigation hold start dates, there's two

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

issues.  One, for many people there is no date provided.  For those where a date has been provided, there are very different dates, right.

That may be because --

THE COURT:  Did you ask them, Mr. Dell'Angelo, where the dates come from?  Because I'm not sure why there would be different dates myself.  It seems like there would be one set date, and that would be it.

MR. DELL'ANGELO:  Right.

THE COURT:  But let's move on because honestly --

MR. DELL'ANGELO:  Okay.

THE COURT:  -- to me that's actually not a significant or major issue.  What other information are you saying is missing?

MR. DELL'ANGELO:  So for texts and non-text communications, when the threads start and when they end in terms of what has been -- what exists and what's been collected.

THE COURT:  What threads?

MR. DELL'ANGELO:  The communication threads.  So a text -- so I'm referring to a text conversation as a thread, say.  So in terms of the data that they have identified and collected, when does it begin, when -- when does it end.  So --

THE COURT:  You mean when is information available and when information is not available?

MR. DELL'ANGELO:  Correct.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

THE COURT:  Okay.  So you're saying you don't have information as to when, for example, there may be texts that are unavailable for various reasons, either they were not stored or they were automatically deleted, right?

MR. DELL'ANGELO:  Correct.  So we have it for some custodians and not others.  And -- and even -- and so -- yeah, so we -- we have it for some and not others.

And then in the July disclosure, one of the things that the defendants provided was when these non-text apps had been imaged, like a WhatsApp or Instagram or Signal.  We have that for -- that's been disclosed for some custodians, but not all custodians.

I mean, if it's -- if it's helpful, Your Honor, I think one efficient way to get to this is if I -- I'd be happy to provide you a copy of this chart.

THE COURT:  So, first of all, Mr. Dell'Angelo, for the future --

MR. DELL'ANGELO:  Yes.

THE COURT:  -- right, you should have provided this to me before today, right.  You shouldn't come to me today and talk to me about gaps and ask for information on a chart I haven't seen and that Mr. Chiu hasn't seen.

MR. DELL'ANGELO:  Yeah.  Well, I have --

THE COURT:  I'm just saying, Mr. Dell'Angelo, when we have these meetings, for the future, I expect you to come

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

prepared, right, because I can't do anything.  They can't respond, right, if you're going to come to me and for the first time present information.  Now I'm happy to discuss other information that you've already presented, but I'm not going to go through that today.  And I'm just saying we're going to be having these meetings, right, and I'm simply not going to discuss with either party something that comes up for the first time here.

MR. DELL'ANGELO:  I understand.

THE COURT:  So for the future, Mr. Dell'Angelo, if you want something at these hearings or if the defendant wants to raise an issue, you have to let me know about that ahead of time, right.  And you've done that in other situations where you filed the list of the issues and we're working off of that.  That's actually what I'm working off --

MR. DELL'ANGELO:  Okay.

THE COURT:  -- right.  I'm not working off this.

MR. DELL'ANGELO:  Yeah.

THE COURT:  So as it relates to the device disclosure, the main thing that I wanted to clarify was the issue of the carrier.

MR. DELL'ANGELO:  Right.

THE COURT:  Now --

MR. DELL'ANGELO:  Well --

THE COURT:  -- I do think that to the extent that they

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

have the information the device type and phone number should also be provided, and that to me seems to be important.  So, for example -- and that was brought up previously, which is the device type, the phone number, and the dates for which information is available or not available.  I think that we talked about that last time.

MR. DELL'ANGELO:  Right.

THE COURT:  So is there any change as it relates to that?  Because they already know about that.  I'd already said that that should be updated.

So, as far as I understand it, right -- and, Mr. Chiu, I'll let you respond -- if there is information that is not available, it's because they don't have it.

MR. DELL'ANGELO:  Right.

THE COURT:  Now, if you want to raise an issue about that, the spoliation issue, which we're going to talk about, that's separate.

MR. DELL'ANGELO:  Okay.

THE COURT:  But we first have to figure out between all of the parties what actually exists.

MR. DELL'ANGELO:  Understood, Your Honor.  And --

THE COURT:  So hold on.

So, Mr. Chiu, let me go back to you because, again, we can have a separate conversation about spoliation and how we deal with that, but I have to know what exists and doesn't

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

exist.  Is there any outstanding information that you're seeking to obtain that you believe that you can obtain that you'll provide?  And I'm going to ask about three specific categories: device type, phone number, and dates of available information.

MR. CHIU:  Okay.  The answer to that, Your Honor, is no.  I think what we had -- understand as issues that have been raised and that we're running down coming out of the last hearing and -- and prior to Mr. Dell'Angelo just raising -- I don't even know what he's talking about in terms of missing custodians and devices -- is the carrier information, which we have now provided with respect to Ms. Long's device and Mr. White's device.  We're running down the remainder of the carrier information for the devices that we have disclosed.

And our understanding was with the -- the July 3rd disclosure, which the Court has, we specifically provided all the information that the Court had asked for, which -- and I have it with me and I can provide the Court with a copy.

THE COURT:  Well, I did want to ask you about one thing --

MR. CHIU:  Yeah.

THE COURT:  -- Mr. Chiu, because I do want to clarify something, which is date of available information.  Because I do think that we all need to understand what information may be available for a device.  So, for example, if you have a phone number for Ms. Long or Mr. White where you have the number, but

you know that there are no text messages associated with that account or there's no message associated with that account, that we do need to identify because --

MR. CHIU:  Right.

THE COURT:  -- I'm going to have a spoliation hearing, but I don't want to have it about stuff that actually exists if it exists.

MR. CHIU:  Right.

THE COURT:  Do you have that information?

MR. CHIU:  We have it and we've provided it to plaintiffs I think -- we've produced that information.  I mean, that is -- honestly, Your Honor, that is frankly how they -- they were able to raise, right, there's a gap in Ms. Long's phone with respect to certain amounts of information, which we're now running down.  They have that information.  That's how they're able to raise those gaps because they know, okay, from this date period we have these texts starting from here to here.  There's a gap.  That -- that's why we're here.

So this idea that they don't have that information, I think is is incorrect, Your Honor, because we have produced and we have logged and we have disclosed apps, phone numbers, devices by custodian.  And, frankly, if there are other issues, of course they can raise them with us and we'll try to look at -- you know, run it down.

But to this point, our understanding of what remains at

dispute is what we're working on before the Court.

THE COURT:  Okay.

MR. DELL'ANGELO:  If I may, Your Honor.

THE COURT:  Uh-huh.

MR. DELL'ANGELO:  Here -- here's -- there are two issues.  The first is -- so here, for example, is the October 13th disclosure that they made in response to Judge Weksler's order.  It has 17 custodians.  Our simple point is, yes, they've disclosed some of the information, but not the information for all of the custodians.  The same --

THE COURT:  Mr. Dell'Angelo, I'm going to ask you this same question.  What information are you talking about, right?

MR. DELL'ANGELO:  Yes.  So this is what I was trying to list, Your Honor.  And just to orient us for a moment, in the statement that we filed that was the subject of our last hearing, there was an exhibit.  It's Number 2 to the defendants' statement, and it shows up in a bunch of places.  And that is where we tried to do what -- just the chart I was holding up for you a moment ago where we tried to summarize certain information about, you know, whether or not there had been a disclosure for specific apps -- sorry -- I believe it's our statement, not defendants'.

But in that statement what we tried to do was summarize in a variety of exhibits exactly what I was talking about this morning, that, you know, the July 3rd and October 13 disclosure,

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

yes, there was a disclosure, but it's not for everybody.  And to the -- and so the info- --

THE COURT:  But, Mr. Dell'Angelo, what I hear Mr. Chiu saying is if there's missing information, it's gone.  Now, we can have a separate conversation about where it went and why they don't have it.  That's -- right, as you point out, that's the purpose of the spoliation hearing.  We're going to have a conversation about that.

MR. DELL'ANGELO:  Okay.

THE COURT:  But you're saying that as if they have it and they're not providing it.  And we need to distinguish between information that you believe that they have and they're not providing because they think there's a privilege or something else or there's some other indicia that it exists versus them saying, "It is what it is.  If you think we have more, show us where it is.  But, otherwise, we don't have anymore."  And then you can make an argument as you have to me about spoliation.

But you're saying these things as if they have it and they're not providing it, right.  And so I don't know why you're saying that specifically because Mr. Chiu has been clear, I mean, even to the point of setting up the spoliation issue, they don't have certain information, right.

MR. DELL'ANGELO:  Okay.

THE COURT:  Right?

16
2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. DELL'ANGELO:  I mean, if the implication is, Your Honor, that -- on the -- for example, taking the October 13th disclosure where their production was 33 or 35 custodians, whatever it was, and they're only listing information for 17, that they just don't -- that they have nothing for the other half, that's fine.

THE COURT:  Well, look, it's not nothing, right, because they've given you something.

MR. DELL'ANGELO:  Yes.

THE COURT:  All I'm saying to you, Mr. Dell'Angelo, is I'm not going to rule on a specific request that is first brought today.  If you identify the gaps and send them a specific request saying, "We want to confirm that this information does not exist," then Mr. Chiu and his colleagues can say, "It does and we're trying to find it," or "We've looked and we don't have it."

But it's not productive for us to come here today and do this because they're not prepared to talk about it.  I don't have anything in front of me, right.  And so let's do this. Send a final list, right, so that we're all on the same page --

MR. DELL'ANGELO:  Okay.

THE COURT:  -- from the device disclosure and just ask them, "Do you have this information," right.  That way if you think that they have it, you can request it, and they can say either we do or don't have it.

So --

MR. DELL'ANGELO:  Okay.

THE COURT:  -- the other thing, though, Mr. Chiu, I will say this.  If they send you that, I would like for you to identify specifically in the production where you've produced it.

MR. CHIU:  Sure.

THE COURT:  What I don't want is for you all to say, "We've already given it to you" without referencing where that is because then we'll be going back and forth.

MR. CHIU:  Absolutely.  I just -- I just would like to make two points very briefly.  Number one, this idea that we're missing custodians on the device disclosure -- just kind of stepping back, right, what we've made clear to plaintiffs on the custodians in the device disclosure that we've disclosed to plaintiffs, it's not that what we haven't disclosed is missing. It's that part of this process is actually we had done the work to talk to the custodians, did they use -- which devices did they use for work and things related to this litigation, right. There ostensibly could be some custodians we did not disclose who said, "I don't use my personal device."

So the insinuation that because, let's say, there's a number of custodians that are not on the disclosure means that there is spoliation is not true.  It's the result of our investigation, right.

Now, if they want to raise and say, "Oh, we think there's something wrong with that because we" -- we'll look into it. But I just -- I want to correct that because I think Mr. Dell'Angelo was trying to insinuate that, "Oh, because there's a gap, that means everybody else was -- you know, their devices are spoliated." That is not what happened here.

And then the second point is to this issue of them missing the beginning and end date of what messages exist for the custodians and devices. In this very disclosure that we gave to plaintiffs coming out of the hearing with Judge Weksler, we have the earliest date of the threads and the latest date for every device, multiple devices, for a number of custodians. This is in their possession. I can provide it to the Court. We have disclosed that information.

THE COURT: This is the October --

MR. CHIU: The beginning date --

THE COURT: This is on the October...

MR. CHIU: Correct.

THE COURT: I already have that, so...

MR. CHIU: Yes. So, again, the suggestion that they don't have it, we've produced that information to them.

THE COURT: So what we don't -- I don't want to go back and forth, Mr. Dell'Angelo.

MR. DELL'ANGELO: Understood.

THE COURT: What I want to do is if you think stuff is

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

missing, I will give you until December 9th, Tuesday of next week, to send a final list of what you think is missing.

And then, Mr. Chiu, I'll give you until the 15th to respond because it sounds like you may say, "Look, we already have it," or "We don't have it."

The one thing I do want to add, Mr. Chiu, which may create some of this confusion. If your investigation indicated that a custodian had a private device that was not used for business, I would like for you to identify, not anything about the device, but which individuals indicated that. That way what we don't have is a situation later on where people are saying, "Well, I used something here for a message and it was not on my personal, but it's on my business," and we're going back and forth. So it's helpful for us to have a record.

You're not -- again, you're not required to -- as of now not required to disclose anything about the device, but I do want you to identify people who through your investigation you have found may have had other personal devices at the time, but didn't use them for business. Okay? Because it sounds like you've already done that, actually.

MR. CHIU: I mean, that's -- that's always the process that happens that leads to this.

THE COURT: Right, as I assume.

MR. CHIU: Yeah.

THE COURT: And, again, I don't think that that would

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

violate any privilege or anything else.  Just simply identifying that --

MR. CHIU:  Which custodians?

THE COURT:  Which custodians may have had other personal devices, right.  And I say that also because that's going to tee up a little bit the spoliation issue which we need to talk about a little bit later.  But that's what I'm going to order the parties to do.  So that was the first thing on my list, the device disclosure list.

The next thing I wanted to ask the parties is, I know I received a status report from -- yesterday from the defendants. Is there any other updates as relates to disclosures?  So, Mr. Chiu, since we were last here, have there been any additional disclosures related to what we discussed last time?

MR. CHIU:  Coming out of the last...

In terms of productions, right, we have -- with respect to the Cirkunovs case, as we indicated, we have committed by December 5th to producing, right, documents, all texts and e-mails, related to -- involving Mr. Cirkunovs.  And that's just consistent with our -- our view from day one that, you know, that -- that is the corpus of the arbitration-related discovery. So we're on track to do that.

THE COURT:  Do you have a sense, since that's tomorrow, of approximately how many documents we're talking about? Because I assume you're pretty much almost done if you're

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

producing it tomorrow.

MR. CHIU:  I -- I don't have the number at my fingertips, but I can provide --

THE COURT:  Well, I'm saying that, Mr. Chiu, because it would be helpful -- sure, take your time -- it would be helpful to place it in context the conversation which we're going to be talking about --

MR. CHIU:  Yeah.

THE COURT:  -- which is I'm sure your response to the search terms and how voluminous that is.  It would be helpful to know in searching for one fighter what you found in terms of the amount of documents and how you did that so we can go back and look at --

MR. CHIU:  Yeah.

THE COURT:  -- this, whatever, 5 million documents and figure out what probably is the realistic number and how we get there.  So could you just confer with your colleagues --

MR. CHIU:  Yeah.

THE COURT:  -- and figure that out.

MR. CHIU:  If you can give me a moment --

THE COURT:  Yes.

MR. CHIU:  -- I believe we have the information.

THE COURT:  Yes.

(Defense counsel conferring.)

MR. CHIU:  So our understanding is it's about 20,000

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

documents:  e-mails, text messages, and then any other files that hit on Mr. Cirkunovs' name.

THE COURT:  Do you have an approximate breakdown -- and you can take a few more minutes -- of e-mails versus correspondence versus text messages?  I mean, 20,000 documents is a fair amount, but his name could appear in lots of different, essentially, irrelevant documents like multiple places like, for example, in an accounting document or something like that.  I mean, right now the focus obviously is going to be related to the contract and contract negotiation and potentially ultimately what he might have been offered and then paid, but 20,000 documents seems like there is some -- more there than would be related to that.

Do you have a breakdown of approximately what that looks like?  And, again, if you could take a moment to confer, it would be helpful.

MR. CHIU:  Sure, if you would just give me a minute.

THE COURT:  Sure, take your time.

(Defense counsel conferring.)

MR. CHIU:  Unfortunately, Your Honor, we can't provide an exact breakdown right now.  We'd have to check with the vendor.  But what I can say is the 20,000 documents is, to your point, like, things that include texts and e-mails that would hit on Mr. Cirkunovs' name.

So it could -- you're right.  It ostensibly could pull

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

in a lot of other information that is beyond, right, the -- the sorts of things that would be relevant to the negotiation period and his contract, whatnot.

THE COURT:  Well, I say that, Mr. Chiu, because it would also be helpful to me in deciding about the search terms and linear review what we could learn from Mr. Cirkunovs in a way that would make the arbitration review manageable.  And I know you disagree about the terms, but I've already made a ruling about what I think is relevant.  But I don't think it should be overly burdensome, and I don't think you should be looking through 5 million documents.  I think there's a more efficient way to do that.

And it seems to me that the Cirkunovs discovery might be a useful microcosm of how we go about doing that.  And I don't know if you all have had a chance to do the final review of that, but, again, it would also be helpful to figure out how you got to those documents.  And then we could talk about potentially doing some type of sampling or something as it relates to the arbitration terms and doing this on a rolling basis.

But it's hard for me to be able to know that without knowing what was produced or what will be produced.

MR. CHIU:  Understood.

(Defense counsel conferring.)

MR. CHIU:  Your Honor, we could run that analysis down

24

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

pretty quickly.  I just -- I don't have it at my fingertips.

THE COURT:  When you say "pretty quickly," how quickly?  Because we were going to be here all day today anyway.  I mean, it would help quite a bit, Mr. Chiu, since we're all here to know that information because I think it will significantly inform my decisions as it relates to the larger search terms regarding arbitration that the plaintiffs have presented.  So can you give me an estimate?  Because I'm happy to take a recess, honestly, to do it.

And really, Mr. Chiu, just so you understand, it doesn't have to be run on every document.  But, for example, what would be helpful would be to have some sense of, okay, there were 50 different versions of contracts.  There were, I don't know, 100 e-mails about the contract, 20 between Mr. Cirkunovs and Zuffa representatives, and 80 or whatever between other individuals.  Because a lot of this is about capturing the discussions about the negotiations for the contracts, right.

I'm not interested in at this point -- although it may be relevant for the larger Johnson discovery, right, but we're setting that aside -- in all of the accounting data necessarily, right, maybe some of the FightMetric data, and we could talk about that, too.  But I would want to know given my rulings about what would be relevant for the arbitration issue what is captured in that.  Is there a way for us to try to figure that

2:21-cv-01189-RFB-BNW,  2:25-cv-00914-RFB-BNW,  2:25-cv-00946-RFB-BNW

out today?

MR. CHIU:  We can try, but it -- it involves, you know, analytics with our vendor.  So we can reach out right now and try to do that, but I -- I can't sit here and guarantee to the Court that we would --

THE COURT:  No, I appreciate that, Mr. Chiu.  And I know that that's a lot of work and you all have a whole team here and it will get done tomorrow in terms of production.  And then after that you can have -- we can have a conversation.  But I just think it would inform our conversation here.  But I appreciate that update as it relates to that.

Anything else, Mr. Chiu, you wanted to update me about as it relates to the production of material that we have previously discussed?

MR. CHIU:  No, Your Honor.

THE COURT:  So one question I had related to that, Mr. Chiu, is this issue of spoliation and what is and isn't missing.  I take it from our prior conversation that as of now the plaintiffs' representations about what may be missing for Mr. Long -- excuse me -- for Ms. Long and Mr. White as of now you have no reason to believe that that information is going to be forthcoming or that you have it and are going to be producing it.  Is that accurate?

MR. CHIU:  That's not accurate.  I think we're continuing to run down these issues.  We're continuing to

investigate.  It's taking some time.  So I don't want to sit here and say it's a foregone conclusion that that information is lost and missing.  We are -- we are continuing to look and figure it out.

THE COURT:  Can you tell me more about that?  Because obviously I'm going to set a spoliation hearing, and the last thing I would want, Mr. Chiu, is like the day before the hearing, right, all of a sudden data is discovered.

MR. CHIU:  Yep.

THE COURT:  And so it's helpful for me to have some sense of the timing of that and, again, without disclosing, sort of, attorney-client privileged conversations, right.  I just don't want to say, like, two days before the hearing for Mr. White and Ms. Long all of a sudden, right --

MR. CHIU:  Yeah.

THE COURT:  -- these texts and messages materialize.  That would be concerning to me.  So can you tell me when you say that we're still searching, what that means?

MR. CHIU:  I want to be careful and just not disclose privileged information, but we're undergoing the process of going back and looking at, you know, why there is a gap and, you know, is there -- are there devices or other places we can look to see if information was not captured.  So that process is ongoing.  I think it takes sometime.  We've been diligently, kind of, working through that for -- and -- and as to --

THE COURT:  Yes, but I'm sorry, Mr. Chiu.  Do you have an estimate for that?  And, look, I want to be honest.  As you know, Rule 37 has some fairly significant potential penalties for spoliation, and I don't want to start down that pathway until I've given you all enough time to be able to say, "We've tried and it's not here," right.  So I need a bit of an estimate, Mr. Chiu, about the timing of that because right now I intend to set the spoliation hearing late January/early February.  That seems to me to be more than enough time to be able to clearly indicate whether this information exists or doesn't.

MR. CHIU:  Yeah, I was going to propose, Your Honor, that, you know, just being realistic as we kind of go through that process, another month, month and a half as we kind of work through that between vendors, you know, obviously talking with individuals, and -- and undergoing that process, so...

THE COURT:  Okay.  Because one of the other things I want to do today was to set a hearing date or a hearing range for the spoliation hearing where at a minimum Ms. Long and Mr. White would testify that's consistent with all of our schedules, their schedule, because we're going to have to obviously go back and forth and figure that out.  But I'm looking at the first or second week of February to do that.  So that's the other thing I was going to tell you all is you all should look at your schedules and you should speak with at least

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

those two individuals, Mr. Chiu, to figure out what their schedules are.

But I definitely want a date within that two weeks.  I think that's a reasonable timeframe to offer to set the hearing, and it's far enough out that I don't think there should be any conflict issues.  And given what you've said, by that point in time we should know one way or another if information's forthcoming or if it's not likely to be produced.

Any reason why those dates wouldn't work, Mr. Chiu?

(Defense counsel conferring.)

MR. WILLIAMS:  Your Honor, Colby Williams.

Just we will need to run down the prospective witnesses' schedules, as you just indicated, but subject to that, I think that timeframe would work.

THE COURT:  Well, I don't want to go passed that.

MR. WILLIAMS:  No, I understand.

THE COURT:  So just when you're talking to the witnesses, if those two weeks don't work, then we'll move it into January, but I don't really, Mr. Williams, want to go passed that.  And I do want to emphasize that this is obviously an important matter and I appreciate people's schedules, but absent something really extraordinary, someone having plans that they've already made to be out of the country or a medical procedure, I would expect that we would be able to find a day or two within that range.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. WILLIAMS:  Understood, Your Honor.

THE COURT:  I appreciate you're hedging as lawyers do, but I do want to emphasize the significance of that hearing. And I think it will probably take -- I'm just going to block a whole day.  And we'll do Mr. White and Ms. Long preferably on the same day so that you all don't have to fly -- well, you're not flying -- but everyone doesn't have to fly back and forth. But I appreciate that.  Thank you, Mr. Williams.

MR. WILLIAMS:  Right, we'll run it down, Your Honor. And I understand the Court's directive.

THE COURT:  All right.

MR. DELL'ANGELO:  Your Honor, may I just request a clarification on that?

THE COURT:  Yes.

MR. DELL'ANGELO:  Because I think at the last hearing you had indicated that in advance of the anticipated spoliation hearing that Mr. White and Ms. Long would sit for deposition on these issues.  Is the plan to still do a deposition before that hearing?

THE COURT:  Well, part of that depends in part, Mr. Dell'Angelo, on what I hear from Mr. Chiu as it relates to the status of their search.

MR. DELL'ANGELO:  Understood.  Okay.  Thank you, Your Honor.

THE COURT:  Because, I mean, I don't -- honestly, I

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

don't know that we need a deposition necessarily.  I think you all can prepare questions and I'll have questions, right.  And we can just come in here and just have the hearing.  I think the issue with the deposition is that just prolongs this process, and if I feel like we need to come back, we can always have them come back, I mean.

But given my experience in this case, I think a depo schedule and you all agreeing to questions and how that -- that's a whole set of hearings that we'd have to have regarding that.  Now, we'll certainly agree to what the questions will be, but, look, as relates to spoliation, the questions are fairly straightforward in terms of what was known and not known about the duty to preserve this information, what steps were taken or not taken, who was involved.

I mean, the only issue that, Mr. Chiu, you'll have to think a little bit about are privilege issues because that's certainly going to come up in the context of this.  But, as you know, the rules are slightly different when it comes to spoliation and privilege.  You know, lawyers can't be advising their clients in ways that destroy evidence.  So it's going to be a bit delicate, and so we'll probably have to have a hearing about the scope of the spoliation hearing before anyway.

But I don't see a reason, Mr. Dell'Angelo, unless you think otherwise, to have a deposition.  I thought about that and I had indicated that, but I think that's just going to prolong

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

this process.

MR. DELL'ANGELO:  I appreciate that, Your Honor.  I mean, I think it could be helpful in setting up the hearing and framing the issues, but I of course defer to Your Honor.  I just wanted to raise it because you had mentioned it last time, and to the extent that we needed to factor that into the schedule, I just wanted to make sure.

THE COURT:  No, but what we will have is we'll have a conversation regarding what the scope will be.  Because what's tricky about this is that the spoliation actually affects all three cases, but I don't know that we need to go into all three cases separately because I think the issue of spoliation affects them all in the same way.

So to the extent that exhibits or information was or was not preserved for Cirkunovs or as relates to Johnson, my questions would be more or less the same because it's missing information, at least as of this moment.

MR. DELL'ANGELO:  Right.

THE COURT:  So I don't -- the spoliation issue, just so we're clear, will cover all three cases.  But I don't know that it will involve, sort of, extensive questioning.  Now, what again I've said is we will have a conversation about the scope of that, but I don't think we need a deposition, unless you all think we need one.  I just don't think we need one at this time.

Mr. Chiu, do you think that would be necessary?

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. CHIU:  Not at all, Your Honor.

THE COURT:  All right.

So let's turn to the issue of the search terms.  So, Mr. Dell'Angelo, I assume that you saw the defendants' status report as relates to the number of documents.

MR. DELL'ANGELO:  I did.

THE COURT:  Now, I don't know and, Mr. Dell'Angelo and Mr. Chiu, it would be helpful for me to know, sort of, further metadata about documents.  Because, certainly, 5 million documents is a fair number of documents, but the source of the documents and other things matters and certainly analytics can be used to narrow that further.  The question really is, sort of, what metadata exists regarding all of those documents such that they could be narrowed.

And so I don't know, Mr. Chiu, if you and Mr. Dell'Angelo have had a conversation about these hits, but it would be helpful for you all to have that conversation before I made a decision.  And I think it would also be helpful, honestly, for me to be able to hear from plaintiffs after they get the Cirkunovs material tomorrow because I'm obviously not going to order defendants to produce 5 million documents, and I don't think the plaintiffs want that either.

So, Mr. Dell'Angelo, I'll start with you in terms of suggestions about how do we approach that.

MR. DELL'ANGELO:  I very much appreciate that, Your

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

Honor, because I -- we have several.  So these would be, sort of, a friendly amendment to your questions to the defendants about, you know, how -- how they're, sort of, categorizing the Cirkunovs documents.

So we, too, have an interest in making this process efficient for the arbitration terms in particular.  So I think there's a handful of pieces of very high-level information that, I mean, frankly are probably available immediately.  I suspect we could get that information today and discuss it as a group.

But -- and I'll just run through those.  The first would be the hit report, right.  So what the hit report does, these are routinely exchanged, is just shows for each term how many hits in the document set that particular term returns.  It's -- it's standard in all these document negotiations and search term negotiations.  One reason that's a really effective process, Your Honor, is say you've got one term that's returning a really disproportionate number of hits, you know, generally what the parties will do is try to find a way to, you know, understand why that term is doing that and how to fix it.

I mean, a simple example might be, it might be that a fighter name is also the same name of somebody who works in a particular document -- department who has a large number of e-mails, so you're capturing all of those people's e-mails when it's not really what you're -- you're after.  Or maybe there's just -- you know, we have a lot of fighter names here --

THE COURT: Okay. All right. So --

MR. DELL'ANGELO: Yeah. Okay. Right.

THE COURT: -- get the hit list. That's Request Number 1.

MR. DELL'ANGELO: So hit report. I think it's also really important here, Your Honor, to make sure the search terms, plaintiffs' search terms, as they were run that we know the timeframe because, as Your Honor knows, the arbitration period really begins in 2020. So I want to make sure that it's really just being run on 2020 forward.

THE COURT: I would assume that would be in the hit report, right? I mean, it would have to be -- well --

MR. DELL'ANGELO: I don't -- typically, no.

THE COURT: Well, wouldn't they have to tell you -- well, wouldn't they have to tell you, like, the search -- the timeframe they searched?

MR. DELL'ANGELO: Well, I think there's a special circumstance here, right, because we have a relevant time period that goes back to 2015, but the -- but the arbitration period is really 2020 forward.

THE COURT: Okay. So just identify the relevant time period for the hit report.

MR. DELL'ANGELO: Right, against which the terms were run, yes.

THE COURT: Okay.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. DELL'ANGELO:  The next simple thing I think is to just identify the sources against which it was run, because as -- as I think everybody agrees, the scope of documents that defendants would have collected for the case or cases in toto is broader than the arbitration issues.  So we want to make sure that there aren't sources in here that we I think would say, "Hey, those are sources you don't need to search, are capturing a lot of irrelevant documents, or almost no one."

THE COURT:  Okay.

MR. DELL'ANGELO:  The next would just be to know the custodians against whom the terms were run.  You know, that might be an opportunity where we would say either you should add this person in or we don't think you even need to include this person for the arbitration search.

The other thing I think is really important to know, Your Honor, is what's the total size of the document collection against which the terms are being run.  Because 5.4 million certainly sounds like a large number, but if there's 300 million documents in a collection, it's actually comparatively quite small.

But, anyway, it just gives you some sense of proportionality.

THE COURT:  Well, and I recognize like it's 5.4 million documents, but in this era no one is physically reviewing and sending --

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. DELL'ANGELO:  Right.

THE COURT:  -- 5.4 million documents.

MR. DELL'ANGELO:  Right.

THE COURT:  And at some point, Mr. Chiu, I would obviously ask you to talk about, even if it was 5.4 million documents, how they would be transferred because, again, I think we're all, sort of, old enough to recognize a time when that would have been so daunting that it would -- no one could physically do that, but now we're using computers to do that.

MR. DELL'ANGELO:  Right.

THE COURT:  But for me the bigger issue is the later debate which has already happened in this case multiple times where, Mr. Dell'Angelo, you say, "We want this" and Mr. Chiu says, "We've already provided it."

MR. DELL'ANGELO:  Right.

THE COURT:  So, to me, the size of the documents isn't by itself an issue.  The issue is identifying what's within the documents because I don't want to have to go back and forth where, again, Mr. Chiu says, "The negotiations of the contracts are right here."  And you're saying, "We can't find them."

MR. DELL'ANGELO:  Right.

THE COURT:  So, to me, the important aspect of the production is for both sides to clearly understand what's within the documents.  Now, it's certainly not their job to find every single document for you.  But, on the other hand, obviously,

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

Mr. Chiu, it's important to the extent you all have information that helps to narrow that to provide that.  So I'm happy to hear more suggestions.

MR. DELL'ANGELO:  Okay.  Thank you.  I have a few more, Your Honor.

Just another simple piece of analytics that's routinely exchanged and very helpful in this process are just what percentage of the documents did the search terms hit, you know, did they hit 10 percent or 99 percent.  Because, again, that gives -- it gives us a lot of insight into --

THE COURT:  Well, wouldn't you get that from the total size of the dataset?

MR. DELL'ANGELO:  If -- yes, as long as we get that information, we can figure that out.

THE COURT:  All right.

MR. DELL'ANGELO:  Then the other big question is whether is -- is deduplication, right.  So has the dataset been deduplicated and have the hit results been deduplicated?  Because, again, the search terms will return a dataset, but once we deduplicate it, that immediately reduces the size of the search terms, right.

So if you say, "Oh, well, it's 5.4 million," but if you deduplicate it and it has that, you know, you just have a different conversation.

The other thing I just think is important to know is

38

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

there already has been a production here, right.  So we want to make sure that the 213 or so thousand documents that were produced weren't part of that set so we're, sort of, searching them again.  That's I just think --

THE COURT:  Well, I don't know how you would avoid that given the search terms that you all indicated.  I think that's --

MR. DELL'ANGELO:  Well, I think, typically, what they would do is take -- well, you know, I think there's ways to take those out of the set.  If they don't, that's fine, but that's just something that we thought would be helpful.

THE COURT:  Okay.

MR. DELL'ANGELO:  And then the other thing I think is really important to know, you know, as we're reading the status report at Docket 95 that was filed last night at Page 2, you know, what it says is it hit directly on 5.4 million documents, and it refers to them having come from defendants' current docket -- document database.  It then goes onto say that it -- that the terms implicate 2,281,400 and 4,000 [sic] mobile data documents.  And I guess, you know, the other thing it would just be helpful to know is those, quote, mobile data documents, just what are they, right.  Because I suspect -- they then go onto say that there's 800,000 -- I'm sorry -- 830,164 daily chat threads.  So that would mean that there's something like 1.64 million is the delta there of mobile data documents.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

So it sounds like there's 830,000 of these chats.  And then there's this -- you know, this difference of the 1.6 million documents on those -- those mobile devices.  Is that part of the collection as well, right?  Because you -- you sort of run into this double-counting.  Because you'd expect, for example, e-mails to be on those mobile devices, but if you're also searching on the server, this is why deduplication is important.

THE COURT:  Okay.

MR. DELL'ANGELO:  So just knowing what those are.  And I think that gets at everything.  You know, just again high-level analytical basic data about what was searched, how it was searched, that I think the parties could use running through, you know, two or three runs of the hit reports with that information to get to a very efficient set of documents.

THE COURT:  Okay.

So, Mr. Chiu, these don't seem to be like unreasonable requests to me and would seem to be fairly standard, and it would be helpful to go through them.  Is there any reason why you all could not go through these steps with the plaintiffs?

MR. CHIU:  No.

THE COURT:  Okay.

MR. DELL'ANGELO:  Yeah, and to that end, Your Honor --

MR. CHIU:  I think the only thing is, you know -- yeah, we've provided hit reports before.  We can.  Just a lot of those

search terms themselves being single words and almost 4,000 search terms is going to net a lot of hits.  But in terms of those metrics, we're happy to provide them.  I mean, that's how we got those numbers.

In response to the 5. -- you know, approximately 5.7 million and the additional 2.2 million, those -- the 2.2 million, that is from the mobile devices, right.  So that's like the data and the texts and whatnot from the devices alone.  So that's -- there could be overlap on e-mails, but mostly that I don't expect --

THE COURT:  That is separate information.

MR. CHIU:  That is separate.  The 5. -- you know, the 5 million number, that is kind of like the e-mail and documents, right, from the custodians.  And that -- I think that the additional detail there is that is of just the custodians for which we have previously agreed and collected.  In their proposal that they sent on December 1 they proposed adding eight more custodians who we've never discussed before and never -- and so that -- that count ballooned, right, because we don't actually -- those eight new custodians are not individuals that we've --

THE COURT:  Well, hold on.  I'm sorry, Mr. Chiu, because their letter came before your status report.

MR. CHIU:  Correct.

THE COURT:  Are you saying to me that in the status

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

report it doesn't cover the eight new custodians?

MR. CHIU:  Correct.

THE COURT:  Okay.

MR. CHIU:  Correct.

THE COURT:  And just for the record, can you identify who those eight new custodians are so that I am aware of who they are.

MR. CHIU:  Will you give me a moment?

THE COURT:  Sure, I just want to be clear so that I know.

MR. DELL'ANGELO:  And I would just note, Your Honor, during the meet-and-confer process I believe these are all custodians that we have proposed.  So I agree that it's -- they are custodians to whom or for whom the defendants have never agreed to, but we had proposed them.

THE COURT:  That's fine, Mr. Dell'Angelo.  Again, I'm just trying to make sure we have a record of who we're talking about.

Go ahead, Mr. Chiu.

MR. CHIU:  Yeah, the eight are:  Reed Harris, Shane Kapral --

COURT REPORTER:  Could you spell these?

MR. CHIU:  Sure.  Reed Harris, R-E-E-D, H-A-R-R-I-S; Shane Kapral, K-A-P-R-A-L; Christoph, no E at the end, Goessing, G-O-E-S-S-I-N-G; Chika Yoshinaga, C-H-I-K-A, Y-O-S-H-I-N-A-G-A;

2:21-cv-01189-RFB-BNW,  2:25-cv-00914-RFB-BNW,  2:25-cv-00946-RFB-BNW

Buffey Curtis, B-U-F-F-E-Y, Curtis, C-U-R-T-I-S; Crista Hall, C-R-I-S-T-A, Hall; Nichole Durand, N-I-C-H-O-L-E, Durand, D-U-R-A-N-D; and Osvald Arias, O-S-V-A-L-D, A-R-I-A-S.

MR. DELL'ANGELO:  Yeah, and, Your Honor, I think counsel just may have misspoke with respect to Harris. Mr. Harris does appear on defendants' July and October disclosures.

THE COURT:  Okay.  Well, again, we can iron that out a little bit later.

MR. DELL'ANGELO:  Okay.

THE COURT:  So it seems to me, Mr. Dell'Angelo and Mr. Chiu, that it would be premature for me to rule on anything further until you all have met and conferred, one, about the Cirkunovs production and, two, about these additional requests. I don't think that I'm in a position to rule one way or another about what I might order further or what I might say you all don't get until you've had a chance to look at that.

And so I want to start with you, Mr. Dell'Angelo, because I'm not sure what else we should do today, I mean.

MR. DELL'ANGELO:  Yeah.

THE COURT:  It will be shorter than I anticipated, but I think it will be productive for you all to meet and confer before I do anything else at this point.  And I don't know, as much as I would love for it to happen, that there's enough time for you all to do that today.  But we can certainly come back.

I don't know that it will take that long.  I have time, for example, next week if you all want to come back out to Vegas.

I'd like to get this moving as quickly as possible, particularly as it relates to the arbitration issue, and I don't know that it will take that much time.  So you all tell me because I'm happy -- I'll look on my calendar.  I'm happy to have you come back next week because I think it wouldn't take that much time.

MR. DELL'ANGELO:  Right.

THE COURT:  Mr. Dell'Angelo?

MR. DELL'ANGELO:  So I have two -- I appreciate that, Your Honor.  I have two thoughts on that.  So, first of all, the, kind of, roughly nine or 10 things that I laid out, like getting hit reports, the timeframe, whatever, I think -- we're here all day, right.  So I think that's basic information that I would suspect is obtainable now.  So we're happy to, sort of, stay here and work with the defendants and the Court and get that information because I actually think we could cut through a lot.

THE COURT:  Well, the question is this, Mr. Dell'Angelo.

MR. DELL'ANGELO:  Yeah.

THE COURT:  It's not that you couldn't do it.  Look, I'm not going to stop you all from working today if you all want to work today.  The issue is if you're going to then come back

to me and say, "We want X, Y, and Z," they have to have time and you all have to have time to be able to respond to that.

MR. DELL'ANGELO:  Right.

THE COURT:  So what's helpful about this letter is you laid it out.  They then responded.  They provided the request.  Because then what I'd ask you to do is, okay, you've met and conferred.  Here's our second, sort of, request.  In the letter, this is what we think is the next step.

MR. DELL'ANGELO:  Right.

THE COURT:  So I just don't know that it makes sense, Mr. Dell'Angelo, for me to take any action until that happens where you all have met and conferred.  You say, "We think we're entitled to this information."  They say, "Yes," "No," "Maybe," right.  "This is what's available."  And we proceed.  So I'm not sure what you envision we would do further today.

MR. DELL'ANGELO:  I -- I think you're right, Your Honor, and I agree with you.  I do have a suggestion.  And I think the one thing we could do today there is just establish a very simple process, and we have something in mind to that end.  So, for example, just to get the hit report and that information.  We will respond in, you know, two business days or 48 hours.  We don't mind doing it over the weekend.

THE COURT:  You mean a schedule?

MR. DELL'ANGELO:  Yeah, just a simple schedule.

THE COURT:  No, that's fine.  I'm happy to set a

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

schedule.  I think schedules are helpful and important.

MR. DELL'ANGELO:  Right.  And, you know, our thinking is if we could then just have an understanding where maybe we do three rounds of the hit report, you know, we'll get back to them in 48 hours.  They get us a new hit report back.

THE COURT:  I'm sorry.  When you say "three rounds of the hit report," I'm not sure what that means.

MR. DELL'ANGELO:  Okay.  I understand, Your Honor.

So they've run our search terms against some corpus of documents.  They would give us a hit report.  The hit report just says in addition to the other information that we've talked about Search Term 1 is returning X number of documents, et cetera.  We would then look at the -- the process that we go through in every case is we would look at that report and say, "Okay.  This term seems to be hitting a lot of results, whatever.  Here's a way we'll modify this term or exclude this term or it's duplicating.  Please" --

THE COURT:  So you're asking me to direct that you get three requests --

MR. DELL'ANGELO:  Right.

THE COURT:  -- for the search terms.

MR. DELL'ANGELO:  So we try to funnel it down.  And I think doing that and with the information we've asked for, we could narrow or eliminate disputes, right.  And --

THE COURT:  Are you promising me that each subsequent

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

request would be fewer terms?  Because I wouldn't mind doing it, but what I don't want to have happen is, you know, with each subsequent request/search, right, we are getting more terms and more documents.

MR. DELL'ANGELO:  No, I don't --

THE COURT:  It's not to say that you can try to -- you'd have fewer terms and sometimes they may still yield more documents, but --

MR. DELL'ANGELO:  Right.

THE COURT:  -- I don't want you adding search terms, right.  I don't mind with you all going back and forth.  That sounds reasonable so long as we're trying to narrow and not trying to expand terms.

MR. CHIU:  Right.

MR. DELL'ANGELO:  The objective really is -- is to drive the outcome, right, the number of results, right.  So -- but, yes, I don't anticipate we would be proposing more terms.  The intention of the process and what we do in every case is you look at what the term is returning and say, "How can I modify/change that term so that it" -- because it's hitting some outsized number of results --

THE COURT:  That's fine.  I understand the concept, Mr. Dell'Angelo.

MR. DELL'ANGELO:  Yeah, yeah.

THE COURT:  And I think it would be useful so that I

don't have to referee each --

MR. DELL'ANGELO:  Right.

THE COURT:  -- time the search is done because I don't think that I need to do that.

MR. DELL'ANGELO:  Right.

THE COURT:  But, on the other hand, I just want to make sure this is not like a free-for-all where you're just going in and we're adding terms here willy-nilly, and the dataset's getting bigger and bigger.

MR. DELL'ANGELO:  No, the idea really is to narrow the dataset and narrow the disputes, right.  And my thinking was if we just, you know, in a reasonable but kind of rapid-fire process, you know, two days, two days, two days went through three sets of these -- the hit reports with the other information, we could narrow -- I mean, in many cases we just completely eliminate the disputes about the search terms.

And my thinking is if at the end of that process there are disputes, we could just give you a very short status or JSR that says, "Here they are," and that would frame our -- whoops -- frame our next hearing.  And, you know, the Court could resolve whatever, you know, disputes may exist, but hopefully there would be few, if any.

THE COURT:  Mr. Chiu.

MR. CHIU:  I like to be optimistic, but I think that this idea of just, like, we're going to go through search term

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

hits in three iterations, my understanding hearing the Court is that there needs to be more work done to kind of just -- for example, on the Cirkunovs' production to understand, for example, time periods and whatnot.  I think what I envision is we would -- we're happy to get that information over to plaintiffs quickly.  But the parties come back with -- having engaged in this process come back with actual counterproposals for the Court to then rule.

THE COURT:  Well, I think it would be helpful, Mr. Chiu, for me to have some sense of what it looks like if they get narrowed.  So I do think having -- and you could run your own, like, terms against the larger dataset and say, "Here's what we ran and we found this," right.  I wouldn't stop you from doing that.

I do think it would be helpful for me to have from either side one or two additional runs against the larger dataset as a proposal.  Because, otherwise, it's hard for me, Mr. Chiu, to evaluate your proposal if you don't come back to me and say, "Well, we ran this and we have many more documents than we had the first time where you had concerns.  We think theirs is unreasonable because it's capturing these types of documents."  But I won't be able to do that if you don't run this a few times yourself.

And so I appreciate that, but I think we're going to have to come back either way.  But I can't evaluate the

proposals without a few of these examples.  Again, I'm not saying you'd have to run it on the hour, but I am saying that you all having a few conversations and each side running them.

So I think it would be helpful, let's just say, for each side to get an additional three runs at the larger dataset. And, again, Mr. Chiu, it would be helpful for me...

(Defense counsel conferring.)

THE COURT:  ... for you all to be able to identify why you think this information doesn't need to be run the way that they're running it.  And that way I can look at competing runs of the data, because I do think it's not unreasonable to have some additional, sort of, narrowing of the terms.  I think doing it three times is not -- given the amount of volumes or documents we're talking about isn't, sort of, unreasonable at this point.  And you're not producing anything, but we're just going through the hit reports.

So I'll start with you, Mr. Chiu.

And then I'll go to you, Mr. Dell'Angelo.

I think three additional rounds of searches with three hit reports that have this information that Mr. Dell'Angelo has indicated would put me in a position to be able to then make a final decision about what would be the next step regarding the documents.

Mr. Chiu, I know you don't want to do it that many times, but other than maybe wanting to do it fewer times, is

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

there anything else you want me to consider?

MR. CHIU:  No, Your Honor.  I mean, I think our -- you know, as it stands, obviously, we -- we maintain our objection to --

THE COURT:  Right.

MR. CHIU:  -- you know, this -- the scope of arbitration-related discovery.  But understanding the Court has ordered us to go down this path, I think that's sensible in terms of trying to get to at least a place where we have counterproposals to present to the Court.

THE COURT:  Right.

Mr. Dell'Angelo?

MR. DELL'ANGELO:  I think that that proposal works well, Your Honor.  It could do a lot to make the process more efficient, so I appreciate it.

THE COURT:  So, Mr. Chiu, I did have one question which relates to the letter here, which relates to this notion of there being a fighter drive.  And this is one thing -- bless you -- that I'm going to direct you to look into, which is it's hard for me to believe that your client doesn't have a database that has all of the executed contracts in it, and it's not just the contracts that are attached to Ms. Long's e-mails.

I just don't see how a company this size with all these fights doesn't have someplace, whether it's a legal department or whatever, that has all of the contracts that it has with

fighters in place.  And so I am going to ask you to confirm the existence or not of such a repository, again, of executed contracts.

Now, I know the drafts may be slightly different because drafts can be attached to e-mails and other things.  I'm not talking about that.  But when we were last here I think there was a little bit of confusion about the finally executed contracts for the fighters.  That seems to me something that there would have to clearly be in one place that should not be difficult at all to identify and would be organized.

And so I want to make sure that you speak with your client about that because, again, we had a back-and-forth about that.  And, again, if there are negotiations in there, too, I would want to know that because, again, that could narrow quite a bit the arbitration issues.  I mean, as I've indicated, even though I don't agree with your position, I'm still not opening this up completely to, sort of, unfettered discovery as it relates to the arbitration issue.  I've identified the areas where I think it's relevant.

And so particularly as it relates to contracts, contract drafts, and contract negotiations and communications about that, if there's a way to focus that, I think it would be very helpful.  But at a minimum at least I am going to direct you to speak with your client about identifying where the executed fighter contracts are and providing those.

52

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

I think that that's a reasonable thing to be provided in two weeks.  And let me say this.  Let me clarify this.

Let's just say that by next week, a week from today, you will confirm with the plaintiffs, right, the existence or not of such database or repository, and then you'll provide an estimate as to the production of that material.  Because I know sometimes in that situation it may actually involve a manual process.  If they're stored in a file, someone may have to actually click on it and save it.  That's slightly different.  Or there may be contracts saved with legal things in there.  So that actually may be a more involved process.

But I would like with that same indication to the plaintiffs an estimate, Mr. Chiu, of how long it would take to produce the contracts and any negotiations regarding them that are in those files.

Because I think that may actually take, potentially, time in a different way than just running hits through a database.  But, again, I don't know how good the analytics are these days, and you may be able to just search within that particular database and pull information out.  But we need to start in terms of narrowing down what are the repositories of information.

MR. CHIU:  Understood, Your Honor.

THE COURT:  All right.

All right.  Mr. Chiu, is there something else you

53

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

wanted to add?

MR. CHIU:  No, I think the -- I think there's a little bit of -- I want to clarify.  I think in terms of the fighter contracts from the central repository, we have -- and I believe I mentioned this last hearing, we did kind of -- as a concession with plaintiffs we have agreed to produce those.  There was a small two-year gap where we've -- where those additional contracts will be going out tomorrow.  So --

THE COURT:  Okay.  Well --

MR. CHIU:  -- this issue of the repository, I know previously there was a dispute because our position was we produced -- you know, they were in the form of e-mails, attachments to e-mails, between Ms. Long because she's the one who --

THE COURT:  Who finalized them.

MR. CHIU:  -- handles them.

THE COURT:  Right.

MR. CHIU:  But we have additionally agreed to go back and look for them from whatever central file.  And my understanding is we have produced a number of those and the rest are to follow, so...

THE COURT:  Well, the main thing is just to identify whether or not there is actually a repository that exists as well, Mr. Chiu, so that it's clear to me that you all have searched in the right place.  And to the extent that, again, you

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

may or may not have a contract you can say, "Look, this is where we keep this material and this is what's there."

MR. CHIU: Okay. Yeah, we can confirm that, but that's just to clarify that issue.

THE COURT: Well, that's helpful. Thank you. I appreciate that.

MR. MADDEN: If I may clarify. Patrick Madden for plaintiffs.

In 2017 we took a deposition of their custodian of records, and as part of that process, we were given a binder by Zuffa that identified central files that they had and what was maintained in those central files. That binder said that it's not just the final executed contracts that are maintained in the central, quote, fighter files, but also to some extent negotiations related to those contracts.

And what I understood Your Honor to be referring to is that file and whether it had negotiations documents in it. And then what I heard Mr. Chiu to be referring to is just the executed contracts. And so I want to make sure that we don't miss each other on this issue of whether there are negotiations in a centralized file.

THE COURT: So let me clarify. So what the defense would have to identify is is there a centralized fighter file and what types of documents are within it. And if you've already produced documents, you can say that, Mr. Chiu. But if

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

there are negotiations in there or if there are drafts of contracts, right, in there, that's something that should be identified, which is not to say that that's going to be the entirety of the repository of drafts of contracts.  But it is to say that to the extent that this central repository of fighter contracts exists, you'll identify the categories of documents.

MR. CHIU:  Understood, Your Honor.

THE COURT:  All right.

MR. MADDEN:  Thank you, Your Honor.

THE COURT:  All right.

Okay.  What I want to do right now is I want to take a short recess.  What I would like for you all to do, since we're all here, is to have a short, sort of, meet-and-confer and let me know if there's anything else that you think we need to address.  And then figure out when you all would like to come back based upon talking about how long it will take to run these three rounds, right.  I'd like to come back within a few weeks. I want to try to get this -- continue to have this move forward. And so I'm going to look at my calendar, but potentially...

(Court conferring with court reporter.)

THE COURT:  So let's look at the week of December 15th as a possible time to come back.

And then, Mr. Williams, if you could let me know about the dates for the witnesses because I'd also like to try to lock that down as soon as possible, too, please.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

MR. WILLIAMS:  Yes, Your Honor.  I'm going to meet with them this weekend.

THE COURT:  Okay.  I appreciate that.  Thank you.

All right.  So why don't we take about a 15-minute recess, and you all can meet and confer about some of the issues that we've discussed and I've ordered.  And then we'll come back and figure out what else we need to do today.  All right?

COURTROOM ADMINISTRATOR:  Please rise.

(Recess taken at 11:10 a.m.)

(Resumed at 11:41 a.m.)

THE COURT:  Please be seated.

All right.  You all work everything out?

MR. DELL'ANGELO:  I think so, Your Honor.  We met and conferred.  I think we worked out a schedule.  I think the only wrinkle is it may be dependent on the Court's availability as to whether or not the Court's available for a hearing on December 18th, just, I understand the defendants have some limitations on their schedule.  So we were able to build a schedule that would work if that --

THE COURT:  Let me look and see right now.

MR. DELL'ANGELO:  Okay.

THE COURT:  Yes, the 18th will work.

MR. DELL'ANGELO:  Okay.  Great.

Would it be helpful, Your Honor, if I laid out the schedule or just leave it --

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

THE COURT:  Yes, it would definitely be helpful.

MR. DELL'ANGELO:  -- as we discussed it?  Okay.  Thank you, Your Honor.

Okay.  The thinking was that by tomorrow, December 5th, the defendants would provide a hit report and the other information that we discussed, like the timeframe, et cetera, regarding the application of the search terms.  Plaintiffs would respond by December 8th with additional questions or recommendations for additions or deletions to try to narrow the process.  Defendants would respond with a new hit report and additional --

THE COURT:  Okay.  I'm sorry.  Is December 8th your first request for a rerun?

MR. DELL'ANGELO:  Yes.

THE COURT:  Okay.  Because I want to make sure I know the dates when we're doing -- we're all on the same page about when we're doing the reruns.

MR. DELL'ANGELO:  Yes.

THE COURT:  And I assume, Mr. Chiu, if you're going to have me looking at the defendants' runs, that you're also going to be sharing those with the -- the hits reports with the plaintiffs.

MR. CHIU:  Correct.

THE COURT:  Okay.

MR. DELL'ANGELO:  Yes.

THE COURT: So just so I know when each side is doing the runs. And then, Mr. Chiu, if you all are doing your runs, then you're also going to be letting them know so that we don't have an issue of me having you all come back and you haven't seen them.

MR. DELL'ANGELO: Right.

THE COURT: So just to make sure to the extent we need to clarify that and what you're telling me, Mr. Dell'Angelo, we'll do that.

And, Mr. Chiu, jump in any time to clarify that.

But go ahead, Mr. Dell'Angelo.

MR. DELL'ANGELO: Thank you, Your Honor.

So defendants would commit to providing updated -- a new hit report and any updated information on December 10th. Plaintiffs would respond to that by December 11th. And then --

THE COURT: I'm sorry. So December 11th is the second run.

MR. DELL'ANGELO: Correct, yeah.

THE COURT: All right.

MR. DELL'ANGELO: Well, it would be our -- yes, it would be our response to the second hit report and then any attempt to continue to narrow it and additional --

THE COURT: Well, you get three, Mr. Dell'Angelo.

MR. DELL'ANGELO: Yes.

THE COURT: So let's be clear about what the dates are.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

So --

MR. DELL'ANGELO:  Yes, and I have -- I have that baked in, Your Honor.

THE COURT:  Okay.  So December 11th is Run Number 2.

MR. DELL'ANGELO:  Correct.  So then --

THE COURT:  And I'm sorry.

Mr. Chiu, is there any reason why defendants couldn't do their runs afterwards?  And let me ask this question, Mr. Chiu.  Are you going to be running this yourself multiple times?  You don't have to, but, as I indicated, it would certainly help me if you're going to be asking for a different way of running this that you've run something.

MR. CHIU:  Yeah, I don't think we had envisioned, kind of, doing simultaneous, you know --

THE COURT:  You don't have -- again, you don't have to do it, Mr. Chiu, but I would expect you're going to do it at least once maybe at the end, if you would like to.  I just want to make sure that you do it -- if you're going to run it, that you run it in between when they run it, right, so that we don't have an issue with them saying, "Well, we'd like to do one more run because they did the final run and we're having issues."

So I think what makes sense is for you all to do your first run or if you want to do more, but at least your first run after December 11th when they're doing their second, so between their second and their third.  Any reason why you couldn't do

that, Mr. Chiu?

MR. CHIU:  Are you saying to the extent we want to consider a counterproposal --

THE COURT:  Yes.

MR. CHIU:  -- do that?  There's no issue with that.

THE COURT:  Because I'm just saying to you, Mr. Chiu, it will be very helpful for me if you come in with more than "these terms don't work" and "we don't think they should use them," right.  That's not helpful rather than saying, "We take some alternative version."  And, again, I'm not requiring you to run it.  What I am saying is it would be much more persuasive for me if you could come up with something that you believe captures what they're seeking and what I've ordered, but narrows it more.

So I leave it up to you, but to the extent that you run it, you'll run it after December 11th.  And when's the third run for the plaintiffs, Mr. Dell'Angelo?

MR. DELL'ANGELO:  So on -- the way we had worked it out is on December 12th, the defendants would give us the third hit report of this process, and plaintiffs would respond to that on December 14th.  Then by --

THE COURT:  So December 14th would be your final third round.

MR. DELL'ANGELO:  Correct.  And then on December 15th the parties would essentially exchange their respective

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

positions about the process that I just outlined.  And then what we thought would make sense and discussed with the defendants is on December 16th defendants could run a final hit report, and that way that -- so that's what we could provide to the Court so you'd have, kind of, the result of the back-and-forth process. And then on December --

THE COURT:  Yes, but that's like a fourth run, so --

MR. DELL'ANGELO:  Well, but it's not one for debate. It's really just something that we could provide to the Court to say, "Here's where we have come out."

THE COURT:  Yes, that's a nice try, Mr. Dell'Angelo. Three, that's what you get.

MR. DELL'ANGELO:  Okay.

MR. CHIU:  So I think a point of clarification.  Our understanding was, right, after the three rounds the parties would submit kind of like a proposed -- there could be disputes, right.

THE COURT:  Right.

MR. CHIU:  It's that -- right.

THE COURT:  You would submit a proposal based upon the hit reports from the multiple runs.

So, Mr. Chiu, you all would need to run yours, right, between -- after getting the plaintiffs' second, so on December 12th or 13th, and provide it to -- so let's just say, Mr. Chiu, you all will do yours -- actually, your run on December 12th, to

the extent you run it.  That way -- and give it to them.  That way they have enough time that they can on their third run say, "We saw this and we have a response," right.

So on December 12th, right, you will provide them, Mr. Chiu, with their results from the second run, the hit report, and your results and terms that you used, again, to the extent you're going to do that.  Again, let me be clear.  I'm not requiring you to do that, but if you are going to do that and argue for a proposal for me, you'll give them your search terms and your report at the same time you give them the report from their second run.  Does that make sense?

MR. CHIU:  Yep.

THE COURT:  Okay.  And so then the last run will be December 14th, right.  And then we'll say by December 16th you all will then submit to me your proposals by the close of business on the 16th.

So just to go over this again --

MR. DELL'ANGELO:  Well --

THE COURT:  -- the hit -- I'm sorry.  Was there something else, Mr. Dell'Angelo?

MR. DELL'ANGELO:  Yeah.  I'm sorry, Your Honor. Because I think the one thing that we were envisioning with the three hit reports, just as you go through the progression.  So when -- when we get the first one on the 5th, which is just based on what's already been done, we're responding on the 8th,

right.  So there's sort of one, kind of, iteration of attempt at refinement from our perspective.  And then we're responding on the 11th with, again, an attempt to, sort of, further refine it.

What we had been envisioning was, sort of, three rounds of, kind of, iteration which is why we had that final one on the 16th.  I mean, just --

THE COURT:  No, the final one is on the 14th.

MR. DELL'ANGELO:  Well, the 14th would be our final -- our response.

THE COURT:  Yes, that's when you're also going to ask them to run it --

MR. DELL'ANGELO:  Okay.

THE COURT:  -- right.

MR. DELL'ANGELO:  I understand.

THE COURT:  Because that's -- your third, right, rerun is on the 14th, right.

MR. DELL'ANGELO:  Okay.

THE COURT:  And then they're going to give you, just so we're clear, the results on the 15th, the hit report.  Then on the 16th you all will then make your proposals.

MR. DELL'ANGELO:  Understood.  Thank you, Your Honor.  Appreciate that clarification.

THE COURT:  Okay.

Okay.  Mr. Chiu, any reason why we can't proceed that way and is that consistent with what you all agreed to?

MR. CHIU:  Yeah, that's...

THE COURT:  Okay.  All right.

Anything else on this issue?

MR. DELL'ANGELO:  No.  No, Your Honor.

THE COURT:  Okay.

MR. CHIU:  Your Honor?

THE COURT:  Mr. Chiu?

MR. CHIU:  Just as a housekeeping matter, as we're trying to figure out just -- I know we're beyond this issue, but on the, kind of, planning for the February dates for witnesses, you know, defendants would request that, you know, Mr. Cirkunovs also be available for that hearing.  And, additionally, that plaintiffs -- as it relates to as we kind of round out this arbitration-related discovery that plaintiffs produce and provide Mr. Cirkunovs' communications and e-mails as it relates to the arbitration issue.  That has -- none of that has been produced yet.

THE COURT:  So have you requested it?

MR. CHIU:  Not yet, but --

THE COURT:  Okay.  Well, what you should do is make the request.  Let them respond.  I'll -- how long do you think it would take for you to make that request, Mr. Chiu?  Because I can deal with it on the 18th when we come back.  That's why I'm saying that.

MR. CHIU:  Could I request in a week?

THE COURT:  Okay.  So I'll give you a week to do -- a week from today to do your request as it relates to Mr. Cirkunovs', right, information.

And tell me, Mr. Chiu, why Mr. Cirkunovs would be relevant to the defendants' spoliation.  Because if it's about what you think may be missing, right, I'm not sure that he's the sole person related to that.  I mean, for his case, but the spoliation issue is actually across all three cases.  So tell me what you would expect that he would provide that would help the Court make a decision about that.  Because right now, again, I'm just focussed on the missing information from those two individuals across the three cases.

MR. CHIU:  Yeah, I think with respect to the impact of potential spoliation on the motion to compel arbitration of Mr. Cirkunovs' claim, right, we are talking about two custodians, Mr. White, Ms. Long.  You know, one thing that is at issue is, well, you know, based on the gaps for right now, for example, for Mr. White's device, you know, our understanding is that, number one, he did not actually communicate or negotiate with Mr. Cirkunovs with respect to Mr. Cirkunovs' contract, and that's the arbitration clause at issue.  But that -- as it relates to that issue, you know, to the extent there was any spoliation or we need to figure that out or whether that impacts, for example, the Court's determination of the arbitration issue, well, if Mr. Cirkunovs did in fact

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

communicate with Mr. White, those communications would be in his possession as well.

So, you know, from our perspective as it relates specifically to the Cirkunovs case and the pending motion to compel arbitration, that is relevant to understanding, right, if there is in fact missing information while we're still running that down whether that implicates the arbitration issue before the Court.

THE COURT:  Mr. Dell'Angelo.

MR. DELL'ANGELO:  It sounds to me like a -- it's a version of a good defense is a good offense, Your Honor.  So Cirkunovs filed his case in mid-2025, right.  So his preservation obligations are very, very different than those for the defendants to go back to 2015.  I mean, we'll certainly expect a document request as to Mr. Cirkunovs.  We'll get those.  We'll respond -- you know, collect and respond.  It may provide some insight, but I don't think it answers the spoliation questions in this case.

THE COURT:  Well, here's what I think we should do.  I mean, they'd be entitled to a certain amount of discovery with respect to Mr. Cirkunovs anyway.  You can make that request in a week, Mr. Chiu.  I'll make a decision after I hear the two custodians whether or not we need to hear from him.  I think he should potentially be available.

But Mr. Dell'Angelo is right.  I mean, the spoliation

issue really is about, sort of, the preservation obligation, and certainly Mr. Cirkunovs wouldn't have had that until the case was filed or at least when he was contemplating the case at some point, maybe a little bit before that.

But it may be relevant as you indicate, Mr. Chiu, depending upon, sort of, what I hear from the other custodians about who was involved, who was involved with him, who was involved with the other fighters in terms of negotiating contracts.

So I'm not going to, sort of, say categorically now that Mr. Cirkunovs wouldn't have to testify, but I want to hear from the two other individuals first and maybe more depending upon what they say before we'd get to Mr. Cirkunovs. But I'm not going to rule out his testimony at this point.

Let's see. Given the potential overlap of some of the issues that Judge Weksler's going to be hearing today, I don't know if you have any update as relates to the motion to compel because there was a back-and-forth about this. I'm going to resolve those motions actually that she was going to handle when we come back on the 18th because I want you all to be focussed on this other material first.

But the motion to compel seemed like there was information that was produced after that was there, then there's the request for strike because of new arguments, and then more information was provided. So someone, perhaps, can give me an

update about that.  Because I want to address that, but I just want to hear the latest as it relates to what's been provided.

MR. MADDEN:  I don't know that we have an update, but I think that where it came to rest -- and Mr. Chiu can correct me if I'm wrong, but if all the briefs come in, the sur-reply and the sur-sur-reply, I think that resolves the motion to strike and the other motion.

THE COURT:  When you say "resolves," you mean that the parties are in agreement as to what happens or it resolves it from the standpoint of all the arguments are in and then it's just up for me to decide?

MR. MADDEN:  The latter.

THE COURT:  Okay.  Because my concern is it looked as if there was more information that was coming in after the initial motion to compel was filed.  I was unclear about that.

MR. MADDEN:  It is correct that there was additional information.  So defendants responded to the motion to compel initially by getting an extension and then producing responses.  And then in our reply we addressed why those responses should continue to be treated as a failure to --

THE COURT:  Right.

MR. MADDEN:  -- respond.

THE COURT:  Which they viewed as new argument.

MR. MADDEN:  Correct.

THE COURT:  Right.

MR. MADDEN:  So they wanted to strike the reply or in the alternative allow a sur-reply.  And we said, "No, you don't strike the reply, but if you -- if you do allow their sur-reply, then we should get a sur-sur-reply."  And I think that where it came to rest in terms of their opposition to our sur-sur-reply is that if all four briefs come in, then I think everyone is set with their positions.

THE COURT:  Well, they're already filed --

MR. MADDEN:  Yeah.

THE COURT:  -- right.  And typically, which is always funny in these situations, where people say, "I would like a sur-reply and here's what I will say," it's effectively the same thing.  You all are smart lawyers.  You have done that.  I'm just going to consider everything, and then we'll just move forward.

I just wasn't sure if there was anything else that I needed to consider as relates to what's been produced on that.  So I'll also rule on that, those motions, on the 18th since we're coming back.  And I do think there could be some overlap between what you all are searching and what may come up in the context of at least some of those questions and those interrogatories about who's responsible for negotiating fights and the completeness of that.  So I might ask you questions about how the information you've done searches on might inform that those are, as I understand it, purely Johnson-related

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

motions.  But there's some overlap, so we might as well address that.

So you all should just be prepared to answer questions regarding those motions when we come back on the 18th.  Let me look at the time.  Let me give you the time.

Let's see.  We've got a sentencing.  1:30 on the 18th. Well, you know what we're going to do, why don't we do this. I'm going to bring you in actually -- what is the first one? That's 10:45.

We're going to get started at 9:30 because what we may -- but you should be prepared to be here the whole day.  So don't book a flight at 2 o'clock, please, particularly because I may ask you all to go back and forth on terms and things.  We may spend sometime doing that after I look at your proposals. So I expect that we'll start at 9:30.  I have some other matters, but I'll give you some homework, we'll come back, and then we'll make some rulings.

Here's the other thing that I want you to file by the 16th, which would be the scope of the questions of the two witnesses for spoliation.  I want to be able to address that so that you all can be prepared.  To the extent that there's going to be questions about various matters, I want to be able to address what's going to be the scope of the questions.  Okay?

MR. CHIU:  Sorry.  This is for the plaintiffs, Your Honor?

THE COURT:  Well, I assume you're going to be asking questions of the witnesses, too.

MR. CHIU:  Oh, this is for the February...

THE COURT:  For the February hearing because I want to -- right, to the extent we're going to have a back-and-forth because I expect that we will, right, and to the extent there's going to be some discussion, Mr. Chiu, about what's actually still, sort of, outstanding, it would be helpful to not, again, wait until later.  So I'm going to ask you all to give, again, what you anticipate would be, sort of, the scope of the questions and the topics, right.  I mean, you don't have to give the exact questions, but just the scope.

And I just want to be clear, I'm not going to do case-specific questions.  The spoliation issue covers all three cases.  So I don't believe it's necessary to limit it to arbitration because I don't think that it would be efficient to do that in this case, which is why it may take a little bit longer.  But I also think the questions about who negotiates contracts and how Mr. White or Ms. Long retained that information, that would apply across all three cases anyway so it wouldn't really change.  So I don't anticipate that the questions would be different across the cases, but I just want to be clear that the spoliation hearing is for all three cases. Okay?

And so to the extent you think there may be different

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

questions that need to be asked for the different cases, you should bring that up with me on the 18th so we can hash that out, right.

Any questions about that, Mr. Madden?

MR. MADDEN:  No, Your Honor.

THE COURT:  Mr. Chiu?

MR. CHIU:  Nope.

THE COURT:  But I'm not requiring you -- Mr. Chiu, you all don't have to ask any questions, but I anticipate that.

The one issue, Mr. Chiu, that I also am going to want to know and you all to think about is the assertion of privilege.  In these types of spoliation hearings, as you know, it can get a little tricky if a witness says, "I was advised," for example, "that I didn't have to keep this particular information," right.

And so I want to hear from you about, sort of, how we're going to manage the privilege because obviously, as you know, I have to make a credibility determination about to what extent things were done intentionally or inadvertently or in bad faith, and that can turn on the information that a particular witness received.  And that can implicate attorney-client privilege issues which it often does in these hearings.

And so we don't have to decide that issue finally on the 18th, but I do want to hear from you about what you anticipate would be issues that I'd have to resolve and whether

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

or not you would anticipate, for example, there being some either ex parte or some other form of a separate privilege, you know, log or communication or something that would happen in this case.  Because, again, it can be very tricky as it relates to what the witnesses may have been informed or advised by counsel, by, you know, internal counsel and then outside counsel.  I don't know.  It may not be an issue.  But I don't want us to encounter it the first time at the hearing.

MR. CHIU:  Yeah, so I guess hearing that, Your Honor, I guess in light of the fact that we're still running these two issues down, I know we had talked about the hearing, you wanted to set it in February.  You know, I just wonder whether it makes sense at this time, you know, by the 18th for us to have submitted, kind of, a proposal for how that hearing will go as opposed to -- you know, I expect, you know, over the next month my hope is that we will have run down these issues.

So I just wonder if it's premature at this point, understanding before you had said, you know, prior to the February hearing there will of course be some briefing or teeing up of issues to the extent it's still -- it's still a live issue.

THE COURT:  I appreciate that, Mr. Chiu.  It's sort of hard for me to know because I think it's hard for you to know when information may potentially be produced or potentially be available that it wasn't previously available.

So for now I think we can still have the scope of the questions because I don't know the scope will change that much, particularly from the plaintiffs' standpoint in terms of what they're going to ask. You can potentially hold off on the privilege issues. I wanted to tee that up and have you start thinking about that, right, because I don't want to have the hearing delayed because you all say, "Well, we have to go through attorney-client communications because we need to make sure that we are protecting privilege, but at the same point in time providing information we think is relevant for the Court's determination."

So you don't have to say that now, Mr. Chiu. I'm just trying to avoid a delay if we end up going forward with the spoliation hearing based upon privilege. Because that can actually delay it quite a bit because then you all can come forward and say -- you know, and it can be done sometimes on an ex parte basis where you're saying --

MR. CHIU: Yeah.

THE COURT: -- "Here are the issues." I just want to, sort of, tee that up. So what I'll do is I will hold off on you teeing that up for the 18th, but I will set a timeframe by which you'd have to confirm what does and doesn't exist probably some time in mid-January after we come back on the 18th, so at least we can be clear about the schedule then. I know you all are still trying to figure out, sort of, what still exists.

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

But I'll hold off on making any particular findings or requiring any submissions regarding privilege at this point. But we'll just add to our to-do list that on the 18th we will discuss the issue of when we're going to set a deadline for, sort of, a final determination of what does and doesn't actually exist.

All right.  Anything else on that point, Mr. Chiu?

MR. CHIU:  Nothing further.  Thank you, Your Honor.

THE COURT:  All right.  Okay.

Anything else on the outstanding motions that were in front of Judge Weksler?

MR. MADDEN:  No, Your Honor.

THE COURT:  Anyone else?

MR. CHIU:  No, Your Honor.

THE COURT:  Because for now I'm going to ask her just to hold off on holding any further discovery matters until we get these issues resolved and because there's overlap.  I don't know if you all have anything outstanding that's due for her. Do you all?

MR. DELL'ANGELO:  So Michael Dell'Angelo, Your Honor.

No, I guess the -- just the thing that we've been thinking about and it sounds like Your Honor is as well that we've just been trying -- the needle we've been trying to thread is that, you know, Your Honor is obviously doing a lot on the arbitration discovery and the search terms and custodians, et

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

cetera, to move that process along.  But, you know, there's really a parallel process that relates to all three cases where we still have these, sort of, same disputes.  And, I guess, I am just wondering how we kind of -- since the magistrate had been handling that, how we deal with those issues.

THE COURT:  So, Mr. Dell'Angelo --

MR. DELL'ANGELO:  Yeah.

THE COURT:  -- I assume the discovery's moving forward in these other cases.  I'm not saying that you should stop, either side, with your discovery obligations.

MR. DELL'ANGELO:  Yeah.

THE COURT:  All I'm saying is that there are certain discovery motions in all three cases that overlap and I'm going to handle those.

MR. DELL'ANGELO:  Right.

THE COURT:  So that's not in any way to suggest that you all shouldn't continue to propound discovery, they shouldn't continue to propound discovery, and there shouldn't be responses.  I'm not --

MR. DELL'ANGELO:  Right.

THE COURT:  I'm not delaying anything.  I am not in any way advancing anything.

MR. DELL'ANGELO:  Right.

THE COURT:  I'm simply saying those motions that she was going to handle I think overlap with what I'm addressing in

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

arbitration, so I'm going to handle them.  But if you have a discovery issue, either side, go ahead and file your motion. I'm not telling you to stop doing that.

MR. DELL'ANGELO:  Okay.  Thank you, Your Honor.

THE COURT:  Right.

MR. DELL'ANGELO:  Yeah, and I appreciate everything that you're doing and I understand what you're saying.  I think what -- and I think I now have it, you know.  The clarity I was trying to get is, you know, at the last hearing you made some findings about -- I think you said that they were disingenuous search terms, right, that -- and we're running that process for arbitration, but that same search term process, you know, it affects all three cases and, you know, discovery in Davis and Johnson.

THE COURT:  But I think, Mr. Dell'Angelo --

MR. DELL'ANGELO:  Yes.

THE COURT:  -- the process of the arbitration and search is going to inform the other.  So it doesn't make sense for you to be doing that in front of Judge Weksler --

MR. DELL'ANGELO:  Right.

THE COURT:  -- when we're going to spend a whole day doing search terms, right, and I'm going to be talking with you about it.  I will then turn to the other case, but the fact is --

MR. DELL'ANGELO:  Okay.

THE COURT: -- a lot of what you're asking for in the arbitration for search terms is going to cover the discovery in the other case. If you look at the interrogatories and the other things, there's overlapping. You're going to want the fighter contracts, the negotiations, and communications about the contracts. I mean, that's what you wanted previously in the prior case. That's what you're going to be seeking now. The FightMetric data, all -- basically a lot of what you're seeking that we're going to be working on in the Cirkunovs case regarding arbitration is going to overlap with that.

And so from my perspective it makes no sense from a judicial economy standpoint to have Judge Weksler simultaneously and on a parallel basis be talking with you all about search terms.

MR. DELL'ANGELO: Understood, Your Honor, and I appreciate that. And it sounds like maybe after December 18th we'll, sort of, figure out the process about how to deal with the larger discovery issues.

THE COURT: Well, even across the three cases --

MR. DELL'ANGELO: Yeah.

THE COURT: -- the priority for me is to get the arbitration issue resolved, right.

MR. DELL'ANGELO: Understood.

THE COURT: And to the extent I know you all have big firms and a lot of lawyers involved, but I want you focussed on

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

dealing with this issue right now in the next few weeks and the spoliation issue because that also addresses all three cases.

But the discovery will proceed in the normal course in Johnson, right, and in Davis consistent with what's already been set for the schedule.  To the extent that either side has any issue that it wants to raise, discovery, you file it and Judge Weksler and I will simply decide who's the appropriate judge to handle it.

MR. DELL'ANGELO:  That's very helpful.  Thank you, Your Honor.

THE COURT:  Okay.  All right.

Mr. Chiu, any questions about that?

MR. CHIU:  No, I think from our perspective everything's been teed up.  So it sounds like, you know, before Judge Weksler and now the Court has taken it back.  So from our perspective there are no other, kind of, live issues.

THE COURT:  Okay.

MR. CHIU:  The one -- the one clarification I had and not that there are any live issues, but I know the Court had previously, kind of, set a procedure where, you know, plaintiffs -- there was a procedure in place for plaintiffs raising discovery issues, kind of, like the one-letter-a-month, if that's back in play or --

THE COURT:  No.  No.  I mean, I think because of the need to prioritize the arbitration issue and because of the

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

overlap, right, today's hearing is an example of that.  Doing the once-a-month in front of Judge Weksler I think just doesn't work until we get the arbitration issue resolved because what comes up in that is going to come up in the other cases which is why I'm doing the discovery because it's just not efficient.  Because -- and then we'd be going back and forth.

So from my perspective I'm likely to handle almost all the discovery at least through February-March when I decide the spoliation issue and how it affects all three cases and hopefully by that time also the arbitration issue, right.  And at that point then we might go back to potentially a different procedure depending upon whether or not I grant the motion to compel or not or what happens, right.  But I think that, for now, it doesn't make sense for Judge Weksler to handle the other matter, except for again she has matters involving sealing which she'll, I think, continue to work on.  And there's a stipulation and things of that nature she's already worked on.

But as it relates to what we're dealing with right now in terms of search terms and document production, I'm going to handle that for now.  All right?

MR. DELL'ANGELO:  Yes, Your Honor.  Thank you.

THE COURT:  Okay.  All right.  Listen, I appreciate your time.  We'll be back here December 18th.  Let's see.  What time did I say here?  9 -- what did I say, Chantal?

COURTROOM ADMINISTRATOR:  You said 9:30, Your Honor.

81

2:21-cv-01189-RFB-BNW, 2:25-cv-00914-RFB-BNW, 2:25-cv-00946-RFB-BNW

THE COURT: 9:30. Okay. All right. Safe travels everyone. Take care.

MR. DELL'ANGELO: Thank you, Your Honor.

MR. WILLIAMS: Thank you, Your Honor.

(Whereupon the proceedings concluded at 12:13 p.m.)

--oOo--

COURT REPORTER'S CERTIFICATE

I, PATRICIA L. GANCI, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date: December 4, 2025.

/s/ **Patricia L. Ganci**

Patricia L. Ganci, RMR, CRR

PATRICIA L. GANCI, RMR, CRR