2:21-cv-01189-RFB-BNW

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

KAJAN JOHNSON, et al.,              )  Case No. 2:21-cv-01189-RFB-BNW
                                    )
MIKHAIL CIRKUNOVS, et al.,          )  Case No. 2:25-cv-00914-RFB-BNW
                                    )
PHIL DAVIS, et al.,                 )  Case No. 2:25-cv-00946-RFB-BNW
                                    )
                Plaintiffs,         )  Las Vegas, Nevada
                                    )  Tuesday, August 26, 2025
        vs.                         )  10:21 a.m.
                                    )
ZUFFA, LLC; TKO OPERATING              STATUS CONFERENCE
COMPANY, LLC f/k/a Zuffa
Parent, LLC (d/b/a Ultimate
Fighting Championship and
UFC); and ENDEAVOR GROUP               *C E R T I F I E D   C O P Y*
HOLDINGS, INC.,

                Defendants.
_____


REPORTER'S TRANSCRIPT OF PROCEEDINGS

THE HONORABLE RICHARD F. BOULWARE, II,
UNITED STATES DISTRICT JUDGE


APPEARANCES:        See Pages 2 and 3


COURT REPORTER:     Patricia L. Ganci, RMR, CRR
                    United States District Court
                    333 Las Vegas Boulevard South, Room 1334
                    Las Vegas, Nevada  89101

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

2

2:21-cv-01189-RFB-BNW

APPEARANCES:
For the Plaintiffs:

**MICHAEL J. GAYAN, ESQ.**
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane, Suite #100
Las Vegas, Nevada 89107
(702) 655-2346

**ERIC L. CRAMER, ESQ.**
**MICHAEL C. DELL'ANGELO, ESQ.**
**PATRICK F. MADDEN, ESQ.**
BERGER & MONTAGUE, P.C.
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000

**DANIEL GIFFORD, ESQ.**
COHEN MILSTEIN SELLERS & TOLL, PLLC
88 Pine Street, 14th Floor
New York, New York 10005
(617) 877-0508

**JOSEPH SAVERI, ESQ.**
THE JOSEPH SAVERI LAW FIRM, INC.
555 Montgomery Street, Suite 1210
San Francisco, California 94111
(415) 500-6800

For the Defendants:

**J. COLBY WILLIAMS, ESQ.**
**SAMUEL R. MIRKOVICH, ESQ.**
CAMPBELL & WILLIAMS
700 South 7th Street
Las Vegas, Nevada 89101
(702)382-5222

**WILLIAM A. ISAACSON, ESQ.**
DUNN ISAACSON & RHEE, LLP
401 Ninth Street NW
Washington DC 20004
(202) 240-2900

**AARON T. CHIU, ESQ.**
LATHAM & WATKINS, LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
(415) 391-0600

2:21-cv-01189-RFB-BNW

CONTINUED:

**JOSEPH AXELRAD, ESQ.**
LATHAM & WATKINS, LLP
10250 Constellation Boulevard, Suite 1100
Los Angeles, California 90067
(424) 653-5500

ALSO PRESENT:

Francisco Arias, General Counsel, UFC
Lydia Franzek, Senior Counsel, TKO

LAS VEGAS, NEVADA; TUESDAY, AUGUST 26, 2025; 10:21 A.M.

--oOo--

P R O C E E D I N G S

THE COURT:  Please be seated.

COURTROOM ADMINISTRATOR:  Good morning.  We have three matters now before the Court:  Case Number 2:21-cr-1189-RFB, Johnson v. Zuffa, et al.; Case Number 2:25-cv-914-RFB, Cirkunovs versus Zuffa, et al.; and 2:25-cv-946-RFB, Davis v. Zuffa.

Counsel, please make your appearances beginning with the plaintiffs.

MR. DELL'ANGELO:  Good morning, Your Honor.  Michael Dell'Angelo on behalf of the plaintiffs.

MR. CRAMER:  Good morning, Your Honor.  Eric Cramer for the plaintiffs.

MR. MADDEN:  Good morning, Your Honor.  Patrick Madden for the plaintiffs.

MR. GIFFORD:  Good morning, Your Honor.  Daniel Gifford for plaintiffs.

MR. SAVERI:  Good morning, Your Honor.  Joseph Saveri for the plaintiffs.

MR. ISAACSON:  Hello, Your Honor.  It's Bill Isaacson for the defendants.  And we have some new folks for you here today.  Francisco Arias is the General Counsel of UFC, and Lydia Franzek is the senior counsel with TKO.

THE COURT:  Good morning.

So we have a few matters -- well, I know who --

MR. WILLIAMS:  Good morning, Your Honor.  Colby Williams on behalf of the defendants.

MR. CHIU:  Good morning, Your Honor.  Aaron Chiu on behalf of defendants.

MR. AXELRAD:  Good morning, Your Honor.  Joseph Axelrad on behalf of defendants.

MR. MIRKOVICH:  Good morning, Your Honor.  Samuel Mirkovich on behalf of defendants.

THE COURT:  Okay.  I didn't mean to slight you all, though I know who all of you are from prior hearings and from your filings.

So we have a little bit of work to do today.  Let's start with the parts where we agree.  I want to talk a little bit about scheduling in the case and to see if there is an agreement.  I know there's some back-and-forth about expert matters, but I want to talk a little bit about, sort of, where the parties agree regarding scheduling and scheduling dates so

2:21-cv-01189-RFB-BNW

we can focus on getting something set, and then let me know what may come in on a rolling basis or where I need to decide a dispute regarding dates.

So, Mr. Cramer, is that going to be you?

MR. CRAMER:  Yes.

THE COURT:  And then, Mr. Isaacson, I'll ask you to respond.

MR. ISAACSON:  I'll let Mr. Chiu handle the scheduling issues.

THE COURT:  Okay.

MR. CRAMER:  So, Your Honor, we have agreed regarding the schedule except for one matter, and that is the motion to compel arbitration that was --

THE COURT:  Was just filed.

MR. CRAMER:  That was just filed.

THE COURT:  Right.

MR. CRAMER:  The schedule provides that we would respond within 30 days, unless there's good cause shown.  We believe there's good cause because we require discovery in order to respond to the motion to compel arbitration and --

THE COURT:  And for a moment, Mr. Cramer, tell me what discovery specifically you would like to request.  I don't necessarily disagree with that, but because we've had some discovery issues back and forth, I want to understand that and that might impact the rest of the schedule.  So let's talk a

2:21-cv-01189-RFB-BNW

little bit about that.

MR. CRAMER:  So we have already requested the discovery that we need.  We need back-and-forth regarding the negotiation and instantiation of the arbitration clause in the contracts. We need to know the intent, why it was done.  Part of our allegation is that the arbitration clause was inserted as part of the overall scheme to insulate the monopoly and monopsony from challenge.  And so we need documents relating to the intent and meaning of the arbitration clause itself.

THE COURT:  So what does that mean, Mr. Cramer?  You say you want documents related to intent.  Like, if they talked to their lawyers and the lawyers gave them advice, I'm not sure that you're getting that.  So I'm not sure when you say "intent" -- if you have communications between different executives at these -- whatever the entity is -- because I know there are different entities involved in the operation of the UFC for this period of the class.  But are you asking for communications between executives regarding the purpose of the arbitration clause?

MR. CRAMER:  Yes, we are.  Obviously we're not seeking attorney-client privileged materials, but we believe that there may have been a business case made to insert these arbitration clauses and, thus, discussions among executives relating to the purpose, the need, the meaning, the interpretation, the intent of these clauses.  They were inserted in, I believe, 2021.

2:21-cv-01189-RFB-BNW

There was an explicit carveout for the Le case.  We believe that there was -- that we at least have reason to believe that there were discussions, business discussions, related to the arbitration clauses and --

THE COURT:  So let me ask you a question, Mr. Cramer.

MR. CRAMER:  Yep.

THE COURT:  So what?  Right.  I mean, I assume that they may not have done it for that reason.  They're not in any way prevented from doing it for that reason.  Like, they may say, "Yes, of course we did it for that reason.  We realized that we needed the protection of arbitration."  They're allowed to do that.  So I'm not quite sure why that particular type of discovery is intended.

Now, I guess if they say, "Well, we did it for a different reason," that might be one thing.  But they could -- they could legitimately say, "We wanted this for our protection because of the lessons learned from the Le case."  There's no -- there's nothing preventing them from doing that, is there?

MR. CRAMER:  If -- well, it depends upon the rationale.

THE COURT:  Okay.

MR. CRAMER:  What we are alleging is that the contracts themselves are part of a monopsonization and monopolization scheme and that the arbitration clauses were inserted as part and parcel of that scheme.  And we believe we're entitled to demonstrate that they were inserted as part of a scheme to

———————2:21-cv-01189-RFB-BNW———————

monopolize the monopsony.

THE COURT:  So, in other words, you're saying they're inserted as a part of a way to be able to continue to maintain their alleged control over the fighters.

MR. CRAMER:  Correct.

THE COURT:  All right.

MR. CRAMER:  So that's some of the evidence.  There may also be information relating to the interpretation and purpose of the clause and how they're supposed to be interpreted, and we're entitled to discovery regarding -- regarding those matters.

What I would propose is that the plaintiffs and the defendants -- since they just filed this last night, we haven't actually reviewed it in detail -- we meet and confer upon the discovery that is needed, maybe attempt to get that front-loaded, and then propose jointly, if we can agree, on a response date triggered by the production of certain discovery.  So that's -- that's the proposal that we would make.

THE COURT:  Okay.

Mr. Isaacson or Mr. Chiu?  I'm sorry.  That's right.  You designated Mr. Chiu to do that.

MR. CHIU:  Yeah.  So, Your, Honor I think our position is that, you know, in any motion to compel arbitration the opposing party generally responds and makes a showing in the opposition as to whether --

2:21-cv-01189-RFB-BNW

THE COURT:  Let me help you, Mr. Chiu.  I think discovery is relevant and necessary, and I think they're entitled to some of it.  But as you can see from my questioning of Mr. Cramer --

MR. CHIU:  Yeah.

THE COURT:  -- I don't know what -- how much is necessary.  As I said, I think that your client is entitled to be able to --

MR. CHIU:  Absolutely.

THE COURT:  -- add arbitration agreements.  I do think it's potentially relevant if there are communications that essentially say, "Well, we're going to lose some of our fighters if we don't put these in."  I don't know whether or not that still wouldn't legally be something that they could do, but that might be something that would be relevant.

So given what they're requesting, which is really communications between executives regarding the arbitration agreements and the contracts and why they would be placed there, that doesn't seem to me to necessarily be a large body of documents.  But, again, I don't know.  You've been living with this case obviously and the documents a lot longer than I have.

And so what would be helpful for me would be for you to give me a sense of that, if I say they're entitled to discovery, but the discovery really is going to be focussed on discussions between the principals or other individuals about what would be

2:21-cv-01189-RFB-BNW

the purpose and effect of the arbitration agreements.

Now, I think it probably makes sense to include in that, sort of, the business argument. Again, I'm not sure how much that's going to swayed me one way or the another, but I think it's discoverable for the motion to compel arbitration.

Assuming that's the universe of documents, Mr. Chiu, how long do you think it would take to produce those documents?

MR. CHIU: Honestly, sitting here, I can't give you an estimate because we haven't looked into it, but we're willing to meet and confer with plaintiffs on it. I will note that this idea that there may have been business discussions as Mr. Cramer just noted in terms of its relevance to the monopsony claim, it stretches far afield from what's before the Court on the motion to compel arbitration, right, which is whether there is a legitimate, valid arbitration agreement to which both parties consented to. That's before the Court.

And so, you know, I think that the --

THE COURT: Well, the monopsonization is relevant to the enforceability of the arbitration agreement. I mean, I assume, right, there are going to be substantial arguments and your motion seems to at least anticipate some of that, right, that there are going to be arguments about the viability and legitimacy of the arbitration agreements in the context of a monopsony scheme. It's a somewhat -- you know, it's a unique circumstance.

2:21-cv-01189-RFB-BNW

And so what I'm saying to you is I don't find that to be irrelevant to the legal conversation.  I may ultimately decide that for the legal analysis here it's not persuasive or compelling as an argument not to enforce the agreements, but I think it's something that the Court has to consider.

So that's why I'm saying I think discovery is appropriate on the motion to compel arbitration, and this type of discovery I think is appropriate.  Again, ultimately having not seen it, I can't say what the effect will be one way or the other, but I think it's relevant.

So it sounds to me like you need a little bit of time to check with your client about the nature of the documents and then speak with the plaintiffs about it.  What I'm going to direct the parties to do in this instance is to meet and confer and then come up with a date.  I'm not going to order a response to the motion to compel arbitration until we have a discovery deadline set.

Now, as I've indicated to you previously, we're going to be meeting probably once a month to go over this.  Now, I may still appoint a special master, and we'll get to that conversation later.  But this is something that we'll deal with. If you all haven't dealt with it within a month, then I'm going to deal with it when we next come back, but I'd prefer for the parties to work this out in this case.

So since the motion was just filed last night and this

———————————2:21-cv-01189-RFB-BNW———————————

is an issue, what I'll do is just direct you all to meet and confer and try to come up with an agreement regarding the date of the production and the universe of it. But just, Mr. Chiu, so we're clear -- Mr. Cramer, so we're clear -- I do think that the information regarding, sort of, the discussions regarding the arbitration agreements are relevant and discoverable. Obviously privileged material, Mr. Chiu, would not be discoverable, but communications between individuals regarding the arbitration agreements and its effect on the business are -- would be relevant for discovery in the Court's consideration.

MR. CHIU: So just, Your Honor, I think it would be helpful, if that's the Court's guidance as to the scope of what is permitted in arbitration-related discovery, are we to take that to go forward? I mean, what I'm anticipating is as we meet and confer there will be more requests and whatever, but, you know, it sounds like plaintiffs have made their -- their argument for what they think is relevant in the scope and it sounds like the Court agrees.

THE COURT: Well, I think the devil is in the details. I agree, Mr. Chiu. It's not going to be an open-ended, sort of, discovery request. It should be time limited around the time when the arbitration agreements came into effect, right. There should be some agreement about that.

And, you know, there should be some limitations about what possibly could be related to a discussion of the

2:21-cv-01189-RFB-BNW

arbitration agreement.  So not every communication during that timeframe I think is related to an arbitration agreement.  I think that would be a reasonable issue for you all to raise.

So I -- from my perspective, and I'll hear more from the plaintiffs, a time constraint, right, some limiting principle regarding communications.  Like, there has to be some way that you all can come up with an understanding.  Like, it doesn't necessarily mean that you only produce documents that explicitly reference arbitration, right, obviously.

On the other hand, sort of, any discussion of business models or any discussion isn't necessarily relevant either.  There is going to be -- there are going to be conversations where individuals talk about the class and the need to prevent class action in the future, for example, without referencing arbitration agreements.  That would be an example for me, Mr. Chiu, of something that should be produced, right.

So when you talk about the business model and the need to protect the interests that your clients had in the fighters, that would be relevant even if they're not explicitly talking about arbitration agreements.  And I think that would be a fair limiting principle that would apply here.

Mr. Cramer, is there something you wanted to add?

MR. CRAMER:  No, I -- we agree with what you just said. I just wanted to observe, Your Honor, that we have already served RFPs relating to arbitration issues, RFPs 8, 9, and 10.

We've met and conferred with the defendants about those RFPs. They had promised to produce responsive documents already. We don't have them. So it's not as if we haven't pursued documents of the type that Your Honor just described.

I am looking at a letter from Paul Weiss to the plaintiffs dated July 29, '25, Page 3 of 4. It's Exhibit 26 to ECF 217. And that is where the defendants have agreed to produce responsive documents. So I just wanted Your Honor to know that we have been pursuing these documents.

THE COURT: Okay.

MR. CRAMER: Oh, I'm sorry. That's the file date. The letter date is May 19th, 2025.

THE COURT: Okay.

MR. CRAMER: Thank you.

THE COURT: All right.

Mr. Chiu, is there something else you wanted to add or wanted to request in terms of clarification from the Court?

MR. CHIU: No, I think that's helpful. I think some limiting principle here so it doesn't explode. We're willing to meet and confer with the plaintiffs on the scope --

THE COURT: Okay.

MR. CHIU: -- and proposed schedule.

THE COURT: And, Mr. Chiu, as relates to the other dates, you agree with Mr. Cramer that essentially there's an agreement about that. I think there's still outstanding dates

—————————2:21-cv-01189-RFB-BNW——————

about, I think, experts, if I recall.  But other than that, the dates that you all have provided, you would agree are --

MR. CHIU:  Yes.

THE COURT:  -- dates that the Court can set?

MR. CHIU:  Yeah, the joint proposal across all three cases, you know, we would agree with the plaintiffs on those dates, so...

THE COURT:  Okay.  So I'll go ahead and sign that joint proposal.  And then, Mr. Chiu, can you tell me a little bit about the dates regarding the experts?

MR. CHIU:  Yes.  So in terms of the experts, I think our issue really has to do with the sequencing in terms of, you know, having the, you know -- having sequencing merits experts after class.

THE COURT:  I'm sorry?  Your voice drops.

MR. CHIU:  Sorry.  Sequencing -- sequencing merits experts after class.  And that's just -- the fundamental disagreement is that there could be issues of sequencing, not having, you know, defendants and plaintiffs essentially do one round of experts because generally in antitrust cases we have class certification and then merits experts.

MR. CRAMER:  Your Honor, we --

THE COURT:  Hold on.  Hold on a second.

Again, I want to make sure I'm understanding, Mr. Chiu, what the issue is.  You're going to have a first round -- you're

going to have one round of experts -- when you think about the Le class, you have the first round of experts.  Reports are done.  Then there are rebuttal reports that are done, right. Then there's class certification, right.  And then is it -- is it your concern about after class certification further experts? That's what I'm trying to figure out, if the Court were to grant it.  Because if the Court doesn't grant it, then there's no issue of experts.

And so I'm trying to understand if you're anticipating something.  I just don't know when you say "sequencing," what date is the relevant date that you're saying the before and after that you're concerned about.

MR. CHIU:  Sorry.  I think -- I think I misunderstood Your Honor.  You're focussed on -- you're talking about the number of hours for the expert?

THE COURT:  No, no.  I'm just talking about, when I looked at your filings, it looked as if there was a disagreement about expert timing and, sort of, reports and disclosures, right.  And I don't -- I'm not sure what that means.  I'm not sure what the disagreement is about.  If it's just about hours or if it's just about small things that you all can work out, that's fine.  But it seemed like there was something that I may need to resolve.  And so I wanted to get from you what you understood to be the disagreement between the parties regarding the experts' either disclosure deadlines or the timing of that.

2:21-cv-01189-RFB-BNW

MR. CHIU: Yeah. So I think -- I think I misunderstood, Your Honor. I think we have actually agreed to the sequencing in the schedule with expert disclosures in the proposed schedule.

THE COURT: Okay.

MR. CHIU: So as set forth in the joint proposal, it is sequenced that way. That's -- the parties are agreed on that.

THE COURT: Okay. I just want- -- that's what -- in the filings it seemed that there might have been some disagreement. I wanted to clarify that. So in terms of other than this issue regarding, sort of, the motion to compel arbitration and the arbitration discovery issues, all the other deadlines including experts are set and agreed upon by the parties. Is that correct, Mr. Chiu?

MR. CHIU: That's correct.

THE COURT: Is that correct, Mr. Cramer?

MR. CRAMER: The only issue is the number of hours for expert depositions. That's the only disputed issue. And I can just lay it out simply.

The plaintiffs' position is that if the expert is a repeat expert from Le, the other side should get seven hours for that expert, the normal length. If it's a new expert that hasn't been deposed before in Le and cross-examined many times in Le, the other side should get 10 hours for that expert.

It's the defendants' position that they should have 14

2:21-cv-01189-RFB-BNW

hours with every expert.  We think that's too long, especially given that some of these experts may be the same experts that testified several times in Le, such as Dr. Singer if he appears again in these cases.  We don't think they need 14 more hours with Dr. Singer.

THE COURT:  Mr. Chiu.

MR. CHIU:  Your Honor, our view is that, you know, these are three new cases --

(Court reporter interruption and clarification.)

MR. CHIU:  These are three new cases.  You know, while Johnson is a continuation of Le, there are going to be different issues.  We expect the plaintiffs to, you know, disclose experts.  Even if they want to use someone who is the same, we're entitled to full depositions of their experts regardless of who they disclose.  14 hours across three cases for each expert does not -- is actually, you know, not more than what we would get in each individual case.

THE COURT:  So, Mr. Cramer, my question to you is, are you going to be relying upon, for example, some of Dr. Singer's prior reports for the new cases?

MR. CRAMER:  Well, we haven't ultimately decided that, but --

THE COURT:  Well, that's why this matters because --

MR. CRAMER:  Yeah.

THE COURT:  -- if -- because we have this -- this order

2:21-cv-01189-RFB-BNW

based upon where I've said you can use the discovery.  If you're using the same discovery, I'm going to -- they're entitled to be able to question them, right.  If it's a new report, that's something different.  I mean, to me, the issue is I wouldn't want, Mr. Cramer and Mr. Chiu, there to be extensive questioning on an old report for hours and hours.  That to me is not productive.

Now, there might be questions, right, having seen the Court's class cert order, where you feel like we should have discovered this.  We didn't.  They're entitled to do that.  That to me is fine.  But, you know, he was deposed for many hours before.  I wouldn't want us to be going through some of that same discussion.

But I do think, Mr. Chiu and Mr. Cramer, that the defendants are entitled to, for example, as to Dr. Singer, question him about aspects of his prior report.  However, if he's going to produce a new report, then they should get enough hours for them to question about the new report.

So it really is important to me, Mr. Cramer, that you all have to decide because you've asked me to be able to include discovery from these -- from Le, which I think is appropriate so long as, right, they have an opportunity to be able to further explore it as necessary consistent with what they think is appropriate.

Again, I don't want it to be excessively duplicative,

2:21-cv-01189-RFB-BNW

but they have more information now than they did previously and they have seen the prior certification order.  And it went through the expert reports fairly extensively, and they're entitled to be able to question, whether it's Dr. Singer or whomever, regarding that.

But you need to be able to tell me whether or not he's going to do a new report or not or whether or not he's going to incorporate some of the findings from the old report.

And I don't know if they're going to do the reports first because we can also just wait.  I can wait to see what the reports say, and then we can come back and have a conversation. If he's incorporating a fair amount of his prior reports, then we can make a determination about what that looks like.

MR. CRAMER:  I think that might make sense, Your Honor, not to decide in advance.  We can maybe negotiate once all the reports have been produced how many hours each expert should be deposed.  We think 14 hours for one expert is a lot; seven hours is quite enough under the federal rules.  But I think the proposal to wait until we have the reports in front of us is probably the right decision.

THE COURT:  Mr. Chiu, any reason why we can't do that? It's a little bit difficult for me to make -- to, sort of, hear the discussion back and forth based upon theoretical or hypothetical expert reports.  And I don't know how many experts the parties are going to designate and what the theories are

2:21-cv-01189-RFB-BNW

going to be.  I mean, there may be completely new approaches.  I have no idea.

MR. CHIU:  In principle, we don't have an issue with that.  Obviously we weren't in a position to agree to that for the purpose of the joint proposal.  I will say, you know, it's not our intention to essentially, you know, recross Dr. Singer on his Le report to the extent plaintiffs, right, reproduce that.  The idea is that these are new cases and, ostensibly, without seeing their expert disclosures we're not in a position to limit our depositions to seven hours.

THE COURT:  Well, I agree with that.  So what we'll do is we'll just hold off on deciding hours until the reports are done, and then we'll come back and decide it.  I mean, we have a little bit of time before that's going to happen so --

MR. CRAMER:  Thank you, Your Honor.

MR. CHIU:  Thank you.

THE COURT:  All right.  Hold on here.  What's next.

Mr. Cramer, are you standing for something else?  Bless you.

MR. CRAMER:  No, we're agreed --

THE COURT:  I'm just going through my notes of what else we have to discuss.

MR. CRAMER:  We're agreed on the rest of the schedule and status report proposals.

THE COURT:  Hold on.  Let's see.

2:21-cv-01189-RFB-BNW

(Pause.)

THE COURT:  So let's turn now to some of the other motions here.  One of these I can dispose of fairly directly.  The Court's going to deny the motion to strike class allegations under Rule 12(f).  The Court finds that the motion is untimely, right.  Zuffa filed its answer on February 5th, 2024, and filed this motion on April 2nd, 2025.  Relying on Rule 12(f), then, that makes the motion untimely.  Based upon the Court's determination, it will be denied.

Now, I want to address the motion to deny class certification.  Who's going to be arguing this for the plaintiffs?

MR. CRAMER:  Your Honor, I can -- I can take that.

THE COURT:  Mr. Cramer, why don't you come up to the podium, please.

So, Mr. Cramer, part of the issue that I have really relates to the timing as to when we address the issue of the class members who don't have arbitration agreements representing class members who do.

While I am inclined to deny the motion, in part, because I think discovery would be appropriate, at some point I think that issue is going to come up.  The question is the context in which it comes up and how the Court decides it.  It may not be in this particular motion, but I wanted to hear from you about at this point what the plaintiffs' view was in terms

of adding class members or not.

I don't want to go through a lot of work on this if you intend to add class members or there's a -- you know that now. When we were last here, it was a very fluid situation.

MR. CRAMER:  Right.

THE COURT:  Right.  The case had just been filed. Mr. Isaacson had barely seen some of these cases, right.  And so we were in a different situation.  Now there's been sometime. The dust has settled.  There's obviously no stipulation here. There's no agreement here.  This motion is pending.  While I am not inclined to resolve it now, I think the issue has to be resolved at some point.

And so I'm not sure, Mr. Isaacson, if you're going to be arguing this or whoever.  I'm going to ask you the same question.  I think that in this case it's premature to decide class certification without some discovery, but I don't know that at some point we need to address this standing or not standing issue as it relates to the arbitration clauses and how that works between the three cases.  Because now we have three cases, right.  And we have a class that is composed of individuals with just arbitration agreements, right, and a class that may not be, and Johnson technically covers both classes right now.

So if there's going to be some approach addressing that, I want to understand that now before we engage in some

2:21-cv-01189-RFB-BNW

lengthy back-and-forth, right. Because there are different ways to deal with that. One is simply to limit the Johnson class to people who don't have arbitration agreements, and then you proceed with the one in Cirkunovs. And then, right, the arbitration agreement is addressed there. The Johnson class could potentially be expanded or they could be combined if there's a ruling later finding the arbitration clause unenforceable, or if it is enforceable, the Johnson class --

(Court reporter interruption and clarification.)

THE COURT: Sorry.

-- the Johnson class is already set, right. So I'm not sure why we are going through this exercise right now. I understand why they filed it previously, but we now have three cases.

MR. CRAMER: Yes.

THE COURT: And the only reason why I'm deciding this or have to decide it is you all don't have an agreement anymore, but we have three cases with three separate classes, right. Why do we need to decide this and what's going to be your approach to these three different cases?

MR. CRAMER: So I think the first answer, Your Honor, is as a result of the conversation we had moments ago, Your Honor is most -- most likely going to adjudicate the motion to compel arbitration and determine whether these arbitration

2:21-cv-01189-RFB-BNW

clauses are enforceable.  If Your Honor decides that they are enforceable, then they're enforceable both in Cirkunovs and Johnson and the issue will go away.  And if Your Honor decides they're not enforceable, then they're not enforceable in Cirkunovs and Johnson and the issue will go away.

So I think our preference is to -- we'll wait.  We don't know what the class in Johnson is going to look like yet, and we don't know whether these arbitration clauses are going to be deemed enforceable.  And that is the key issue, and that will be front-loaded given the conversation we had.  And I think that's the best way to proceed.

THE COURT:  Okay.

MR. CRAMER:  Ultimately, I think Your Honor -- I think Your Honor is correct that ultimately the only reason why we still have arbitration-clause plaintiffs or class members in Johnson has to do with the statute of limitations, and we have ways that we can resolve that issue.  We are concerned -- there is a concern that the statute may not be tolled for -- outside of the Johnson case and may not be tolled for the Cirkunovs case.

THE COURT:  Right.

MR. CRAMER:  And we have ways that we can resolve that issue.  But, again, our preference is to wait until Your Honor decides the enforceability question of these arbitration clauses and then we can address the other issues.

2:21-cv-01189-RFB-BNW

THE COURT:  Okay.  Thank you, Mr. Cramer.

MR. CRAMER:  Thank you, Your Honor.

THE COURT:  So, Mr. Isaacson, why wouldn't I take that approach?  You all have now filed your motion to compel arbitration.  Why wouldn't I just -- that's obviously the elephant in the room.  Why wouldn't I just decide that?

MR. ISAACSON:  So --

THE COURT:  And then we can come back to this issue. Because it's a different issue depending upon how I decide that. If I find the arbitration agreements are enforceable, right, then the class is automatically limited in that way.  And so I'm just trying to think from a judicial economy standpoint and from management of this case I'm not sure why I wouldn't deny this motion as premature for that reason.

I could do it for other reasons.  I also think that it's -- there should be discovery moving forward, but I want to focus on this issue because I think it's relevant to managing the case anyway and the timing.  I just don't know why I wouldn't focus on a decision on arbitration, also, because that decision is immediately appealable, right.  That's something I think will affect the entire case.

MR. ISAACSON:  So the reason, Your Honor, is before you get to the issue as to whether the arbitration clauses are enforceable, which in Johnson you have to have a class representative who has standing and who is qualified to litigate

2:21-cv-01189-RFB-BNW

that issue.  Otherwise, any rulings that you make in Johnson about the arbitration clause enforceability are going to be of no help to either side because they're not going to be binding on the class.

If you proceed with -- so we think it's crystal clear that in Johnson, because there is no class representative with an arbitration clause, that they don't have a plaintiff with standing or who's a qualified class representative.  I won't go through all the case law on that, Your Honor.  You've seen that case law.

THE COURT:  Yes.

MR. ISAACSON:  So if -- you know, we have filed the motion to compel arbitration in Cirkunovs where there is just an -- there's an arbitration plaintiff.  Okay.  Johnson does not have an arbitration-named plaintiff.

THE COURT:  But my question to you, Mr. Isaacson, is this.  Isn't whatever I decide in Cirkunovs going to apply to the Johnson class members who have arbitration agreements anyway?  If I were to find that it's enforceable, would you not say that it applies to the Johnson class as well?  Even if I -- whatever I decide on standing, wouldn't you say that?

MR. ISAACSON:  The problem will be if you find it's not enforceable, you don't have a party in Johnson who can take -- who can move forward with that, right.  The only way you can decide this issue is in Cirkunovs.

2:21-cv-01189-RFB-BNW

THE COURT: Right. But what I'm saying to you is, I don't know how I'm going to decide the issue yet in terms of the arbitration agreement.

MR. ISAACSON: And I'm sorry. And, technically, while we would say you should apply it in Johnson, we wouldn't be able to make it binding in Johnson because there's no adequate plaintiff.

THE COURT: I feel fairly confident that you all would make that argument even if there wasn't a plaintiff there saying essentially that the law and the facts are the same if I were to find the agreement enforceable. What I'm -- what I am just focussed on, Mr. Isaacson, is just, again, it's just a question of focus and time and energy, right.

MR. ISAACSON: I --

THE COURT: And that it seems to me that decision on the arbitration agreement drives a huge amount in all three cases.

MR. ISAACSON: Right.

THE COURT: And so I'm not sure why I wouldn't just from a judicial economy standpoint decide it first, right. And it sounds like what you're saying is even if I decided it, there might still be an issue if I found the arbitration agreements to be unenforceable. If I find them to be enforceable, then of course, right, it's less of an issue.

MR. ISAACSON: I --

—————————2:21-cv-01189-RFB-BNW—————————

THE COURT:  But it does seem to me that just, again for the reasons I've stated, other than the reason which I'm allowed to deny the motion also regarding it being premature for discovery, I just think practically it makes sense for me to decide it first.

MR. ISAACSON:  Right.  So -- and I understand, Your Honor, but I am not just speaking of those two issues.  I'm speaking of the broader issue of both constitutional standing and being qualified class representatives in Johnson.  So that when you make a ruling in Cirkunovs, we might say, "Well, gee, that should apply over in Johnson," but if individual class members bring actions individually against the UFC, none of that's going -- who are members of the Johnson class, none of that's going to be binding on them.  Because they weren't -- because there wasn't a class -- an adequate class representative and there wasn't one with standing.

It's right now for the Johnson arbitration class members.  There's no ability to make that class work and to have your rulings, whether they agree with us or disagree with us, binding on them.  You can only do that in Cirkunovs, which is why we think the most efficient thing is to have Cirkunovs proceed as the arbitration class and not -- and recognize that there are no qualified plaintiffs in Johnson for those -- for any rulings about arbitration there.

We think that ultimately -- because one of the points

2:21-cv-01189-RFB-BNW

of class actions, even, you know, win or lose for a defendant, is that we get certitude that --

THE COURT: Right.

MR. ISAACSON: And we are not going to have that during this entire period because of that, which is why the best way to clean this up is to recognize what we think is obvious, that the only class representative that can litigate this issue, to litigate the issue of the enforceability of the clauses, is in Cirkunovs and not in Johnson.

THE COURT: Okay. Thank you, Mr. Isaacson.

MR. CRAMER: Your Honor, if Your Honor finds in Cirkunovs that the arbitration clause is not enforceable, then it's not enforceable in Cirkunovs and Johnson and there's no issue, right. There's no enforceable arbitration clause to be concerned about. And if Your Honor decides that it's enforceable, then it's enforceable in both cases.

And, in fact, what's going to happen is in Cirkunovs, either way, that is going to be appealed, and then the Cirkunovs case is going to be stayed.

THE COURT: Right.

MR. CRAMER: And -- so that's the first point.

The second point is that there's no standing issue at the moment. There's no plaintiff in Johnson that anyone is questioning the standing of. It's just a question of class representative adequacy --

THE COURT:  Right.

MR. CRAMER:  -- which is almost -- you always dealt with at the class certification stage.  And there's now going to be a schedule where we're filing a motion for class certification, and at that point Your Honor will decide whether -- whether the plaintiffs in Johnson are adequate to represent the class that we seek in Johnson.  We haven't filed that motion yet.  It's premature.

THE COURT:  Okay.  Thank you.

MR. CRAMER:  Thank you, Your Honor.

MR. ISAACSON:  Can I just say, Your Honor, to be clear, our papers make clear we are challenging the standing as well as the adequacy of class representatives.

THE COURT:  I know.  You've made that argument.  I mean, I looked at it previously when we were here previously.  So I appreciate that.  I just wasn't sure if there had been any change based upon what's happened subsequently.  It sounds as if you all are essentially sticking with the arguments you previously raised, which I have previously reviewed.

And I don't need any further discussion on that.  Just a moment.

(Court conferring with law clerk.)

THE COURT:  So, again, I don't have any further questions about the motion to deny class certification.  I think the Court's likely to deny the motion as being premature and,

2:21-cv-01189-RFB-BNW

also, I don't agree with the standing issue being necessary to be decided until class certification.  Although, I'm going to go back and take a look at this one final time.  But I say that because I don't want there to be any holdup in discovery as relates to the case proceeding.  Because, obviously, if I grant the motion, then the case would come to a grinding halt and you all would address that.

But right now I don't think that that's going to happen.  And so I am saying that because I'm going to look at these arguments and just finalize my ruling, Mr. Isaacson.  But I don't want there not to be continuation of the case while I review that again --

MR. ISAACSON:  Right, I --

THE COURT:  -- based upon our discussion today.

MR. ISAACSON:  That is absolutely agreed, but I just want to make clear that if you grant the motion in Johnson, that also does not pull -- put any case to a grinding halt.  Johnson continues with --

THE COURT:  No --

MR. ISAACSON:  -- with the non- --

THE COURT:  -- I don't mean grinding halt.

MR. ISAACSON:  -- arbitration clauses.

THE COURT:  I just meant that there would be -- we'd have to revise things.  In other words, I just think we'd have to revise schedules and other things.

2:21-cv-01189-RFB-BNW

MR. ISAACSON:  I don't think --

THE COURT:  They could still obviously -- as I asked Mr. Cramer before, there's still the possibility of adding class members, but what I'm saying is we'd have to come back and rework things, potentially.  I don't know that it would be a big deal, Mr. Isaacson.  So when I say "grinding halt," I didn't mean that the whole case would stop.

MR. ISAACSON:  Right.  It's not clear to me that we would need to revise the schedule.

THE COURT:  Okay.

MR. ISAACSON:  Because Cirkunovs -- what would happen is Cirkunovs would go forward with arbitration and Johnson would go forward with non-arbitration.  And I think our schedule accommodates that.

THE COURT:  Okay.

Well, again, I'll take a look at it, but at this point I'm inclined to deny the motion and the case will proceed in that fashion.

Now, let's turn to the issue of the motion -- the motion to compel, and this is for Dominance.  Who's going to be arguing on behalf of Dominance?

MR. WILLIAMS:  Your Honor, Dominance is represented by Christiansen's office.

THE COURT:  I thought they were going to be here today.

MR. WILLIAMS:  I didn't see anything directing them.

The reason I'm speaking is I've been in touch with their office on other issues, just about the status of the case, but I don't think they ever received a notice they were supposed to be arguing that today.

MR. SAVERI:  And, Your Honor, Joseph Saveri.

We filed the motion, but it hasn't been docketed for a hearing.  So there's no --

THE COURT:  Okay.  You know, we were preparing.  Like with most of this case, most of the time I assume that everyone's here and arguing -- prepared to argue these motions. But we'll -- we can separately docket the motion for Dominance.

MR. SAVERI:  Yeah.  Thank you.  And that's one of the things on our list is to get that -- that hearing on that motion docketed so that they will show up and we can adjudicate it.

THE COURT:  Well, let's see how quickly we can do that.

MR. SAVERI:  The papers, Your Honor, are fully briefed.

THE COURT:  I know.  I'm fully prepared to actually discuss them.

MR. SAVERI:  Well, I'm prepared to argue against no adversary, too, but someone told me a long time ago ex parte is the best party.

THE COURT:  Right.

MR. SAVERI:  But I don't think --

THE COURT:  Exactly.  Well, let's see if we can't get them.  We don't have anything this afternoon.  You all are here

in town, so it makes sense for me to try to get this done today.

MR. SAVERI:  I'm here, Your Honor.  I'll --

THE COURT:  Right.  And you guys can have an excuse to spend the night if you have to, but let's -- we'll reach out to Mr. Christiansen's office and see if we can't get them here.  I mean, I know it's fully briefed.  Hopefully it shouldn't take them that long to be able to be prepared.  Let's see what we can do about getting them here this afternoon.

MR. SAVERI:  And, Your Honor, if we can't do it today, I'll come back and I'll stay here as long as I need to in order to get it heard, so...

THE COURT:  I'm just saying, we were prepared to go forward to discuss it today.  It makes sense while everyone's here to discuss it.

MR. SAVERI:  100 percent, Your Honor.

THE COURT:  So let's see if we can't get them in here.

(Court conferring with courtroom administrator.)

THE COURT:  Okay.  Well, let's skip over that, then.

So, let's turn to the motion for sanctions and for a special master.  So who's going to be arguing this for the plaintiffs?

MR. DELL'ANGELO:  I will.  Michael Dell'Angelo, Your Honor.

THE COURT:  Mr. Dell'Angelo, why don't you come up to the podium there.

36

2:21-cv-01189-RFB-BNW

So I will give you a little bit of guidance here. I'm not ordering case-dispositive sanctions. I don't think it's appropriate here. Now, I do think that there have been some violations of my order. And so the question is, short of dispositive sanctions -- you have, one, asked for a special master and then there can be other sanctions. I think one of the sanctions you asked for is some sort of instruction to the jury should the case go to trial about what's happened here.

I have to tell you, I'm not inclined to give that type of a sanction either without some further investigation into this. It's not clear to me that that's warranted. That's a fairly substantial sanction in the context of the case.

So we're, sort of, left with monetary sanctions and a special master. So I want to talk with you a little bit about that. Why do we -- we're -- why do we need a special master? I mean, we're meeting actually fairly regularly in this case. I mean, this case has a long history. And so one of the reasons why I wouldn't appoint a special master is to get up to speed on this case would take a long, long time. We've all been sitting with this case for years. I'm not sure I'd put someone in that particular situation, and I'm not sure they'd have the full context in which to be able to decide things. And if we're meeting regularly, why do we need a special master?

MR. DELL'ANGELO: So, Your Honor, the parties seem to have different conceptions on what a special master would do. I

2:21-cv-01189-RFB-BNW

think under our proposal the concerns that you've articulated don't obtain.

The special master that we're asking for is really one that would step into the shoes of counsel for the defendants and essentially complete the process of identifying, collecting, reviewing, and producing discovery.  And, actually, there's a development this morning.  I mean, we -- I will say, we are in --

THE COURT:  So what does that look like?  Does that mean that, for example, what you would be asking for the special master to do is, like, reviewing things in camera in order for them to produce things that then have to be reviewed by the special master that are then ordered to be produced?

I mean, if we're meeting regularly, just bring it up at the regular meeting and then I'll address it at the regular meeting.  Why do we need a special master in addition to that?

Because then that adds a layer where then I have to review the special master's findings --

MR. DELL'ANGELO:  Sure.

THE COURT:  -- people are going to object to the special master's findings.  Then I have to do the work anyway, right.

MR. DELL'ANGELO:  Yeah.

THE COURT:  That's -- part of, sort of, the advantage and disadvantage of having a special master is they'll do some

work, but you all are not going to agree.  Someone's going to object.  And then there's going to be an objection.  And then they're going to object to what you are asking or you're going to object to the special master making a particular finding, and then I have to go back and do the work anyway.

MR. DELL'ANGELO:  Right.

THE COURT:  So I'm not sure why I would do that when I'm already doing the work right now.

MR. DELL'ANGELO:  So for three reasons, Your Honor.  First, because I think unfortunately the orders that you've issued have not been carried out in a way that have gotten us to where we needed to be.  Secondly, what we're not asking for is a special master who is a referee.  We are -- that's what the defendants are suggesting.  What we are suggesting is something very different, which is what Magistrate Judge Leen did in the *Small* case, which we cited in our motion at Docket 217, which is one who quite literally steps into the shoes of defense counsel, sits down with potential custodians, interviews them, and goes through the process of identifying, collecting, reviewing, and producing documents as if they are defense counsel, not someone with whom the parties negotiate, right.  But that person would provide reports to the Court.

And, actually, there's a development this morning as we understand it that I think helps highlight why this matters.  So, Exhibit 30 to our motion is the defendants' --

—————————2:21-cv-01189-RFB-BNW—————————

THE COURT:  Hold on.  Let me just pull it up so I can get there, too.

MR. DELL'ANGELO:  Okay.  It's the defendants' July 3 --

THE COURT:  Wait, wait.

MR. DELL'ANGELO:  Okay.

(Pause.)

THE COURT:  Hold on just a moment here.  Having some challenges.

I'm sorry, Mr. Dell'Angelo.  What exhibit are we talking about?

MR. DELL'ANGELO:  Exhibit 30.

THE COURT:  To the motion to -- for sanctions.

MR. DELL'ANGELO:  Yeah, so it's motion ECF 217-32.  It was filed under seal.

THE COURT:  And what is it?  Because I'm --

MR. DELL'ANGELO:  It is the defendants' July 3, 2025, letter to plaintiffs that constitutes the disclosure that this Court ordered that the defendants make in response to the Court's June 3, 2005, order at the last hearing to disclose personal devices.

THE COURT:  I'm sorry.  Whose letter is this?

MR. DELL'ANGELO:  This is the defendants' letter.

THE COURT:  From?  Who signed it?

MR. DELL'ANGELO:  It was signed by Mr. Axelrad.

THE COURT:  Yes.

2:21-cv-01189-RFB-BNW

MR. DELL'ANGELO:  And it's to Mr. Cramer and myself.  I could hand up a copy if --

THE COURT:  No, I have it.  I have it now.

MR. DELL'ANGELO:  Okay.

THE COURT:  Go ahead.

MR. DELL'ANGELO:  Okay.  So this is the disclosure, right.  This is the part -- this is part of what is driving our motion, issues such as this.  There are a lot of deficiencies with this disclosure which we kind of -- we lay out at Exhibit 45 to our motion.  But if I can direct Your Honor to the very last page of that exhibit, which was the attachment to the letter that is the Appendix A.  The penultimate line lists Dana White, right, and this is in response to the Court-ordered disclosure.

And what you'll see is that there's a phone listed, iPhone 11 Pro.

THE COURT:  Right.

MR. DELL'ANGELO:  I won't read the phone number out loud, but it ends in 092.

THE COURT:  Right.

MR. DELL'ANGELO:  That's listed there because -- okay.  So we went through this chart.  We listed all sorts of deficiencies that compared to the April 23 disclosure that kind of precipitated the motion that the Court heard on June 3. Those are laid out at Exhibit 45, and there are many.

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

2:21-cv-01189-RFB-BNW

This morning, as we were walking into court, there was a modest production of I believe about 154 documents from the defendants. Now, we're well past the substantial completion deadline. We've reviewed that production while we were sitting here. And one of the things that I think we've figured out is that there is an additional production of a phone from Mr. White that ends in 682, an entirely new, heretofore undisclosed phone.

And if you look at the backdrop of this case, the Le case was filed in December of 2014. In the litigation in this case -- so that should have triggered a litigation hold. The Johnson case was filed in 2017 while Le was still pending. During the discovery negotiations in this case, I believe in April of 2025 if memory serves, the defendants represented that the litigation hold in Le continued. And of course you would expect a litigation hold in Johnson. So there should be a continuous hold.

We've been back and forth about mobile devices which I think are an absolutely critical part of this case. But if we are interpreting this information correctly, what it is telling us is that almost 11 years on we are still discovering or the defendants are still discovering devices. And when you look at that in the context of Exhibit 15 to our motion, which is ECF 2017-17 [sic], there's a -- there's a line, right, that drives a lot of what's happening here. It's under --

THE COURT: I'm sorry. What exhibit?

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

2:21-cv-01189-RFB-BNW

MR. DELL'ANGELO:  It is Exhibit 15.  It's at ECF 20 -- 217-17.

THE COURT:  Okay.

MR. DELL'ANGELO:  Okay.  On Page 3 of 38 of that -- that document under Roman Numeral 1, Preservation Issues, the very last sentence of that section says:  "As we previously explained, other sources of ESI, such as data from individuals' personal social media accounts or communications made from media mobile devices are either not" reasonable -- "reasonably accessible or not in the possession, custody, or control of Zuffa."

So what we have is this confluence, right, of well after substantial completion, 11 years into this, sort of, continuing litigation, defendants apparently are still identifying, you know, potentially discoverable information and producing it.  If you look at the deficiency chart assuming --

THE COURT:  So what's the solution?  Assuming that I agree -- I'm not saying that I do.

MR. DELL'ANGELO:  Sure.

THE COURT:  I'm going to give them a chance to respond.  What's the solution to this?

MR. DELL'ANGELO:  The solution is --

THE COURT:  I mean, what's a special master going to do exactly?

MR. DELL'ANGELO:  What the special master will do is go

2:21-cv-01189-RFB-BNW

to each defendant:  Endeavor, TKO, and Zuffa, and it will perform the function that litigation counsel would do when running an e-discovery program in litigation.  It will identify custodians.  It will interviewed those custodians.  It will interview a custodian of records to understand what the e-mail systems are like.

THE COURT:  Right.

MR. DELL'ANGELO:  Right.  It will identify discoverable information, collect it, review it, and produce it.

THE COURT:  Why would we do that?  Why don't I just have a date where we have a hearing?  You'll give me 20 witnesses.  We'll put them all on the stand, including all of the people listed here.  And I'll ask them under oath:  What devices do you have?  And if I find that they are in contempt and find other devices, they are individually held in contempt.

Why would we go through all that exercise where what's going to happen, right, is, right, we're going to have this back-and-forth discussion about what we do and don't have?

If we need to have a hearing about the devices or we need to have devices, sort of, taken -- sort of, reviewed by a special master, that's fine.  You just have to let me know.  But I don't want to create another layer of, sort of, a special master going through that.  And I also think there could be a potential violation of defendants' rights where you have someone basically questioning them without their lawyer present or

something of that nature.

If you have concerns about devices, we can have some sort of hearing where we just -- I just bring the custodian in.

MR. DELL'ANGELO:  Yeah.

THE COURT:  Put the custodian under oath.  What devices exist?  If it's an issue about, well, we have individuals, but Zuffa doesn't have control of them, name whatever -- the individuals on the list.  They can either be deposed or we can have an evidentiary hearing.  We can simply ask them:  Do you have a laptop?  Do you have a -- from what -- or what's the information?  We can have a sealed hearing and just deal with it.  I mean, that -- why would we go back and forth in discovery when we can just deal with it that way?

MR. DELL'ANGELO:  So we propounded discovery requests a little over eight months ago.  The state of discovery is really -- if you look at the scope of the production thus far is really in its infancy.  We lay this out at Exhibit 51.  I mean, at --

THE COURT:  So, Mr. Dell'Angelo, you're still not actually answering my question.

MR. DELL'ANGELO:  Sure.

THE COURT:  Right.

MR. DELL'ANGELO:  Okay.

THE COURT:  I'm not understanding the nature of the problem.  If it's one phone that you're concerned about, okay.

2:21-cv-01189-RFB-BNW

Fine.  If you think there are a host of devices that are somehow not being identified, you need to let me know so I have some idea as to why you're saying that.

MR. DELL'ANGELO:  Sure.

THE COURT:  Right now I hear you saying you suspect, but you're not sure.  They're still discovering devices.  And while, you know, that's unfortunate, these things can happen. I'm not -- I'm not necessarily seeing from this particular example, right, an issue.  I think there was an issue about delayed disclosure which I think is a violation of the Court's order and some other issues, right.

MR. DELL'ANGELO:  Yeah.

THE COURT:  I think the work should have been done a lot sooner and I don't see any excuse for that, but that's just about potential monetary sanctions for the timeliness of it. But it's very different to say essentially what we're going to do is send an individual into their business operation and effectively seize electronically-stored information, right. Because that's more or less what you're asking me to do.

MR. DELL'ANGELO:  That's absolutely what we're asking for and --

THE COURT:  Well, Mr. Dell'Angelo, you should have started with that, right.

MR. DELL'ANGELO:  Okay.

THE COURT:  You should have just said to me, "We think

2:21-cv-01189-RFB-BNW

that devices need to be seized and imaged because they're not accurately providing them."  And they can respond to that, right.  Because I don't really see a need for a special master to review things, but if you think that custodians are not being forthcoming and that they would be more forthcoming with a special master or if they need to be placed under oath, you need to make a case for that specifically.  Because that's a very different situation, right, and I want to understand what it is we'd be doing to do that.  I'm not saying I wouldn't do it.

I have actually done that in cases --

MR. DELL'ANGELO:  Sure.

THE COURT:  -- where I've been concerned about information not being properly disclosed.  And in my experience oftentimes the best way to do that is to put someone on the witness stand and let them know, right, that they have to provide truthful testimony.  And frequently that leads to information, or a confirmation of what is or isn't there.

MR. DELL'ANGELO:  Okay.

THE COURT:  So I'm just trying, again, to get a sense of what it is you're asking --

MR. DELL'ANGELO:  Sure.

THE COURT:  -- me to do.  Because it sounds like, while there may have been a trickle and you're complaining about that, the information is starting to flow.  Because there's a separate question I want to ask you which is there's a difference between

2:21-cv-01189-RFB-BNW

a late disclosure and information you feel like is being actually hidden or withheld or destroyed.  Those are two separate things.

MR. DELL'ANGELO:  Sure.

THE COURT:  If you just think that this is slower than it should be, that's one thing.  If you believe that, in fact, individuals are not being completely truthful about devices, that's something different and we need to address that head on.

MR. DELL'ANGELO:  Yes.

THE COURT:  So which is it?

MR. DELL'ANGELO:  It is -- it is a form of the latter, right.  I think there is demonstrably a significant dissonance in what we have been told about what exists.  We actually tried to chart this at Exhibit 45 to our motion.  We looked at the April 23 disclosure that they made and the July 3rd disclosure that they made in response to your Court's order.  And you will see there are lots of problems, right.  There are devices that don't show up.  There are, you know, laptops that don't show up. There are people who are proposed --

THE COURT:  When you say "don't show up," again, I'm trying to understand --

MR. DELL'ANGELO:  On the latter disclosure, right.  So there is a lot of dissonance between these two things, right, where on one disclosure there was the phone and then on the later disclosure the phone doesn't exist anymore.

48

2:21-cv-01189-RFB-BNW

But another way to look at this, Your Honor, is this isn't about pace of production.  It's about the production.  So one of the things that we tried to do for Your Honor at Exhibit 52 to our motion is lay out all of the custodians -- I'm sorry.  It's in our reply brief at 240 -- sorry -- ECF 230-4.

The paucity of the productions from some of the most significant custodians in this cases is shocking, right.  This isn't about timing.  This is about the apparent existence of this material, particularly when you look at it against the backdrop of Exhibit 15 which I read to you which suggests that, notwithstanding these apparent litigation holds, defendants are essentially saying, "We don't have control over this stuff.  It may not exist."

I mean, you look at Exhibit 52 to our reply.  Again, it's ECF 230-4.  So you look at some of these custodians.  Dana White, he's the last custodian.  It's on Page 2 of 5.  As of August 19th they produced a total of 95 documents.  So, right, from something like 2015 to the present as a custodian, as the person who's running Zuffa, putting on live events all across the country as part of a massive publicly-traded company --

THE COURT:  Well, so that raises a separate issue which I want to ask the defendants about, which is these individuals are all listed as custodians.  But someone has to be responsible for all the documents for Zuffa, right.  And maybe -- I'm not sure if that's Dana White or who that person would be, right.  I

2:21-cv-01189-RFB-BNW

don't know that Mr. White is necessarily responsible for all of Zuffa's documents, but whatever documents that Zuffa is producing back and forth, right, should include his documents.

MR. DELL'ANGELO:  Yes, and --

THE COURT:  So who's the person at Zuffa who you all understand is responsible for all of this?  Because there has to be servers or other things that control all of these documents. And who's responsible for that?

MR. DELL'ANGELO:  We have no information, right, about what sources -- beyond the most general descriptions of, like, e-mail, what sources exist, right.  Again, we can't get clear consistent answers on devices.

THE COURT:  Well, let's just -- we can fix that right now.  Mr. Dell'Angelo, hold on a moment.  Why don't you take a seat.  Let me let -- there's been a lot said here.  Let me let whoever's going to respond to this from the defendants come on up so we can discuss it.

So, Mr. Chiu, I guess my basic question is there has to be a custodian at Zuffa --

MR. CHIU:  Correct.

THE COURT:  -- who should be responsible.

MR. CHIU:  And let me --

THE COURT:  Who is that?

MR. CHIU:  -- step back.

(Court reporter interruption and admonition.)

2:21-cv-01189-RFB-BNW

THE COURT:  Who is the custodian who we can talk to who has access to all of Zuffa's documents?

MR. CHIU:  Well, Your Honor, the process in which it works is that there are a number of custodians.  We have engaged not only a vendor --

THE COURT:  Mr. Chiu, here's what I want.  We can't have a number of custodians.  The documents are all electronically stored.

MR. CHIU:  Correct.

THE COURT:  So when you say "a number of custodians," give me a number.  Because 50 custodians is not manageable, right.  So the question --

MR. CHIU:  We --

THE COURT:  -- when you say "a number," how many do you have?

MR. CHIU:  We've agreed to 35 custodians across all the defendants.  And -- and the way this has worked, Your Honor, is that separate and apart from custodian files, which are, for example, e-mails, electronic files in their possession.  They're work related.  We've also gone out and collected other documents, right, that are not in e-mail work files.  That -- that is how generally this discovery works.  And as we mentioned in our papers, right, that's the whole process with lawyers, with e-discovery vendors, right, agreeing to custodians, searching their documents.  There's also the issue with devices.

2:21-cv-01189-RFB-BNW

THE COURT:  But I guess, Mr. Chiu, what I'm not understanding -- I appreciate that -- is...

MR. CHIU:  There's no, like, one custodian of record.

THE COURT:  I don't mean it that way.  What I mean is that there can come a point where the custodians are so divided as to their responsibilities, documents are not produced, right.  And so what I'm saying to you is, certainly there are individuals at Zuffa who have access potentially to whatever documents are being stored there, right.

MR. CHIU:  And that's how -- that's how we approach it, right.  We're not going -- when we collect electronically-stored information --

THE COURT:  Right.

MR. CHIU:  -- right, separate and apart we can set aside the devices, and I want to talk about that for a second.  But we are doing these collections by running search terms and pulling them on the back end, right, from the files of people at the company.  So -- and then we're also going to separate sources of documents.  That -- that is how the discovery works.

THE COURT:  So I understand.  I guess what I'm saying to you is, for example, if you're looking for, let's just say, e-mail communications regarding Zuffa executives, why would you need five custodians to do that?  Is it -- and so that's --

MR. CHIU:  That's what we've agreed to, and that's --

THE COURT:  But why do you need five custodians?

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

52

2:21-cv-01189-RFB-BNW

Why -- what is it about five or six or seven or eight custodians?  Is it efficiency?  Is it time?  Like, what is it, right -- because what ends up happening in a case like this is whether it's me or the magistrate judge, we're having to resolve these allegations, right.  And what I often have done and the magistrate judge has done is we bring a custodian in.

Now, if I have to bring in 35 custodians, I guess I'll do that, but I'd prefer not to do that, right.

But I want to be able to ask individuals or have a magistrate ask individuals, right, have you searched for all these documents?  What have they done?  I don't want this running, ongoing discovery dispute about what exists and doesn't exist.

And so what I'm saying to you is, right, I need to be able to have a way to resolve this.  And oftentimes this results in custodians either being called in or there being some other way for the Court to resolve it in other ways.  A special master is one, but I don't really want to do that.

So what would you propose, then, in terms of resolving this?  Because I assume that you think you're producing everything.  They disagree.

MR. CHIU:  Correct.

THE COURT:  But the question is I have to have a way to resolve this.  So how should I do that?

MR. CHIU:  You know, I think one way we can go is --

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

2:21-cv-01189-RFB-BNW

and, you know, just stepping back to answer Your Honor's question, a lot of that is done by counsel, right. This process of engaging custodians, understanding what they have, what they collect, that's all process that happens in discovery. One way we can do this is to have declarations provided by individual custodians attesting to, you know, the fact that they have done this search. They have served their documents. That is one way we could go without having to haul them into court.

But just stepping back, just the assumption and the -- and the accusation that there has been any sort of process that has been untoward here is just unfounded and baseless. And I just want to highlight this because Mr. Dell'Angelo said this in open court. This idea that we did not know and they did not -- they were not aware of this additional number from Mr. White is -- is plainly incorrect.

At Docket 217-37, Mr. Dell'Angelo writes a letter to us identifying and saying, "Look, there are documents in our production from Mr. White's other number." So this idea that --

THE COURT: So then why weren't they included in the other -- in the chart?

MR. CHIU: Because as we continued this process of discovery and collecting documents, we were able to collect and find responsive texts from that additional number, and we produced them. So this idea that we're hiding or that this process is one where there's something untoward happening is

just not true, Your Honor, and that is how discovery works.

There is a huge record.  We go through this.  We -- and stepping back, you know, looking at the correspondence, there hasn't really been any real engagement with defendants on these issues other than to demand and to, frankly, file motions.

THE COURT:  Excuse me.  But do you have a running master list of discovery you've produced?

MR. CHIU:  Yes.  We can -- we can provide that to the Court.

THE COURT:  Well, I'm glad we can produce it.  Because one of the ways to resolve this, this issue about "you have the number, you don't have the number," is for there to be -- and typically in these cases there is a master list with the productions, whether they're electronically-based numbers or however --

MR. CHIU:  Absolutely.  We have the numbers, yeah.

THE COURT:  Right.  And you've shared that with plaintiffs?

MR. CHIU:  Of course.  They have all the information.

THE COURT:  So I guess my question is, is there and do the parties have a master list of all the discovery that has been produced in this case?

MR. CHIU:  We can prepare that and provide it to the Court.  Yes, we do.  We have that information, of course.

THE COURT:  Okay.  Well, it sounds like there's some

disagreement about that. Because that sounds like that would be the first step in figuring this out, right. Because I do think that that creates issues where one party's thinking we're updating our discovery, but we don't think we have to go back and tell you what we've already indicated, which it sounds like what you're saying, Mr. Chiu, is that "We told you about the number before. We don't feel we have to repeat it each time. We want to tell you about new information we have because we have an ongoing obligation."

MR. CHIU: Correct.

THE COURT: "But we're not repeating our previous responses with each new response," which it sounds like what you're saying, right?

MR. CHIU: Correct.

THE COURT: Okay. So I think a way to avoid this is for you all to create a master list, right, of all the information that has been produced and is responsive.

The other thing, and I want to hear your thoughts about this, what I'm inclined to do is to order Zuffa to identify three custodians who when there are disputes I can simply order them to search for documents or whatever. I don't want to do 35 people. I want you all to be able to identify three people, right, who, first, they can -- the plaintiffs can ask to do a search, and then if I have to, I can bring them in. That way I understand they have full access. They can do a search, right,

and we can get to the bottom of any discovery dispute.

I'm not saying that I would immediately bring them in, Mr. Chiu.  So this would just be in the instance where we're having to resolve this.  Because right now I think the first problem is you all may be talking past each other, as you've indicated, because you said, "Look, we've provided information."

So the first step would be obviously to provide the master list of all the discovery and I know that may take a little bit of time, but I'll give you all a few weeks to do that.  Then the next step is if they have a particular request that they think is somehow missing, right, that they would request it from you, right, and to see if they get an adequate response.  If there remains a dispute, then they would go to one of these three designated individuals and ask for the search. If that continues to be a problem, then we'd bring the person in that I can ask related to that.

That would be the system that I would propose.  Because it is unmanageable to have 35 custodians for me in terms of resolving disputes.

On the other hand, I think having the master list could do -- address a fair amount of this given what you've said.  And my hope is I never have to have that type of a hearing, but I want you to have three individuals prepared who will have full access and who would be prepared to answer any questions presented to the Court or to be able to do searches on all of

2:21-cv-01189-RFB-BNW

the defendants' documents or equipment, whatever would be

necessary, so that I can resolve this, right, without undue

delay.  Okay?

So, again, I'll let you, sort of, comment on why you

think that would or wouldn't be feasible or what your thoughts

are on that.

MR. CHIU:  Yeah.  So, number one, I think just in terms

of functionality and how it works, three individuals is probably

too much just because -- and I can explain.  The way we do --

THE COURT:  Too many, you said?

MR. CHIU:  Too many, correct.  Because as -- again,

with most of this electronically-stored information, the way we

go about collecting and searching is -- is frankly through

attorneys, e-discovery teams that go and search for this

information, right.  That is generally how it works.

So this idea that there could be a custodian of

record -- three custodians of record at the company who could

then be responsible for all this is just -- it's functionally

not how we go about looking --

THE COURT:  They wouldn't be responsible.  They would

be responsible for, if there's a dispute, looking to see whether

or not these documents existed.  So, for example, as

Mr. Dell'Angelo pointed out, you know, you have allegedly 95

documents from Mr. White.  Now, of course that doesn't seem like

it's appropriate discovery production just from him given his

58

2:21-cv-01189-RFB-BNW

role, but it may very well be that he's covered in other documents, I would assume, that have been produced by other custodians.

The issue for me, Mr. Chiu, is how do I resolve that particular inquiry to know that everything that has been produced. The reason why I would want these individuals designated is because it would be these individuals' job to confirm that everything that is in the possession of the defendant has in fact been produced, right. So I need a way --

MR. CHIU: Right.

THE COURT: -- to be able to have someone confirm that. What I don't need are six declarations. That's not helpful or useful.

MR. CHIU: That's fair. I think just also stepping back, though, and I want to kind of address this special master point and I heard, you know, Your Honor's views on that. I do think the one reason why the defendants have kind of agreed to or proposed that as another option is to mediate a lot of these disputes, right. And so kind of the -- the process that you just kind of anticipated and explained, you know, what I foresee is kind of what we've been frankly dealing with up to this point with the plaintiffs, which is unilateral demands, and in that process who's going to mediate, right.

There's -- generally, there's an issue in discovery. "Oh. Do these documents exist?" There could be fights about

relevance, proportionality, whether they are responsive or even relevant. In going back to, for example, the substantial completion issue, plaintiffs effectively demanded search terms that would -- would have had us produce 98 percent of all the files, all the files across all 35 custodians. Of course not all of that is relevant to the issues in this case.

So it's really needing some sort of mediation to help us actually move those disputes along. And what I foresee with what you've proposed is they will come to us and say, "Well, we want all these files from so-and-so executive at UFC." And then we're obligated to go say, "Oh, they exist." And they'll demand them? There needs to be a process there because clearly what's happened is we are talking past each other. There's been an unwillingness to engage other than to wholesale demand everything, which is not -- you know, not within the proportionality and relevance standards. And we have produced already a ton of material. We have substantially complied.

So I'm just kind of thinking ahead, you know, the process that you're anticipating. While I think parts of it do make sense, we're going to need a process to actually mediate what I anticipate will be additional disputes.

THE COURT: Well, I appreciate that, Mr. Chiu. I agree with that. I mean, the question is -- I mean, I don't relish the opportunity to be resolving all of these discovery cases. I generally don't do that in cases, but because of the history of

2:21-cv-01189-RFB-BNW

this case I think it would be difficult, other than, perhaps, Judge Leen -- although she's retired.  Perhaps, I could convince her to come out of retirement.

MR. CHIU:  I mean, she does serve as a special master.

THE COURT:  Because she could serve as a special master.  She is familiar with this case, actually.  That may be something I contemplate.

MR. CHIU:  Yeah.

THE COURT:  But I agree with you.  But I think one of the first issues I see is 35 custodians, to me, just sounds like too many to be able to coordinate in terms of identifying a complete response, even for you all.  So that's why I was saying three or four.  Because if you're trying to get 30 different people to provide different pieces of the production, that is an incredibly unwieldy situation to begin with.  It likely will result in potentially a production not being complete, not necessarily through anyone's bad faith, but because, you know, you're herding cats in that situation.

So I'm trying to think of a way, whether it's a special master or not, to whittle the number down of individuals who can search for and produce these documents.  And I'm not sure why we need 35.  Maybe you can help me understand that.  Because that to me just seems really unwieldy and leading to part of the problems that we're having.

MR. CHIU:  I think we're talking past each other.  I'm

not saying we need 35 of those custodians. I'm saying what we've agreed to as part of the discovery in this case across the three defendants is to go search for and look for documents from 35 custodians. And you're right. There is going to be a lot of overlap, and a lot of the plaintiffs' complaints are superfluous in light of the fact that, for example, we have custodians who have roles at TKO and UFC and their documents overlap. So you're right. There's expansive coverage.

If what we're focussed on is having essentially like a point of contact, right, to just confirm, hey, you know, Mr. So-and-so's documents, did you -- did we look at this repository or did -- are we sure we collected all the e-mail? I mean, generally that happens through counsel. That happens through -- right. And -- and, you know, I'm not opposed to having that single point of contact if that's what the Court thinks would be more efficient.

But that's really the explanation for why there's 35 custodians, is that that's the universe of people, right, that we've identified as --

THE COURT: Right.

MR. CHIU: -- potentially having relevant information in this case.

THE COURT: So your -- so in this sense...

(Defense counsel conferring.)

THE COURT: Go ahead, Mr. Isaacson.

2:21-cv-01189-RFB-BNW

MR. ISAACSON:  I just want to suggest, following up in terms of a productive process forward, you mentioned Magistrate Leen and he mentioned mediation.  Without taking -- having motions brought to a special master, you could have someone make recommendations to the party.  And then if there is still a dispute, you would be hearing those disputes on -- you know, at the regular status conferences.

THE COURT:  Well, because I just think, again, Mr. Isaacson and Mr. Chiu, part of the issue is I'm not opposed to a special master per se, but we are so far down the road together, I just think it would be hard for someone to catch up, honestly, and there's some history here.  And I may find there's some issues that are relevant to some of the dispositive issues I have to decide where I might provide different guidance.  And so I am trying to envision a process where we can actually resolve these disputes because --

MR. CHIU:  Correct.

THE COURT:  -- I do think, notwithstanding some of the difficulty of the production in the Le case, ultimately the production I think through Judge Leen's steady hand resulted in a fair production for both sides.

And so, again, I'll have to think about this given what we're talking about.  We're early in the process.  So -- but I just foresee this being an ongoing issue.

MR. CHIU:  Yeah.

2:21-cv-01189-RFB-BNW

THE COURT:  And, as you said, we need to have some way to mediate that.  So let me think about that.

MR. CHIU:  And --

THE COURT:  I don't agree with the plaintiffs that just a special master who's just going to be looking over the defendants' shoulder, I don't think that that's effective or fair.  And I'm not saying that's exactly what you're proposing, Mr. Dell'Angelo.

MR. CHIU:  No.

THE COURT:  But that's sort of what it sounded like.  I don't think that that's appropriate or fair, but I do think we have to have a way to resolve these disputes.  I also think, Mr. Chiu, the first step is having a master list that they can look to that you can point out that I can see where we can say, "Look, this has already been produced and it was produced on that date."  That would resolve these different issues.

And, I mean, typically, you know, firms usually have something like that.  I know you may have it in different pieces.

MR. CHIU:  That's something --

THE COURT:  I assume that you have some sort of production log or something of that --

MR. CHIU:  Correct.

THE COURT:  -- nature that you could provide.  That would be the first step.  And then I think we would -- we

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

2:21-cv-01189-RFB-BNW

definitely need to find the process --

MR. CHIU:  Yeah, you know --

THE COURT:  -- for mediating conflicts.  And it may be, again, these three individuals or some other individuals, but we need a process to mediate the discovery conflicts so that at our regular status conference I can resolve it to the extent that there's a dispute.

MR. CHIU:  Yeah, I think the last point -- and you're right, Your Honor.  Our proposal on the special master is obviously not what the plaintiffs are proposing, but more in the vein of having someone like Judge Leen who has familiar -- familiarity with this case, kind of, mediate issues as they come up, so we're not getting to the point of every two months when we have a status conference there's another motion to compel or a motion like the plaintiffs have filed, but we could actually deal with things as they come up.

I've had that work in other cases where it's almost, like, an agreed-to informal process where, you know, as things come up, they go to the magistrate or the mediator or a special master.  They kind of get dealt with, and the parties -- both -- both sides agree that, you know, that will govern moving forward.

I just think that what we've seen here in the last couple of months is -- you know, we're here in June.  Plaintiffs are saying there's no issue with the Zuffa and TKO productions.

2:21-cv-01189-RFB-BNW

We're proceeding on pace. And then we get a motion that's complaining about all sorts of things which they haven't engaged on. And I think just for -- as you mentioned, for the appropriate path moving forward, our view is that that -- having some sort of process like that would be beneficial.

THE COURT: Well, we do have a magistrate judge who's assigned to these cases. I just have unreferred it, but Judge Weksler -- I think it's Judge Weksler -- is the judge who is assigned to these cases. And I could simply ask her to perform in that role as you have on a, sort of, limited basis. I mean, I could oversee the overall discovery in terms of deadlines. She would have to manage that. But she could help manage some of these conflicts that come up. So it would be a slightly hybrid, sort of, approach that we would have for the magistrate judge here.

But any reason why we couldn't do that, Mr. Chiu?

MR. CHIU: I don't think so, but, you know, I think just having -- having some guardrails over the process and -- would be -- would be helpful and productive.

THE COURT: Okay. I may bring you back up as we work through this process.

Mr. Dell'Angelo, I'm going to have you come back up here.

MR. DELL'ANGELO: Thank you, Your Honor.

So a few comments, if I may, unless you have --

—————————2:21-cv-01189-RFB-BNW——————

THE COURT:  Well, first, Mr. Dell'Angelo, why wouldn't we just -- again, we start with a master -- I have three thoughts on this.  One, we start with a master list.  I think there should be one.  I'm not sure why there hasn't been one up to date, but that shows all the things that have been produced beginning in the Le case.  Two, we identify individuals from the defendants who can actually confirm or provide confirmation of what material has been produced and searched so that we are talking about custodians.  Because, again, I wouldn't expect Mr. White to be a custodian from whom, like, you would be -- he would be specifically going through, right, and identifying documents.  That's -- right, that's not, I think, would be an appropriate role for him or any other officer at Zuffa, right.

So I don't know how to put into context the 95 documents because obviously there are more documents than that.  And, in fact, I know that more documents than that have been produced, right, for Mr. White, right, even from the Le case.  So that to me, while I appreciate that, isn't -- is an illustration of the problem, which is you all are focussed on those types of productions, but what we need is someone or a group of individuals who can say for Mr. White, for example, all these types of files have been searched with these terms and everything has been produced.

MR. DELL'ANGELO:  Yeah.

THE COURT:  And so I think that that would be

—————2:21-cv-01189-RFB-BNW—————

appropriate. And then if we had to bring that custodian in, we could ask what was searched, what would you -- but 35 is too many, but it sounds like you all have, sort of, identified these 35 as people who may separately have possession of material that may not be in the possession of Zuffa. That's a separate issue which we should also address, which is if individuals have devices that are not in the possession of Zuffa, but you think are relevant, as personal devices often are --

MR. DELL'ANGELO: Yeah.

THE COURT: -- we need to deal with that separately. But why wouldn't we simply just say, "Look, we'll have a master list that's created. We'll identify these, sort of, three, sort of, let's just call them supervisory custodians, right, or four, whatever the number would be." And then we could potentially have Judge Weksler resolve the issues just as it relates to disagreements about these particular discovery issues, not oversee the entire discovery, but just related to that.

Go ahead.

MR. DELL'ANGELO: I'm sorry. Were you finished, Your Honor?

THE COURT: Yes.

MR. DELL'ANGELO: Okay.

THE COURT: So why wouldn't we do that?

MR. DELL'ANGELO: May I make a suggestion?

THE COURT: No. Well, I want you to answer my question

2:21-cv-01189-RFB-BNW

first.

MR. DELL'ANGELO:  Yeah.  No, I think it goes to -- to that.  So in order to have this process, I think we need inputs, right, which I think is exactly what you are getting to, which is this master list.  I actually think that there's some framework for what that master list is.  And I think the process can work very well if we're -- if we have a clear understanding and a robust master list of, you know, what Your -- Your Honor is suggesting.

So one of the things that we referenced in our reply brief --

THE COURT:  But, Mr. Dell'Angelo, I really actually would like you to actually answer my question.

MR. DELL'ANGELO:  Okay.

THE COURT:  Why can't we just proceed that way.

MR. DELL'ANGELO:  Well, we can.  And what I'm trying to suggest, Your Honor, is sort of -- there's some framework for how we do that that already exists before Your Honor and with respect to Zuffa.  So I was just trying to give some context for that.

THE COURT:  But the problem is there doesn't seem like there is a framework because, otherwise, we wouldn't be here.

MR. DELL'ANGELO:  There's a framework in a different case.  That's -- that's the issue.

THE COURT:  Okay.  What's wrong with my framework?

MR. DELL'ANGELO:  No, it -- so in the Bloom case, Your Honor, that's before Your Honor against Zuffa --

THE COURT:  Right.

MR. DELL'ANGELO:  -- there's a declaration that we cited in our reply.  And it -- it is from a David Singer, who is identified as an e-project discovery manager from Zuffa, where he talks about the collection of documents from Zuffa custodians.  And he says things like, "In total -- and I'm quoting -- "I exported over 600,000 files for the Zuffa custodians for the date range of March 4, 2018, to June 3, 2022, including, you know, 217,000 from Ms. Santypal," et cetera.

And what I'm saying is I think this is exactly what Your Honor is getting at, right, and that this sort of declaration provides -- you know, there does appear to be a person at least in Zuffa who does precisely what Your -- Your Honor is getting at who serves the, sort of, overseer/custodian role, who's identifying the documents, who's collecting them, who could then for the -- for the 35 employees, right, where they're collecting the files say, "With respect to 1 through 35 I collected their e-mail.  It was from this date to this date. I got X number of files," right.

And then that framework I think can fuel the process and may actually solve a lot of the problems.

THE COURT:  But, Mr. Dell'Angelo, that's exactly -- I'm not sure --

2:21-cv-01189-RFB-BNW

MR. DELL'ANGELO:  And I'm agreeing with you.

THE COURT:  Okay.  That's what I'm suggesting.

MR. DELL'ANGELO:  Okay.

THE COURT:  The issue is they have to identify who those people are.  I can't know that --

MR. DELL'ANGELO:  Sure.

THE COURT:  -- right.  But I gave Mr. Chiu some outlines, and he's not disagreeing that they can't identify -- he thought maybe more people.  But they're not saying that they can't identify someone or two or three people.  It could be someone like this individual, but I think sometimes, you know, it's a big company, right, and so picking one person may be I think too much.  But three people seems to me to be manageable, right.  And essentially their role is a confirmatory one anyway.

As they've indicated, like, counsel are doing the first, right, take on these productions anyway, which is I think appropriate.

MR. DELL'ANGELO:  Right.

THE COURT:  That's what should happen.

MR. DELL'ANGELO:  Right.

THE COURT:  The issue is when there is a dispute where you say, "Look, we have these two productions and we think there's more here."  Then it's going to this other, sort of, whatever it is, supervisory custodian and then potentially going to Judge Weksler, right.  That's what I am suggesting.  And it

2:21-cv-01189-RFB-BNW

sounds like you've identified individuals in the other case, but I don't know that Mr. Chiu indicated that they couldn't identify such individuals.  I assume they have people, sort of, like this helping them anyway in a case like this when they do the search terms or whatever they're doing.  I assume there's already people within the organization who are part of the litigation team, whomever, who are assisting with that.

MR. DELL'ANGELO:  Right.

THE COURT:  So it sounds like you're not disagreeing with this system.

MR. DELL'ANGELO:  I'm not.  And to kind of put a finer point on this, Your Honor, so, first of all, there are three defendants.  So we need to, sort of, do it for each defendant. But a perfect example is if you take Ariel Emanuel, who at least as of the time we filed our reply on August 18th, there were eight documents produced on his behalf from TKO where he's the CEO of that large publicly-traded company.

THE COURT:  But, Mr. Dell'Angelo, that to me isn't helpful.  You know why it isn't helpful?  I don't know what that means.  It doesn't mean from what I understand there aren't other documents that aren't produced that have his name on them.

MR. DELL'ANGELO:  Well --

THE COURT:  But that's why I'm saying to you, you saying that to me, I don't know how to interpret that.  What I want to do is have someone say, "We've searched all of TKO's

2:21-cv-01189-RFB-BNW

documents, correspondence, e-mail, right, chats, whatever it is. And here are all of the documents regarding this individual" --

MR. DELL'ANGELO: Yeah.

THE COURT: -- "that we found," right. And if there's a further dispute, fine. And if it's on the master list, they identify it and we move forward.

So it doesn't sound like you're disagreeing with me.

MR. DELL'ANGELO: I'm not, Your Honor. I think we're generally --

THE COURT: So the next step is --

MR. DELL'ANGELO: Yeah.

THE COURT: -- what's the next step in the process. And it seems to me the next step in the process is identify who these individuals are for the defendants and then we identify a process. Because I think, as we've talked about, I think the best way to do this -- and I'll speak with Judge Weksler before our next conference -- is simply to say we will -- the defendants will identify these individuals by our next conference. I will speak with Judge Weksler before then explaining to her what needs to be done. I think it's similar to what Mr. Isaacson suggested.

So these wouldn't necessarily be a magistrate judge ruling, whether it's an objection or anything like that, because that is a whole separate added work we don't need. Judge Weksler would simply serve in the role of making a

2:21-cv-01189-RFB-BNW

recommendation to me which the parties would actually see, so it's not like it would be some sort of sealed recommendation, saying, "Here's what I think should happen as it relates to these documents based upon that."  So she would probably meet with you all herself obviously to hear the perspective, maybe meet with these three individuals, and then make a recommendation to me based upon that.  And then I would hear that, and then we would move forward.

But it seems to me that way, right, we have a mechanism for resolving this, right, process --

MR. DELL'ANGELO:  Sure.

THE COURT:  -- and where we resolve it moving forward.

MR. DELL'ANGELO:  Right.

THE COURT:  But I would -- what I would suggest is that's what we do, is that, again, the defendants come up with these three individuals who -- again, let's just call them -- I don't know what would be the appropriate term.  I will just call them, sort of, super custodians.

MR. DELL'ANGELO:  I think sometimes -- sometimes in a deposition --

THE COURT:  Let's call them super custodians, right.

MR. DELL'ANGELO:  -- we actually will call them custodians of record.

(Court reporter interruption and admonition.)

MR. DELL'ANGELO:  I apologize, I apologize.

—————————2:21-cv-01189-RFB-BNW—————————

THE COURT:  These super custodians, Mr. Chiu, who would have the ability to confirm productions.  They'd have -- and they'd need to have access to all of the information, right.  So they'd have to get up to speed, obviously.  There may be people who are already doing this.

MR. CHIU:  Correct.

THE COURT:  But who could -- for example, if there's a question about have all of the communications between Mr. White and, whatever, TKO been produced, they would have the ability and the access to go and search, confirm it, and say, "Yes, they have" or, "No, they haven't and here's more.  But, yes, they have and here's where they are."  And it seems to me that the defendants could identify these three super custodians, and we can move forward.

Mr. Chiu?

MR. CHIU:  Yeah.  You know, we don't have any issue with that.  I will just note for the Court, it may be a combination of people at the company, but also a lot of times we engage, for example, outside discovery vendors who are -- who are, for example, managers of the case who will be the ones facilitating that.  So it could be some combination of those individuals, but --

THE COURT:  Right.

MR. CHIU:  -- to your point, they will be able to access and have information as to what was collected from who,

75
—————————2:21-cv-01189-RFB-BNW—————————

XYZ.

THE COURT:  So long as so we're clear, Mr. Chiu, these individuals for the purpose of discovery will represent the defendants.  In other words, if they offer a --

MR. CHIU:  Correct.

THE COURT:  -- response, what I don't want you to say is, "Well, that's a vendor.  We don't accept that response."

MR. CHIU:  No.

THE COURT:  I don't think you were saying that, but I wanted to clarify that.

MR. CHIU:  Not at all.

THE COURT:  You can designate whomever you think you want to designate so long as they have access, the expertise, right, and the ability to do so in a timely manner.  I don't really care who the super custodian is so long as they meet those particular criteria, right.  It can be anyone, but they need to have access to all of the files.  They need to be able to have access to prior productions, be familiar with them.

Because the other thing that's going to be important, Mr. Chiu, obviously you all will be involved with this, is that if they make a representation to the Court, that is essentially a statement from the defendants.  And so I know you all know that, but -- and you will coordinate with that person.  So I wouldn't expect that you would send someone out into the wilderness without some guidance.

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

MR. CHIU:  Correct.

THE COURT:  But that way we can make sure that we have finality.  So if this person says to me, "We have produced everything," then that's it.  I mean, again, a mistake can happen and obviously things are discovered in a case of this size.  I would expect obviously, as you all have done previously, "We've discovered this.  We're producing it."  That's fine.

But that way we don't have a running dispute between 20 different custodians each searching for documents, right.  I don't want to be going back to CEOs or CFOs and having them 20 times search their devices or whatever we're going to do.  That doesn't seem to me to be efficient.  Okay.

MR. CHIU:  Understood.

THE COURT:  All right.

All right.  Mr. Dell'Angelo, is there something else you wanted to...

MR. DELL'ANGELO:  A few things, Your Honor.

So I'm wondering if we could try either here or with the defendants to come up with some framework for what, sort of, an initial disclosure would look like.  And, kind of, what we are --

THE COURT:  Mr. Dell'Angelo, I've already -- I'm confused.  I've already come up with the framework.

MR. DELL'ANGELO:  Okay.

2:21-cv-01189-RFB-BNW

THE COURT:  I'm not sure why we're still having the conversation.  We have a discovery schedule.  You all have propounded discovery requests.  And all we're talking about is a way to resolve them, right.  There is a framework.  It's --

MR. DELL'ANGELO:  Yeah.

THE COURT:  -- you know, Rules of Civil Procedure.  We're going to follow that.  And then if there are disputes, they can be resolved in the way we've described.  So why would we need any other framework than that?

MR. DELL'ANGELO:  The framework that I had in mind was simply, Custodian 1, we've collected documents, you know, from, for example, e-mail for this period of time.  This is how many documents existed for this period of time, right.

Because here's -- here's where the wheels start to fall off of this process, Your Honor.  So we have Custodian John Doe.  And the agreed-upon timeframe by the parties is, you know, whatever, say from 2015 to the present.  I'm -- I don't think that's precise, but just for purposes of this conversation.

And if they come and say, "We collected this person's e-mail box and we came back with 1,000 e-mails and they're from the year 2025," what that tells us is there are no documents from 2015, 2016, 2017, 2018, et cetera, right.  And that we now know, kind of, what the corpus of documents are.  It tells us a lot about, sort of, the sources, the preservation.  Those things help a lot with search terms, which we're still -- you know,

2:21-cv-01189-RFB-BNW

sort of, still an issue that needs to get resolved. It then helps us -- you know, we haven't got hit reports, right. So once we get -- it, sort of, frames things when we are getting hit reports.

So really all I was looking for was kind of a matrix, right, so the parties are on the same page and aren't coming to the Court with some dispute where we're saying, "Well, all we got was something like the July 3 disclosure that kind of omitted a bunch of stuff that's useful that we need." And just kind of getting ahead of potential disputes so when we're back here in a month we can say we now see the landscape and we can work efficiently from there.

THE COURT: Mr. Dell'Angelo, I'm not going to get that far into the weeds into this. There's already a discovery process in place. And the purpose of this structure I'm setting up is to resolve discovery disputes specifically about "we think you have this" and them saying they don't, resolving of that nature. If there is a genuine discovery dispute that can't be resolved, then of course there is a motion filed, a motion to compel or something. We address it that way.

But I assume that discovery will continue in the way that it has continued. And so what will happen is I'll confirm this process when we next meet. What will happen is, right, if you think, right, that there is a production that's deficient, right, the process would be you would simply send -- not five

letters, right. You would send one letter each month that says, "Here's what we would like for the super custodian to confirm as a deficiency. We point out this letter says this. This letter says that, right. We'd like a confirmation of that," right. They'd then be able to produce it -- they would be able to confirm it at the next status conference. Because, you know, again, at least give them 30 days to respond.

So what I would envision is, again, one letter to the defendants a month, right, not multiple letters. You have one opportunity. You can send it, whenever, the first week of the month. I don't really care, but, again, not multiple letters that says, "Here are the things that we note in terms of discovery." And you identify them, right, like you have done with the phone number and say, "We want to confirm" -- and it's specific, right -- "that these are all of the numbers that are listed for Mr. White in the records" -- whatever it would be, right, "based upon the discrepancy."

And then, right, if there's no resolution, right, that matter could be addressed by Judge Weksler in the first instance. She would make a -- hearing from the parties, make a recommendation, and then I would address it at the following status conference. So there would be, sort of, a bit of a lag, right. So that ideally that worst-case scenario, right, the issue would be addressed within 60 days because you'd have the letter, you'd have Judge Weksler, and then you would have me.

2:21-cv-01189-RFB-BNW

So, hopefully, that wouldn't be the issue because there's been a fair amount of stuff that's already been produced, and so this is really meant to resolve discrete issues.  This is not meant to manage discovery overall.  Judge Weksler will not be charged with that.  I'm not going to ask her to do that, right.  That's something I will be doing with you all at the regular status conferences.

But it sounds like there is production that's happening.  We have discrete disagreements, which we often have in these cases, and we'll move forward.  So that will be the process.  We will lay that out, but that will be the process moving forward, right.  Discovery will proceed in the normal course, right.  We will have, again, this process where you all send a letter, right, to these individuals once a month to identify them.

And, Mr. Chiu, I'll give the defendants 30 days to identify who these individuals are.  You identify them to plaintiffs and to the Court in a sealed filing, sealed for the Court because we don't need the public knowing who they are, but I will need contact information.  And you can send that information to the plaintiffs, right, and then we'll proceed as I have indicated.  Okay?

MR. CHIU:  Understood.

THE COURT:  Any reason why we can't do it that way, Mr. Chiu?

MR. CHIU:  No, I think that the proposal makes sense from our perspective.

THE COURT:  All right.  Mr. Dell'Angelo, any reason why we can't proceed that way?

MR. DELL'ANGELO:  You have been heard, Your Honor.  So, no, there's no reason why we can't proceed that way.  I will just say this so we're clear.  We do not perceive these issues to be discrete, but I am hopeful that the process that Your Honor has outlined for us will get us to where we need to be.

THE COURT:  What I mean by "discrete," Mr. Dell'Angelo, is that they're not objecting to whole categories of "we're never -- we're not producing anything that Mr. White has."

MR. DELL'ANGELO:  I understand.

THE COURT:  Right.  They're identifiable discovery issues.  Sometimes there are categorical larger issues that require more management.

MR. DELL'ANGELO:  Understood.

THE COURT:  Right.  This case doesn't have those.  I mean, there are categories, but those are identifiable categories, right.  I don't see the defendants saying generally, "Well, we don't think any of these devices or all of these devices should be produced or relevant."  That's something I would have to resolve.  You know, there's an issue about what has been produced or not produced or what may be relevant.  That's what I see happens in the normal course of discovery

disputes.

MR. DELL'ANGELO:  I appreciate that clarification, Your Honor.  Thank you.

THE COURT:  Okay.  Thank you.

MR. DELL'ANGELO:  Okay.

(Court conferring with courtroom administrator.)

THE COURT:  So we've been at this for a few hours.  Why don't we take a short recess.  I'm trying to figure out what we can do about scheduling this other motion to compel.  I'd love to try to resolve that today.  It sounds like counsel are not available this afternoon.  We might want to look at that.  I'm going to look at my notes to see if I have any additional issues that I need to address with you all.  But why don't we come back in, say, about 45 minutes so you all can have lunch.

MR. ISAACSON:  Can I ask if we are only coming back for this other motion?  Because some of us might -- might go to the airport during --

THE COURT:  You might try to leave, Mr. Isaacson?

MR. ISAACSON:  Yes, yes.

THE COURT:  Just give me a quick minute.  Let me go through my notes --

MR. ISAACSON:  I think the one thing is if you're going to set a date for the next status conference.

THE COURT:  I am going to set a date.  So if that's the only thing keeping you in Vegas now, Mr. Isaacson, I can work

83

—————————————2:21-cv-01189-RFB-BNW—————————————

that out.  Just give me a few moments.

MR. ISAACSON:  Thank you.  Can I just -- in terms of advice to you, I don't know which month you're thinking about. I have a two-week trial starting September 22nd.  So the week of October 13th I would lobby heavily for.

THE COURT:  Okay.  Let me look at my -- look at my calendar.  I want to try as best I can to make sure that you're here now, Mr. Isaacson.  I know that you don't have as many partners as you once had to fill in for you.  And so I want to make sure that we accommodate your calendar.  So I'll take a look at that.

MR. ISAACSON:  All right.  I appreciate that, Your Honor.

MR. DELL'ANGELO:  And just if I may, Your Honor, while you're do that, I can accommodate the week of the 13th, but I do have a mediation in California on the 13th itself.  So if we could maybe focus -- if you're going to focus on that week, the 14th through the end.  I think the 13th is a Monday.

COURTROOM ADMINISTRATOR:  Your voice keeps dropping off.

MR. DELL'ANGELO:  I apologize.

I believe October 13th is a Monday.  I have a scheduled mediation in California that day.  So I think I could do the 14th through the --

THE COURT:  I'm not available.  That week I'm not

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670

available either.

MR. DELL'ANGELO:  Okay.

THE COURT:  So what about the next week?  Let's pull that up.

MR. ISAACSON:  So you will -- that is the week my son is getting married.

THE COURT:  Congratulations.

MR. ISAACSON:  Thank you.  I will be with family all of that week and not --

THE COURT:  Okay.

MR. ISAACSON:  -- attending to work.

THE COURT:  What about the next week, Halloween week?

MR. ISAACSON:  The next week is fine.  The wedding will be over.

THE COURT:  You'll still be recovering, though.

MR. ISAACSON:  If we could -- starting after Monday would be ideal because --

THE COURT:  Yes.

MR. ISAACSON:  -- I'm coming home on Monday.

COURTROOM ADMINISTRATOR:  I'm sorry.  When?

THE COURT:  So we're looking at --

MR. ISAACSON:  29th or 30th?

THE COURT:  Yes, the 29th or 30th.

(Court conferring with courtroom administrator.)

THE COURT:  So take a look at the 29th or the 30th,

2:21-cv-01189-RFB-BNW

counsel.

MR. ISAACSON:  I think we -- I think that's fine for all of us.

MR. DELL'ANGELO:  Yeah.  I think that -- I mean, the 29th would be preferable, but either day is fine, Your Honor.

THE COURT:  Okay.

(Court conferring with courtroom administrator.)

THE COURT:  So right now we're looking at the 30th as the most likely day.  And so any problem with the 30th that we'd have to have that day?

MR. ISAACSON:  Thank you, Your Honor.  That would be fine.

MR. DELL'ANGELO:  No, Your Honor.

THE COURT:  All right.  So, Mr. Isaacson, before I let you fly out of here, let me just double-check my notes to see if there's anything that we would need all counsel for.

And so who is going to be for the plaintiffs on the motion to compel?

MR. SAVERI:  For Dominance, I am, Your Honor, Joseph Saveri.

THE COURT:  And everyone else, you all are going to leave?  I'm just asking because you don't have to stay.

So really, Mr. Saveri, it really would just be your schedule that we'd have to worry about as it relates to rescheduling.

2:21-cv-01189-RFB-BNW

MR. SAVERI:  Yes, Your Honor.

(Court reporter interruption and clarification.)

MR. SAVERI:  Excuse me.

I'm in San Francisco, too.  So I can come back pretty quickly.  So I could come back in a week.  I could come back at the end of the week.  I didn't plan on this afternoon, perhaps, but I'm here at your convenience.

THE COURT:  Well, yes, why don't you just give me a few minutes.  Because if that's the case, I don't even know if we need to come back at all.  If it's just you, Mr. Saveri, and the rest of defense counsel are not going to be involved with this particular motion scheduling, I may just be able to excuse everyone.  Just give me a few minutes.

MR. SAVERI:  That's fine, Your Honor.

THE COURT:  If you all need to run to the restroom and come back, you can do that.  Just come back in, let's say, 10 minutes, and then I'll have a final decision for you.

MR. SAVERI:  Thank you.

(Recess taken at 12:12 p.m.)

(Resumed at 12:26 p.m.)

THE COURT:  We're back on the record now.  I don't have anything further to discuss with the parties at this point in time.  We're going to look at a possible time to reset the motion to compel regarding Dominance, but likely August 8th at --

——————————2:21-cv-01189-RFB-BNW——————————

COURTROOM ADMINISTRATOR:  28th.

THE COURT:  28th at 3 o'clock.  Is there anything else that we need to address today from the defendants?  Mr. Isaacson?

MR. ISAACSON:  No, Your Honor.

THE COURT:  From the plaintiffs?

MR. MADDEN:  No, Your Honor.

THE COURT:  All right.  With that, we'll be adjourned.  I wish you all safe travels back to wherever you're coming from.

MR. ISAACSON:  Thank you, Your Honor.

MR. SAVERI:  Thank you, Your Honor.

(Whereupon the proceedings concluded at 12:27 p.m.)

--oOo--

COURT REPORTER'S CERTIFICATE

I, PATRICIA L. GANCI, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  August 27, 2025.

/s/ **Patricia L. Ganci**

Patricia L. Ganci, RMR, CRR

PATRICIA L. GANCI, RMR, CRR - (702) 385-0670